# EXHIBIT "A"

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ALONZO BULLMAN; JOEL CASTRO; and
NICOLE MOTYKA;

      Plaintiffs,

Case No. 16-cv-12581

Hon. Arthur J. Tarnow

CITY OF DETROIT; a political Subdivision of the
State of Michigan; MATTHEW BRAY (Badge
2545), Individually and in his Official Capacity as
Detroit Police Officer; IAN SEVERY (Badge S 23),
Individually and in his Official Capacity as Detroit
Police Officer; CHERYL MUHAMMAD, (Badge
4050), Individually and in her Official Capacity as
Detroit Police Officer; SAMUEL GALLOWAY,
(Badge 4184), Individually and in his Official
Capacity as Detroit Police Officer; NICO HURD
(Badge 4121), Individually and in his Official
Capacity as Detroit Police Officer; JOHNNY FOX
(Badge 2563), Individually and in his Official
Capacity as Detroit Police Officer; ALANNA
MITCHELL (Badge 2586), Individually and in his
Official Capacity as Detroit Police Officer; John
Doe, Individually and in his Official Capacity as
Detroit Police Officer; Jointly and Severally,

      Defendants.

                                        /

**EXCOLO LAW, PLLC**
SOLOMON M. RADNER (P73653)
Attorneys for Plaintiff
26700 Lahser Road, Suite 401
Southfield, MI 48033
(248) 291-9712
sradner@excololaw.com

                                        /

1

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiffs Alonzo Bullman ("Plaintiff Bullman"), Joel Castro ("Plaintiff Castro"), and Nicole Motyka ("Plaintiff Motyka"), (hereinafter collectively referred as "Plaintiffs") by and through their attorney, Solomon M. Radner of EXCOLO LAW, PLLC, and state the following for their Complaint against Defendants the City of Detroit, ("Defendant City of Detroit"), Matthew Bray ("Officer Bray"), Sergeant Ian Severy ("Sergeant Severy"), Cheryl Muhammad ("Officer Muhammad"), Samuel Galloway ("Officer Galloway"), Nico Hurd ("Officer Hurd"), Johnny Fox ("Officer Fox"), Alanna Mitchell ("Officer Mitchell"), and John Doe ("Officer John Doe") (hereinafter collectively referred as "Defendants").

1.     This is a civil action arising under 42 U.S.C. § 1983 and Michigan law for recovery for deprivations of Plaintiffs' rights.

2.     Now, Plaintiff Bullman amends this Complaint by including additional Plaintiffs, Castro and Motyka, who have been aggrieved by the same Defendants on the same day and relating to the same incident.

3.     Plaintiff Castro's home was unlawfully raided by Defendants and his legally maintained marijuana plants were seized. After the Defendant Officers forced their entry to the house, they shot and killed two of Plaintiffs Castro's and Motyka's three dogs. Meanwhile, Plaintiff Castro's friend, Plaintiff Bullman, was

2

on his way to Castro's house to pick up his cousin. Seeing Defendant Police

Officers, Plaintiff Bullman, circled the block a few times and was pulled over by

Officer Bray and Officer John Doe who conducted an illegal search and seizure

of his person and vehicle.

4.     Plaintiffs sue the individual Defendants in their individual capacities

as well as in their official capacities as Detroit police officers.

## JURISDICTION

5.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331,

28 U.S.C. §1343(3) and (4), and 28 U.S.C. §1367(a).

## VENUE

6.     Venue is proper under 28 U.S.C. § 1391(b) as the illegal and

unconstitutional acts alleged to have been committed by Defendants occurred

wholly within Wayne County, Michigan.

## PARTIES

7.     At all times relevant herein, Plaintiff Castro resided at 5437 and

5441, Springwells Street, Detroit, Michigan (herein "The Home"), and was a

citizen of the City of Detroit, Wayne County, Michigan. Plaintiff Castro was a

licensed medical marijuana caregiver and owned three dogs as pets in his house.

8.     At all times relevant herein, Plaintiff Motyka resided in and was a

citizen of the City of Dearborn Heights, Wayne County, Michigan. Plaintiff

3

Motyka was the co-owner of the three dogs along with Plaintiff Castro.

9.      At all times relevant herein, Plaintiff Bullman resided in and was a citizen of the City of Gibraltar, Wayne County, Michigan. Plaintiff Bullman had come to the Home to pick up his cousin Chris Bullman and was pulled over by Defendant Police Officers outside Plaintiff Castro's residence.

10.     Defendant City of Detroit is a political subdivision of the State of Michigan acting under the color of State law, and is a person for the purposes of a 42 U.S.C. § 1983 action.

11.     Defendants Officer Bray, Officer Muhammad, Officer Galloway, Officer Hurd, Officer Fox, and Officer Mitchell were at all relevant times police officers employed by the City of Detroit. Defendants Officer Bray, Officer Muhammad, Officer Galloway, Officer Hurd, Officer Fox and Officer Mitchell are being sued in their individual and official capacity.

12.     Defendant Sergeant Severy was at all relevant times a Sergeant employed by the City of Detroit and is being sued in his individual and official capacity.

13.     Defendant Officer John Doe was at all relevant times a police officer employed by the City of Detroit. Officer John Doe is being sued in his individual as well as in his official capacity as Detroit police officer.

4

## COLOR OF STATE LAW

14.    At all times relevant herein, Defendants Officer Bray, Officer Muhammad, Officer Galloway, Officer Hurd, Officer Fox, Officer Mitchell, Sergeant Severy, and Officer John Doe were acting under the color of state law.

15.    Particularly, Officer Bray, Officer Muhammad, Officer Galloway, Officer Hurd, Officer Fox, Officer Mitchell, Sergeant Severy and Officer John Doe acted under the color of law, statutes, ordinances, regulations, policies, customs and usages of the State of Michigan, and its political subdivisions.

## FACTUAL BACKGROUND

16.    At all times relevant herein, Plaintiff Castro rented and resided at 5437 and 5441, Springwells Street, Detroit, Michigan and he was a citizen of the City of Detroit, Michigan.

17.    Plaintiff Castro is a medical marijuana caregiver licensee and is a person designated through the departmental registration process of the Department of Licensing and Regulatory Affairs as the primary caregiver for two registered qualifying patients for whom the marijuana plants are grown.

18.    Plaintiff Castro is also assigned plant possession for his own medical marijuana use.

19.    Marijuana plants were grown indoors at 5441, Springwells Street, Detroit, Michigan, in an enclosed, locked facility where only Plaintiff Castro

5

himself had access.

20.     Plaintiff Castro had planted 26 marijuana plants to care for these patients lawfully, as well as for his own lawful use.

21.     Being designated as a plant possessor for his two patients as well as for himself, under M.C.L. § 333.26424(b)(2) Plaintiff Castro is entitled to possess a total of 36 marijuana plants.

22.     At all relevant times herein, Plaintiffs Castro and Motyka had three dogs in their home as pets.

23.     Plaintiffs Castro and Motyka had a strong emotional bond and affectionate relationship with their pet dogs, namely, Blanca, Junior, and Yayo.

24.     On January 27, 2016, at about 12:40 p.m. Plaintiff Castro was at the Home, playing video games in his living room with a friend, Chris Bullman ("Chris"). Chris is the cousin of Plaintiff Alonzo Bullman. Plaintiff Motyka was not at the Home at this time.

25.     At that time, Crew Code 2968 of the Detroit Police arrived at Plaintiff Castro's home at 5437 Springwells Street, Detroit, Michigan and, at the orders of Sergeant Severy, forced entry into the home.

26.     Immediately upon arriving at Plaintiff Castro's home, Defendants disabled the surveillance cameras that were visible to them, for no lawful reason, causing irreparable damage to the wiring of the surveillance system, all of which

6

needed to be replaced.

27.     When Defendants entered the home, Plaintiff Castro was in the living room standing next to his television stand.

28.     Officer Bray ordered Plaintiff Castro and his friend, Chris to the ground, and they both immediately complied.

29.     While on the ground, Plaintiff Castro observed Officer Bray with his shotgun drawn and Plaintiff shouted out loud that neither he nor his dogs were dangerous and pleaded with the Defendant officers not to harm his dogs. Specifically, he told the Defendant officers, "All I got is some weed upstairs. Please don't kill my dogs!"

30.     The dogs were not vicious and were cowering in the corner of the kitchen which was separated by a secured half door. Attached hereto as Exhibit A is a photograph depicting the half door separating the kitchen from the living room.

31.     The dogs were not attacking the Defendant officers in any way. They were barricaded in the kitchen area, completely separated from the rest of the home.

32.     However, without provocation, Officer Bray reached over the half door, and shot two of the three dogs, Blanca and Junior, both of whom were afraid and cowering in the corner of the kitchen; all the while Plaintiff Castro was

7

begging and pleading for Officer Bray to leave his dogs alone.

33.  Officer Bray fired six shotgun shots in all, killing Blanca and Junior.

34.  Defendants wrongfully and unlawfully raided Plaintiff Castro's home, seized Plaintiff Castro's legally maintained medical marijuana plants and murdered two his three dogs, all of whom were confined behind a five-foot tall half-door.

35.  The warrant to conduct the January 27, 2016 raid was obtained without good cause. The testimony of one Officer Fox was what formed the basis of the warrant. Officer Fox testified via Affidavit that on January 26, 2016 a controlled buy was attempted by the police, but Plaintiff Castro refused to sell marijuana to the undercover informant identified as "SOI #3030."

36.  According to Officer Fox's affidavit, being unhappy with the result of the attempted controlled buy, he conducted surveillance of The Home and observed two people arrive at The Home independently of each other. Officer Fox maintains that Plaintiff Castro then went from The Home to 5441 Springwells before returning to The Home, and the two people left shortly thereafter.

37.  Officer Fox and his team did not stop, search, or arrest these two people or even ask them if they had just recently purchased marijuana from Plaintiff Castro.

38.  Surely, the Court that granted this warrant exercised an abuse of

8

discretion based on the foregoing facts. The subject search warrant and affidavit attached hereto as Exhibit B.

39. Additionally, Crew Code 2968 forced entry immediately upon arriving at the door without giving Plaintiff Castro a chance to open the door, and immediately began ripping down all of the surveillance cameras from the exterior of the house.

40. Officer Hurd falsely testified at a preliminary examination that they had knocked and announced themselves and gave Plaintiff Castro an opportunity to answer before forcing entry. He further testified that they did not force entry until after they announced themselves, there was no answer, and Sergeant Severy gave the order to force entry.

41. This testimony is false because, in reality, Defendants forced entry immediately upon reaching the door without giving Plaintiff Castro an opportunity to open the door, all of which was caught on the surveillance cameras.

42. Defendants' claim that the dogs were attacking them and therefore needed to be neutralized by means of six gunshot shells is not only false but outright absurd.

43. In fact, the Defendants made numerous false statements not only in their Reports but also in their testimony at Plaintiff Castro's preliminary examination in which he was being charged with two counts of delivery and

9

manufacture of marijuana, as a result of the wrongful conduct Defendants' complained of herein.

44.    Defendant Officers involved in this incident made false reports on what happened, which Plaintiffs intend to disprove through discovery or at trial.

45.    With regards to the raid of The Home, Officer Bray made the following false statements in his report stamped "PRE-EXAM" and titled "Investigator's Report":

   a. The crew announced its presence and purpose, received no answer, received orders from Sergeant Severy to force entry at which time they forced entry; and

   b. He was encountered by two vicious pit bulls that charged the crew requiring him to shoot them; and

   c. Officer Hurd recovered only 26 marijuana plants.

46.    Officer Bray referred to himself as "PO Bray" in his own report, which suggests that his report, and all the others reports in this matter, were all authored by the same person or people and simply signed by each officer.

47.    The following false statements are made in the report attributed to Officer Muhammed:

   a. The crew announced its presence and purpose, received no answer, received orders from Defendant Severy to force entry

10

at which time they forced entry; and

b. PO Bray encountered two large pit bulls in the kitchen attempting to attack him and the crew required him to shoot them; and

c. He observed only 26 marijuana plants.

48.   The following false statements are made in the report attributed to Defendant Galloway:

a. He observed Officer Bray encounter two large vicious pit bulls in the kitchen attempting to attack him and crew members.

49.   The following false statements are made by Officer Bray in the Report titled "Preliminary Complaint Record":

a. Officer Bray continued to clear the location when he encountered two large vicious pit bulls running at him and attempting to attack the crew; and

b. He observed only 26 marijuana plants.

50.   Sergeant Severy has the following false statements in his report:

a. Officer Bray encountered two large vicious pit bulls in the kitchen attempting to attack him and crew members; and

b. Sergeant Severy observed only 26 marijuana plants.

51.   Officer Hurd has the following false statements in his Report:

11

      a.  The crew announced its presence and only after receiving no response and being ordered by Sergeant Severy to force entry did they force entry; and

      b.  Officer Bray encountered two large vicious pit bulls in the kitchen attempting to attack him and crew members; and

      c.  He observed and recovered only 26 marijuana plants.

52.    Officer Fox has the following false statements in his Report:

      a.  The crew announced its presence and only after receiving no response and being ordered by Sergeant Severy to force entry did they force entry; and

      b.  Officer Bray encountered two large vicious pit bulls in the kitchen attempting to attack him and crew members; and

      c.  He observed only 26 marijuana plants.

53.    Officer Mitchell has the following false statement in his Report:

      a.  The crew announced its presence and only after receiving no response and being ordered by Sergeant Severy to force entry did they force entry.

54.    In addition to the false statements in the Reports, Officer Hurd and Officer Galloway also made false statements during their testimony at the March 14, 2016 preliminary examination held in the 36th District Court.

55.   Officer Hurd's false testimony included the following:

a.   When asked why the police killed two pit bulls but not the third, he testified, "Because the first two dogs began to come through the board that was separating the kitchen and the living room."

b.   When asked why the dogs had to be killed if the board was separating the rooms, he falsely testified, "They (the dogs) were trying to move the board and coming viciously."

56.   Officer Galloway's false testimony included the false claim that Officer Bray moved the board separating the two rooms, leaving nothing but open space between himself and the two pit bulls, and that the pit bulls charged at Officer Bray leaving him with no choice but to shoot them six times.

57.   Officer Galloway's testimony is not only false, but also contradicts Officer Hurd's testimony.

58.   Defendants' conduct is indicative of a larger problem in Detroit: Cops who seemingly enjoy shooting dogs for no reason.

59.   Defendants, thereafter, seized 27 marijuana plants from the Home, 5441, Springwells Street, Detroit, Michigan.

60.   Defendants reported that they recovered only 26 plants.

61.   Defendants also seized $4,683.00 from Plaintiffs Castro and Motyka.

62.     Defendants refused to review Plaintiff Castro's medical marijuana caregiver license documentation, despite Plaintiff Castro repeatedly offering to provide it to them, and took the plants without performing the due diligence necessary to confirm whether Plaintiff's cultivation of marijuana was truly illegitimate.

63.     Plaintiff Castro was a medical marijuana provider to two patients plus himself and had documentation supporting his care provider relationship with each of them.

64.     On May 11, 2016, Plaintiff Castro filed three motions, including a Motion to Dismiss in relation to the criminal case based on Plaintiff Castro's compliance with the Michigan Medical Marihuana Act.

65.     On May 23, 2016, the Wayne County Circuit Court granted Plaintiff Castro's Motion to Dismiss the criminal case, and did not hear the other two motions since the matters were moot upon the matter being dismissed.

66.     On the same day, on January 27, 2016 at approximately 1:40 pm, Plaintiff Bullman was driving toward the Home of his friend, Plaintiff Castro, to pick up his cousin Chris and together, Plaintiff Bullman and Chris intended to go pick up their young nephew from school.

67.     When Plaintiff Bullman first arrived at Plaintiff Castro's home, he observed several police officers outside of Castro's home wearing what appeared

14

to be SWAT gear, including full face masks and some of whom had their guns in-hand.

68.    Plaintiff Bullman was confused and concerned by the sight of these officers' presence so he decided to circle the block a few times and call Chris' brother to attempt to find out why there were police officer's at Plaintiff Castro's house.

69.    Plaintiff Bullman circled the block around Plaintiff Castro's house twice, then on a third time, when Plaintiff Bullman was in front of Plaintiff Castro's house, he was stopped by one of the police officers, now known to be Officer Bray.

70.    Officer Bray claimed that when he approached Plaintiff Bullman's car, Officer Bray could smell marijuana in Plaintiff Bullman's car.

71.    Plaintiff Bullman understands that, before stopping him, Officer Bray and his fellow police officers including Officer John Doe, had just chopped down 26 large marijuana plants inside Plaintiff Castro's home and carried them outside to the very area where he was being stopped. Thus, if Officer Bray indeed smelled marijuana, the smell likely came from himself, his clothing or the air outside Joel's home where the marijuana plants were destroyed.

72.    Officer Bray then ordered Plaintiff Bullman to get out of his car, and when Plaintiff Bullman stepped out of his car, Officer Bray patted him down,

15

searched his pockets and then put him in handcuffs.

73.     Thereafter, Officer Bray had another officer, Officer John Doe, search Plaintiff Bullman's car.

74.     Ultimately, Defendants found nothing illegal in the car or on Plaintiff Bullman's person.

75.     Thereafter, Officer Bray began questioning Plaintiff Bullman about his presence near Plaintiff Castro's house.

76.     Officer Bray said, "You're not under arrest, I am detaining you . . . why do you keep circling the block?"

77.     Plaintiff Bullman replied explaining "I saw the cops and was curious. I'm just driving around."

78.     Officer Bray was not convinced and yelled, "Stop lying! Tell me what you're doing circling the block."

79.     To that Plaintiff Bullman replied, "I don't have to tell you anything."

80.      Officer Bray became agitated, and asked Plaintiff Bullman to give his name and ID. Officer Bray had another officer, Officer John Doe, run Plaintiff Bullman's name through LEIN.

81.     After a short period of time, Officer Bray said, "Oh, that's your brother in there?"

82.     Plaintiff Bullman replied in the negative, as Chris is his cousin, not

16

his brother.

83.     When Plaintiff Bullman replied in the negative, Officer Bray said,

"Oh, you're gonna be a smart ass, huh?!" Bullman replied to this by saying "No,

I'm just not talking to you. You have no right to do this."

84.     Officer Bray became aggressive in his words, and yelled, "Shut the

fuck up before I take you in the house and fuck you up!" and continued "I'm gonna

give you a Detroit ass-whooping!"

85.     Officer Bray and Plaintiff Bullman went back and forth on the issue

of whether Plaintiff Bullman had to speak to Officer Bray. When Plaintiff

Bullman continued to insist that he had a right to not speak to Officer Bray, Officer

Bray threatened to call Plaintiff Bullman's probation officer and tell his probation

officer that he had violated probation.

86.     Plaintiff Bullman concedes that at the time, he was on probation for

having a house party, where alcohol was provided to minors. Plaintiff Bullman

plead under Michigan's HYTA statute.

87.     After finding that there was absolutely no cause to charge Plaintiff

Bullman with a crime, Officer Bray begrudgingly released Plaintiff Bullman from

his handcuffs and ordered him to leave and to not return.

88.     Only after this incident did Plaintiff Bullman come to understand that

on January 27, 2016, Plaintiff Castro's house was raided by Detroit Police Crew

Code 2968.

**COUNT I**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AND**
**THE FOURTH AND FOURTEENTH AMENDMENTS**
**AGAINST THE INDIVIDUAL DEFENDANTS**

89.     Plaintiffs re-allege all prior allegations and incorporate them here by reference as if fully stated herein.

90.     The Fourth Amendment protects against unreasonable searches and seizures and the Fourteenth Amendment forbids the denial of life, liberty or property without due process of the law.

91.     The Fourth Amendment of the United States Constitution prohibits the government from unreasonably destroying or seizing a citizen's property.

92.     The killing of a dog is a destruction recognized as a seizure under the Fourth Amendment and can constitute a cognizable claim under § 1983.

93.     The emotional attachment to one's dog is not comparable to a possessory interest in furniture.

94.     Indeed, Plaintiffs Castro's and Motyka's Fourth Amendment interests involved are substantial because the bond between a dog owner and his pet can be strong and enduring, and Plaintiffs think of Blanca and Junior in terms of an emotional relationship, rather than a property relationship.

95.     In circumstances where, as here, the dogs did not pose an imminent threat, and Officer Bray was not surprised by the dog and had time to make

18

alternate plans to control the dogs, other than killing it, the shooting of the dogs was an unreasonable seizure.

96. Defendants' actions described herein were intentional, grossly negligent, amounted to reckless or callous indifference to Plaintiffs' constitutional rights.

97. Defendants' intentional and malicious shooting and killing of Plaintiffs' two dogs, was unreasonable under the totality of the circumstances and therefore constituted an unreasonable seizure under the Fourth Amendment.

98. Defendants' intentional and willful shooting and killing of Blanca and Junior was more intrusive than necessary.

99. No governmental interest justifies the intrusion involved in this case.

100. Officer Bray's shooting and killing of Plaintiffs' dogs was objectively unreasonable because Plaintiffs' dogs did not charge at the police officers and because there was a five-foot tall half-door separating the dogs from the Defendant officers, and because the dogs were in a corner of the kitchen and not attempting to charge Defendants or jump over the board.

101. The individual Defendants acted in concert together to kill Blanca and Junior, which is bolstered by the fact that all the reports on this matter contain the same lie, i.e. that the dogs attacked the police, and Officers Hurd and Galloway even lied about it under oath during the preliminary examination.

19

102. A stop and frisk is a search within the meaning of the Fourth Amendment. Therefore, a police officer conducting such a stop and frisk must have a reasonable belief that the suspected citizen was or is currently engaged in criminal activity or intends to commit a crime.

103. Defendants had no such reasonable belief with regards to Plaintiff Bullman because he did not display any disruptive or threatening conduct, shouting, or anything that posed a risk of public disturbance. Moreover, there was no reasonable cause to believe that Plaintiff Bullman was engaged in criminal activity either.

104. Officer Bray and Officer John Doe by their conduct, as described above, and acting under the color of state law sought to search and handcuff Plaintiff Bullman without any reasonable cause because of his mere presence in the locality.

105. After Defendants conducted a pat down search of Plaintiff Bullman, there was no reason for Officer Bray or Officer John Doe to believe that Plaintiff Bullman engaged in any criminal activity, warranting a subsequent warrantless search of his car.

106. Officer Bray claimed that Plaintiff Bullman's car smelled of marijuana, when the marijuana smell could have come from him, his own clothes or the very air around the Home of Plaintiff Castro in which 26 large marijuana

plants were just destroyed. Officer Bray and Officer John Doe, along with Defendant City of Detroit violated 42 U.S.C. § 1983 and Plaintiff's Fourth Amendment rights when they conducted a warrantless search of Plaintiff without a reasonable cause.

107.   There was Fourteenth Amendment violation when search and seizure was conducted by the Officer Bray and Officer John Doe without due process of law.

108.   As a direct and proximate result of unlawful actions of individual Defendants, Plaintiffs has suffered, and will continue to suffer, damages including physical, mental and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AND THE**
**FOURTH AND FOURTEENTH AMENDMENTS**
**AGAINST DEFENDANT CITY OF DETROIT**

109.   Plaintiffs re-allege all prior allegations and incorporate them here by reference as if fully stated herein. A municipality is liable under 42 U.S.C. § 1983 if the acts that violated a person's right were undertaken pursuant to the municipality's policies and customs.

110.   As the first alternate basis for liability against Defendant City of Detroit, the policy maker for Defendant, the mayor, or someone else in a policy making position, delegated full authority and/or empowered the individual

Defendants.

111.   That delegation of authority by the actual policy maker of Defendant City of Detroit placed the individual Defendants in a policy making position, and the acts of the individual Defendants may fairly be said to be those of the municipality.

112.   Those acts therefore subject Defendant City of Detroit to liability for the constitutional violations of the individual Defendants.

113.   Defendant City of Detroit directly caused the constitutional violations suffered by Plaintiffs, and is liable for the damages caused as a result of the conduct of the individual Defendants. The conduct of the defendant officers was a direct consequence of the policies and practices of Defendant City of Detroit.

114.   At all times relevant in this complaint, Defendant City of Detroit, acting through Detroit Police Crew Code 2968, which included all individual Defendants, had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of the individual defendants.

115.   At all times relevant in this complaint, direct and proximate cause of the damages and injuries complained of were caused by policies, practices and /or customs developed, implemented, enforced, encouraged, and sanctioned by Defendant City of Detroit, including the failure: (a) to adequately supervise and

train its officers and agents, including individual Defendants, thereby failing to adequately discourage further constitutional violations on the part of its police officers; (b) to properly and adequately monitor and discipline its officers, including individual Defendants; and (c) to adequately and properly investigate citizen complaints of police misconduct and instead, acts of misconduct were tolerated by the Defendant City of Detroit.

116. Upon information and belief, Defendant City of Detroit has, acting through Crew Code 2968, which included all individual Defendants, developed, implemented, enforced, encouraged, and sanctioned a defacto policy, practice, and/or custom of unlawfully interfering with and/or searching without reasonable suspicion.

117. At all relevant times, Defendants unlawful actions were done willfully, knowingly and with the specific intent to deprive Plaintiffs Bullman, Castro and Motyka of their constitutional rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

118. Defendants have acted with deliberate indifference to the constitutional rights of Plaintiffs. As a direct and proximate result of the acts as stated herein by each of the Defendants, each of the Plaintiffs' constitutional rights have been violated.

119. As a proximate result of Defendants illegal and unconstitutional acts,

Plaintiffs suffered physical, mental, and emotional injury and pain, mental anguish, suffering, humiliation, and embarrassment.

## COUNT III
## *RESPONDEAT SUPERIOR* LIABILITY OF THE CITY OF DETROIT

120.   Plaintiffs re-allege all prior allegations and incorporate them here by reference as if fully stated herein. Defendant City of Detroit is liable under a theory of *respondent superior* for the constitutional violations against Plaintiffs.

121.   At all relevant times, the conduct of Individual Defendants occurred while they were on duty and in uniform, in and during the course and scope of their duties and functions as Detroit Police Officers and while they were acting as agents and employees of the Defendant City of Detroit.

122.   Therefore, Defendant City of Detroit is liable for the wrongful conduct of Individual Defendants under the law of vicarious liability, including the Doctrine of Respondeat Superior.

123.   Plaintiffs are entitled to a judgment for damages, exemplary damages, reasonable attorneys' fees and costs and any other relief that the Court deems just and equitable.

## COUNT IV
## ALTERNATIVE BASIS OF MUNICIPAL LIABILITY – FAILURE TO TRAIN, SUPERVISE, CONTROL

124.   Plaintiffs re-allege all prior allegations and incorporate them here by

reference as if fully stated herein.

125.  As the second alternative basis for liability against Defendant City of Detroit, it is the policy and practice of City of Detroit not to properly train its police officers.

126.  Defendant City of Detroit failed to properly hire, train, supervise, control and/or discipline the individual Defendants with respect to the treatment of dogs as the property of citizens.

127.  Further, the City of Detroit failed to properly train and supervise its officers to not break down doors unnecessarily and to not destroy people's surveillance equipment unnecessarily.

128.  Additionally, the City of Detroit failed to properly train and supervise its officers not to subject any person to searches and seizures without any reasonable cause.

129.  This lack of proper training claim is bolstered by the incredibly high percentage of search warrants that include the Detroit police breaking down people's doors, and the callousness and indifference of Detroit police officers in general and these Defendants specifically. Moreover, individual Defendants not only destroyed the surveillance equipment but also lied about it.

130.  Defendant City of Detroit was thus deliberately indifferent to the rights of others in adopting its hiring and training practices, and in failing to

supervise, control and/or discipline the individual Defendants such that those failures reflected a deliberate or conscious choice by Defendant City of Detroit made from among various alternatives.

131. Those deficiencies were the moving force that caused Plaintiffs' damages.

132. Defendant City of Detroit is well aware that its police officers constantly shoot dogs and break down doors seemingly for fun, even when such force is not necessary, and falsify their Reports and testimony to support such shootings, and yet chooses to fail to train, supervise, and/or discipline its officers.

133. Defendant City of Detroit is also aware that frequently the citizens are subjected to unreasonable and illegal searches and seizures and choses to willfully ignore to train, supervise, and/or discipline its officers.

134. In light of the fact that it was the individual Defendants who engaged in the constitutional violations, the need to correct the deficiencies is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of Defendant City of Detroit can reasonably be said to have been deliberately indifferent to the need to respect dogs as the property of their owners.

135. If Defendant City of Detroit had properly hired, trained, supervised, controlled and/or disciplined the individual Defendants, the constitutional violations committed by the individual Defendants would not have occurred.

26

136.   These failures by Defendant City of Detroit to hire, train, supervise, control and/or discipline the individual Defendants subject Defendant City of Detroit to liability for the constitutional violations committed by the individual Defendants.

137.   On information and belief, Defendant City of Detroit had no policy or training in place regarding the handling of a barking dog, which was evident from Defendants' actions alleged herein, and which is evident from the hundreds of dogs that have been murdered by DPD officers unnecessarily and without justification. However, the City of Detroit did have policies in place that permitted its officers to force entry into people's home armed with weapons to kill the people's dogs, yet still failed to implement training and guidelines for when deadly force is and is not necessary and when doors should and should not be broken down. Plaintiffs assert that City of Detroit did not have any policy in place relating to stop and search of vehicle.

138.   Plaintiffs are entitled, per 42 U.S.C. § 1983 and 1988, to judgment against Defendant City of Detroit for compensatory damages in a fair and reasonable amount, for reasonable attorney's fees, and expenses, for costs and such other relief as may be just under the circumstances and consistent with the purpose of 42 U.S.C. § 1983.

## COUNT V
## VIOLATION OF MI CONST Art. 1, § 11

139. Plaintiffs re-allege all prior allegations and incorporate them here by reference as if fully stated herein.

140. Michigan Constitution too protects a person from unreasonable searches. MI CONST Art. 1, § 11.

141. Bullman did not display any disruptive or threatening conduct that caused a public disturbance, nor did Plaintiff engage in any actions indicating that he was, had been, or would be engaged in criminal activity. Thus, Defendants had no reasonable suspicion to believe that he was engaged or aiding in any criminal activity.

142. Subsequently, the warrantless search conducted of Bullman's car by Officer Bray and Officer John Doe was done without reasonable suspicion and violated CONST Art. 1, § 11 of the Michigan Constitution.

143. When Officer Bray and Officer John Doe conducted a search without warrant without reasonable suspicion, or exigent circumstances, such search was unreasonable and violated MI CONST Art. 1, § 11.

## COUNT VI
## CONVERSION OF PLAINTIFF CASTRO'S AND MOTYKA'S PROPERTY AND MONEY

144. Plaintiffs re-allege all prior allegations and incorporate them here by reference as if fully stated herein.

145. Conversion is any distinct act of dominion wrongfully exerted over

another's personal property in denial of or inconsistent with his rights therein.

146. Defendants' killing of Plaintiffs' dogs was a distinct act of dominion wrongfully exerted over Plaintiffs' dogs in denial of or inconsistent with his rights.

147. Defendants' taking of Plaintiff Castro's and Motyka's money in the amount of $4,683.00 was a distinct act of dominion wrongfully exerted over Plaintiffs' money in denial of or inconsistent with their rights.

148. Defendant's taking of Plaintiff Castro's marijuana was a distinct act of dominion wrongfully exerted over Plaintiff Castro's marijuana in denial of or inconsistent with his rights.

149. Plaintiff Castro and Motyka are entitled to relief under applicable law or in equity, including, without limitation, a judgment and an award of statutory treble damages and all reasonable costs, interest and attorney fees. M.C.L.§ 600.2919a.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

150. Plaintiffs re-allege all prior allegations and incorporate them here by reference as if fully stated herein.

151. Defendants' conduct described herein was extreme and outrageous conduct because it was beyond all possible bounds of decency. The act of killing the pet dogs without any provocation and cause could be regarded as atrocious and utterly intolerable in a civilized community and would (and in fact has) caused

an average member of the community to exclaim, "Outrageous!"

152.  Defendants actions described herein were intentional or reckless.

153.  Defendants' actions caused Plaintiffs severe emotional distress so severe that no reasonable person could be expected to endure it, including without limitation, severe horror, grief and anger over the loss of their dogs.

154.  Plaintiffs Castro and Motyka are entitled to judgment for damages, exemplary damages, reasonable attorneys' fees and costs and any other relief that the Court deems just and equitable.

WHEREFORE, Plaintiffs respectfully pray of this Honorable Court that this Court enter judgment in favor of Plaintiffs and against Defendants as follows:

> a.  Compensatory damages; and
>
> b.  Punitive damages; and
>
> c.  Attorneys fees, costs and expenses in bringing this action; and
>
> d.  Any other relief, equitable or otherwise, that is fair and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: August 3, 2016.

Respectfully submitted,

EXCOLO LAW, PLLC

By: _/S/ Solomon M. Radner_
Solomon M. Radner (P73653)
Attorneys for Plaintiffs
26700 Lahser Road, Suite 401
Southfield, MI 48033
(248) 291-9712
sradner@excololaw.com



STATE OF MICHIGAN                     16 ... ( 2 5 1
COUNTY OF WAYNE          SS                           SEARCH WARRANT AND AFFIDAVIT
TO THE SHERIFF OR ANY PEACE OFFICER OF SAID COUNTY: (CASE#16-0149)

1. Affiant is a sworn peace officer for the Detroit Police Department and has been so employed for almost 7 years, currently assigned to the Major Violators and have been assigned there for 10 months to investigate narcotic trafficking within the City of Detroit and surrounding areas. Prior to becoming a member of the Narcotic Enforcement Section, Affiant spent four years at the Eastern District assigned to a Special Operation Unit. Affiant has received trainings in criminal drug investigations by the Detroit Police Department. Affiant has participated in numerous investigations involving narcotics trafficking, manufacturing and possession. Affiant also has participated in the arrest and interrogation of numerous persons involved in the narcotics trade. As such the Affiant has become knowledgeable in the methods, activities, and patterns of persons who traffic controlled substances.

2. Based on my training and experience and conversations with other law enforcement personnel, I am familiar with narcotic traffickers' methods of operation, including the distribution, storage and transportation of narcotics, the collection of proceeds or narcotics trafficking, and the methods of money laundering used to conceal the nature of the proceeds. I have received training and have collaborated with other law enforcement officers on investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as related money laundering involving the proceeds of unlawful activities and conspiracies associated with criminal narcotics. The Affiant knows from his specialized training and experience the following:

a. It is common in the purchasing, selling and distribution of controlled substances for drug traffickers to "front" drugs (providing narcotics on consignment) to several clients, causing large debts to be incurred. Often these drugs/debts are paid for in installments, over a period of time, and involve large amounts of currency exchanging hands. Because of the large amounts of drugs and debts involved, and to prevent discrepancies, it is necessary for records, such as, but not limited to, papers, notes, ledgers, journals, and logs, to be maintained by these drug traffickers. Frequently, these records are kept for lengthy periods of time and concealed where traffickers have ready access to them, i.e., homes, garages, safety deposit boxes, offices and automobiles.

b. Drug traffickers commonly maintain address books and /or telephone numbers in books, papers, or electronic devices that reflect the identity, addresses, pager number(s), email address, telephone numbers, or other identifying information for their criminal associates in the drug trafficking organization, even if said items are in code.

c. That drug traffickers take or cause to be taken photographs and/or videos of themselves, their associates, their drug proceeds or assets derived from the sale of controlled substances. That these traffickers usually maintain these photographs and or videos in their possession.

3. On January 26, 2016, Affiant received complaint that narcotics were being sold and stored at both 5437-5441 Springwells Affiant and crew members working in conjunction with SOI# 3030, who has been utilized by crew members of the Major Violators Section on numerous occasions, resulting in the confiscations of narcotics, narcotic paraphernalia, money seizures and firearms.

4. On January 26, 2016, Affiant and crew member met with SOI# 3030 to formulate a plan to attempt to make a controlled purchase of narcotics from 5437-5441 Springwells. Crew members searched SOI# 3030 for money and narcotics with negative results. Crew members issued a sum of U S currency to SOI# 3030 which to attempt to make a purchase. Affiant observed SOI# 3030 go directly to 5437 Springwells and knock on the front door. Above described seller opened the door and had a brief conversation with SOI#3030. SOI#3030 then returned to Affiant and stated the above seller would not sell to him due to not knowing him. SOI#3030 also stated the seller had a large sandwich bag containing a large amount of marijuana zip locks in his hand when he opened the door. Affiant then observed the seller exit 5437 Springwells, enter 5441 Springwells, and then return to 5437 Springwells. Affiant is aware through training and experience that narcotics sellers often will not sell to people they do not know in order to avoid detection by law enforcement.

Officer Johnny Fox                    Subscribed and sworn to before me and issued under my hand
this day Wednesday, January 27, 2016.

ASSISTANT PROSECUTING ATTORNEY        JUDGE OF 36 th  DISTRICT Court
                                                 Wayne County Michigan, and a Magistrate

HONORABLE KENNETH ...

**STATE OF MICHIGAN**
**COUNTY OF WAYNE**     **SS**

16 ᵕ ᵕ ᵕ 2 5 1

**SEARCH WARRANT AND AFFIDAVIT**

### TO THE SHERIFF OR ANY PEACE OFFICER OF SAID COUNTY: (CASE#16-0149)

5. On January 26, 2016, Affiant set up a fixed surveillance at 5437-5441 Springwells for approx 45 minutes. During the course of the surveillance, the Affiant observed 2 W/M's arrive at 5437 Springwells independently and separate of each other. Both W/M's arrived on foot, one W/M was wearing a blue sweater and blue jeans and the other W/M was wearing a red jacket and blue jeans. Affiant observed the described buyers walk up to the front door and knock. They were both let inside the location, then the seller would walk out of 5437 Springwells, enter 5441 Springwells, and then return to 5437 Springwells. Then after 30 seconds to a minute, the buyers would exit the location and leave on foot. With Affiant's experience and a prior purchases of narcotics; believes the activity observed at 5437-5441 Springwells is consistent with narcotic trafficking.

6. Affiant has observed this type of activity on numerous prior occasions in the course of prior investigations. Investigations based on similar activity in past investigations has led to the seizure of narcotics, firearms, currency and other indicia of narcotics trafficking from locations where the activity was seen. Wherefore, Affiant's experience combined with observations of the above-described activity gives Affiant probable cause to believe that the above-listed items will be found at the location and seeks to remove same.

Officer Johnny Fox

this day Wednesday, January 27, 2016.

ASSISTANT PROSECUTING ATTORNEY

Subscribed and sworn to before me and issued under my hand

JUDGE OF 36 th DISTRICT Court

Wayne County Michigan, and a Magistrate

HONORABLE KENNETH J KING

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ALONZO BULLMAN, *et al,*

      Plaintiffs,

Case No. 16-cv-12581

Hon. Arthur J. Tarnow

CITY OF DETROIT, *et al,*

      Defendants.

_____/

**EXCOLO LAW, PLLC**
SOLOMON M. RADNER (P73653)
Attorneys for Plaintiff
26700 Lahser Road, Suite 401
Southfield, MI 48033
(248) 291-9712
sradner@excololaw.com

_____/

### CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of August, 2016, I served all opposing counsel of record with a copy of the foregoing **PLAINTIFFS' FIRST AMENDED COMPLAINT** by filing same with the Clerk of Court using the CM/ECF system which will send notification of such filing electronically to all counsel of record at their respective addresses listed on the pleadings.

                                  */S/ Solomon M. Radner*
                                  Solomon M. Radner

Date: August 3, 2016

Attorney for Plaintiffs