# EXHIBIT "B"

2015 WL 5679838
United States District Court,
E.D. Michigan, Southern Division.

Jared A. Baker, et al., Plaintiffs,
v.
County of Macomb, et al., Defendants,

Case No. 13-13279
|
Signed 09/28/2015

**Attorneys and Law Firms**

Sarah Prescott, Deborah L. Gordon, Deborah L. Gordon Assoc., Bloomfield Hills, MI, for Plaintiffs.

Karen B. Berkery, Kristen L. Cook, Kitch Drutchas Wagner Valitutti & Sherbrook, Detroit, MI, for Defendants.

OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF
NO. 57) AND DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT (ECF NO. 59)

PAUL D. BORMAN, District Judge

## I. INTRODUCTION

*1 Now before the Court is Defendants County of Macomb, Sheriff Anthony M. Wickersham, and Captain John Roberts' Motion for Summary Judgment. (ECF No. 57). Plaintiffs' filed their response on September 15, 2014 and Defendants filed their reply on September 22, 2014.[1] (ECF Nos. 77 & 81).

Also before the Court is Plaintiffs Jared A. Baker, Dann Justin Burbeula, Bret Likins, and Jason Tabor's (Partial) Motion for Summary Judgment as to Liability of Defendants Wickersham and County of Macomb. (ECF No. 59). Defendants Wickersham and County of Macomb filed their response on August 29, 2014. (ECF No. 68). Plaintiffs then filed their reply on September 22, 2014. (ECF No. 80).

Plaintiffs originally filed their complaint on July 31, 2013 against County of Macomb and the Macomb Sheriff Anthony Wickersham, alleging retaliation in violation of rights to freedom of speech and association under the United States and Michigan Constitutions. (ECF No. 1). Then, on March 13, 2014, Plaintiffs filed an amended complaint adding Defendant Captain John Roberts on the basis that he also participated in the alleged retaliation. (ECF No. 38).

A hearing on this matter was held on August 20, 2015. For the following reasons, the Court will GRANT IN PART AND DENY IN PART Defendants' motion for summary judgment and DENY Plaintiffs' partial motion for summary judgment as to Defendants Wickersham and County of Macomb.

## II. BACKGROUND

Plaintiffs allege in their complaint that Defendants Sheriff Anthony Wickersham, Captain John Roberts, and the County of Macomb violated their federal and state constitutional rights by retaliating against them in response to their political activities and affiliation. Plaintiffs are employed as deputy sheriffs at the Macomb County Sheriff's Office. Plaintiffs claim that they were transferred from their substation assignments and placed in the general pool (a position also referred to as "common field deputy") by Defendants in retaliation for openly supporting and campaigning for Greg Stone, a candidate challenging Defendant Wickersham in the 2012 race for sheriff of Defendant Macomb County.

A. Assignment Process

Plaintiffs' employment is governed pursuant to Collective Bargaining Agreement ("CBA") between the Police Officers Association of Michigan and the County of Macomb. (Defs.' Br., Ex. A (CBA, 2012-2013), & Ex. B (CBA 2014-2016)).[2] Under the CBA there are both preferred jobs and jobs classified as not preferred. (Exs. A-B, at 14-17). The Sheriff retains the right to make all job assignments pursuant to the CBA, however, the Sheriff must make preferred job assignments according to the provisions of the CBA (specifically, regarding seniority and time limits on job placements). (Exs. A-B, at 14-17).[3]

**\*2** The CBA also provides that "substation assignments are not preferred jobs." (Exs. A-B, at 16). Those positions "shall be assigned at the sole discretion of the Sheriff and offered to any employee within the Office of the Sheriff." (*Id.*). It is undisputed that Defendant Wickersham has the "ultimate discretion in making deputy assignments at the Sheriff's Office" and also has the authority to change any of the deputy sheriffs' assignments recommended by captains of the Sheriff's Office. (Ex. N, Wickersham Decl. ¶ 2).

Generally and historically, the assignment process begins near the end of the year when the deputies at the Macomb County Sheriff's Office create an annual "wish list" for their assignment for the next year and ranked their preferred assignments 1 through 5. (*See* Pls.' Mot. Ex. U & V, 2012 & 2013 wish lists). Notably, the wish lists do not include the position of general pool deputy or "common field deputy". These wish lists are then given to the sergeants and lieutenants who supervise the deputies. (Ex. P, Brossard Dep. 23-25). Those sergeants and lieutenants then make recommendations to their captains (or the jail administrator) for which deputies they would like to have on their shifts and in their substations or other locations. (Brossard Dep. 23-25; Ex. G, Wickersham Dep. at 110-11, 120; Pls.' Mot. Ex. Q, Captain Baker 11/21/12 Email requesting recommendations). The sergeant and lieutenant recommendations and the deputies' wish lists are then forwarded to the captains, including the chief of staff, and jail administrator, who have one closed door meeting and determine which deputy will be assigned to each position. (Ex. GG, Darga Dep. 75-79; Ex. I, B. Baker Dep. at 43-45, 47). In making their decisions, the captains and the jail administrator consult the CBA (as to whether a certain position is a "preferred" position and would involve consideration of seniority or term limits), a seniority list, the deputies' wish lists, and the recommendations of the deputies' supervisors (the sergeants and lieutenants). (B. Baker Dep. at 45-46). After the meeting, the chief of staff takes the list of assignments to the Sheriff for review and he makes any changes he believes are necessary. (Darga Dep. 75-79; B. Baker Dep. at 43).

The captains do not have to follow the recommendations of their sergeants or lieutenants and the Sheriff has the authority to change assignments after the meeting. (B. Baker Dep. at 58). However, it was "true as a rule" that deputies are placed in positions they have signed up for

on their wish list unless they are short of staff and have to assign a deputy. (B. Baker Dep. at 59-60).

### B. Defendant Wickersham and His Staff

Defendant Wickersham has served as Sheriff for Macomb County since 2010 when he was appointed upon the recommendation of County Executive (and former Macomb County Sheriff) Mark Hackel. (Wickersham Dep. at 71). The Sheriff must stand for election or reelection every four years; the most recent election was held in 2012. (*Id.* at 78).

Defendant Wickersham started raising money for his 2012 campaign for Sheriff in May 2011. (*Id.* at 78). He had two privately paid campaign staff members and held multiple fund-raising events. (*Id.* at 78-82; Pls.' Ex. DD, Fund-raising Materials). Macomb County Sheriff's Officer Greg Stone was Defendant Wickersham's only opponent in the Democratic primary. (Wickersham Dep. at 80). Historically, whomever won the Democratic primary would be extremely likely to win the general election. (*Id.* at 80). The relevant primary election was held on August 7, 2012 and Defendant Wickersham won the primary, and the subsequent election in November 2012. (Ex. E, Tabor Dep. at 99).

**\*3** During the relevant time periods, the officers serving directly under Defendant Wickersham were his Undersheriff, Kent Lagerquist; his Chief of Staff, Defendant Captain John Roberts; and Captains Elizabeth Darga and Brenda Baker.

### C. Plaintiffs Support Greg Stone

Plaintiffs all openly supported Greg Stone in the 2012 primary election. Plaintiff Tabor described himself as a "very active [Stone] volunteer". (Tabor Dep. at 93:8). Plaintiff Tabor had a large box in the open bed of his truck that featured an advertisement for Stone. (*Id.* at 90; Pls.' Mot. Ex. P, photos, Bates Nos. 303, 305). Plaintiff Baker also had advertising on his truck in support of Stone. (*Id.*; Pls.' Mot. Ex. P, Bates No. 304). Plaintiff Burbeula pulled another officer's trailer that featured Stone campaign signs. (*Id.*; Bates No. 301). Defendant Wickersham testified that it was common knowledge who the "big Stone backers were" in the office. (Wickersham Dep. at 95). Plaintiff Likins testified that the day of the primary he wore a Stone t-shirt and stood with Stone handing out fliers at the polls some 200 feet from

Defendant Wickersham and Mark Hackel. (Ex. C, Likins Dep. at 158-59). Plaintiff Likins also was driving his personal truck that day that had a "Stone for Sheriff" box in the back. (*Id.*).

Additionally, Defendant Wickersham testified that he was aware that Plaintiff Tabor owned one of the trucks advertising for Stone and that Plaintiff Burbeula also had a truck that featured campaign signs for Stone. (*Id.* at 96). Defendant Wickersham further testified that he knew Defendant Likins supported Stone in the primary. (*Id.* at 134). Defendant Wickersham also knew that these trucks with Stone signs were parked at the substations. (*Id.* at 96). Defendant Wickersham testified, however, he did not know that Plaintiff Baker supported Stone.

Defendants note that Plaintiffs were also critical of the current administration and made comments that the administration was a "bunch of corrupt assholes". (Ex. DD, Sgt. O'Brien Dep. at 39, testifying that he felt the "manner" in which Plaintiffs were becoming vocal could damage their career and included making comments about corruption and also driving vehicles with campaign signs on them to the substations). Defendants also note that Plaintiff Burbeula posted a status on his Facebook profile stating in part: "the Sheriff's office is plagued and corrupt – corruption at the highest levels and we employees suffer for it...Coverups and scandals. I've seen far too many injustices in the department to idly stand by anymore. Greg Stone is one of the most respectful people I've had the honor to work for. He does not believe in politics. He believes in Justice." (Ex. L, Facebook Post; Burbeula Dep. at 87). The post then appears goes on to request donations for Stone's campaign. (*Id.*). Defendant Wickersham was aware of this post. (Wickersham Dep. at 91).

#### D. Assignment Process in 2012

The assignment process began at the end of November, 2012. (*See* Ex. Q, Captain Baker 11/21/12 Email requesting recommendations for assignments). Plaintiffs all requested to remain at their existing substation positions. (Pls.' Ex. V, wish lists). Sergeant Willis testified that, per the usual, he met with other sergeants and lieutenants on the midnight shifts at the substations to review the deputy wish lists and create a handwritten list of recommendations for which deputies they want for their shifts. (Ex. LL, Willis Dep. at 25-30). That recommendation list was then forwarded to Captain

Baker. (*Id.* at 30). Sgt. Willis further testified that it was the unanimous recommendation that all Plaintiffs should remain at the same substation positions they held in 2012. (*Id.* at 31; Ex. K, Sgt. Mason Dep. at 24-25, recommended Burbeula, Likins, and Baker). Captain Baker testified that she had previously spoken in opposition of Plaintiff Burbeula receiving a substation because she did not like his attitude, however, prior to 2013 assignments he had been placed in the substation ostensibly because his supervisors requested him. (B. Baker Dep. at 91-92).

\*4 Defendant Wickersham testified that after being elected he wanted to reorganize the Sheriff's Department, specifically he "wanted to give people with less seniority an opportunity to work" and also believed that all deputies should work the road regardless of their preference. (Wickersham Dep. at 127-28). Defendant Wickersham did not discuss his new reorganization plan with anyone prior to the assignment meeting in November 2012. (*Id.* at 132).

To effect his reorganization, Defendant Wickersham made a handwritten list of deputy names that reflected the deputies that he wanted moved out of the substations to make room for less experienced officers. (*Id.* at 124-29). There is no dispute that all four of Plaintiffs' names were on the handwritten list. (Ex. M, Roberts Dep. at 84-85). Defendant Wickersham handed his list to Defendant Roberts before the assignment meeting took place. (*Id.* at 125; Roberts Dep. at 30-31). Defendant Roberts had been part of the assignment meetings since 2001 but this was the first time he was given such a list. (Roberts Dep. at 12, 31, 40). Defendant Wickersham did not tell Defendant Roberts why he had created the list or discuss it with him, rather, Defendant Wickersham only told Defendant Roberts "[t]hese are the individuals that I want moved out of substations." (Wickersham Dep. at 125:7-8; Roberts Dep. at 30-31, 34). Defendant Wickersham did not advise Defendant Roberts that deputies with less experience should fill the substations openings. (Wickersham Dep. at 128).

A copy of the list that Defendant Wickersham created no longer exists. However, during the assignment meeting, Defendant Roberts kept notes on an assignment sheet. (Ex. J; Roberts Dep. at 79). These notes include hash marks next to certain deputies' names. (*Id.*). Defendant Roberts testified that most of these hash marks corresponded to the names on Defendant Wickersham's list. (*Id.* at 79-80). Thereafter, Defendant Roberts clarified

that the marks next to Deputies Quartuccio and Yunker did not refer to the Sheriff's list. (*Id.*). Defendant Wickersham confirmed during his deposition that the deputies' names that were hash marked, except Deputies Quartuccio or Yunker, may have been on his list and were all Stone supporters.[4] (Wickersham Dep. at 134-35).

Captain Brenda Baker explained that for the 2012 assignment meeting she, Captain Elizabeth Darga, Captain Roberts, and Jail Administrator Michelle Sanborn met to create the assignment list assigning each deputy to a position. (Ex. I, B. Baker, at 42-43). As usual, the captains and jail administrator received input from the command staff working directly with the deputies, specifically the sergeants and lieutenants, in addition to the deputies' wish lists. (*Id.* at 43; Pls.' Mot, Ex. Q, Captain Baker 11/21/12 Email requesting recommendations). During the assignment meeting they also referred to the CBA and a seniority list. (B. Baker Dep. at 46).

Unlike previous years, Defendant Roberts came to the meeting with the list of deputies that were not to receive substation assignments: this surprised the other captains and the jail administrator. (*Id.*; Roberts Dep. at 39; Ex. GG, Darga Dep. at 74). Defendant Roberts explained that usually Captain Baker would make the assignments for the substations at issue because she was in charge of that division, however that year, "[t]he decision of who was in there was her decision other than the list." (Roberts Dep. at 42). Defendant Roberts testified that nearly every previous year sheriffs would make changes after the assignment meeting but he could not remember any instance in particular, and it had never happened "up in the front". (*Id.* at 43).

*5 Captain Baker similarly testified that during the meeting she discovered that the Plaintiffs could not be assigned to a substation per Defendant Roberts. (B. Baker Dep. at 101). She was never given a reason why these particular deputies were not allowed a substation. (*Id.* at 102). At the conclusion of the meeting, Plaintiffs had all been assigned to the general pool.

Sergeant Willis testified that he was surprised when the assignment list became public because while it was common for one or two recommendations to be ignored, ignoring four recommendations was unusual,

stating: "there's always one or two...but never our top guys." (Willis Dep. at 32).

E. Mid-year Openings and "No Fly List"

During the 2013 year, some positions at the substations became open due to promotions and deputies vacating substation positions in Mt. Clemens. (Pls. Mot., Ex. F, 7/8/12 Sgt. Mason, Email re: openings; B. Baker Dep. at 143-44). Typically, when there was a midyear opening, the sergeant supervising that position and shift would recommend a deputy to fill the position and the captain would go along with that recommendation. (*Id.* at 61).

In 2013, Sergeant Edward Mason emailed Captain Baker asking whether the open positions at the Mt. Clemens substation could be filled with unassigned midnight deputies, a list which included Plaintiffs Baker, Likins, and Burbeula. (Ex. F, 7/8/12 Sgt. Mason, Email re: openings; Ex. K, Mason Dep. at 7-8). Sergeant Mason testified that he initially received an email from Captain Baker indicating that he could fill the positions as he requested but that the email was later deleted from the email system. He was later advised by Lt. Michalke that he should rotate all the deputies rather than permanently assign anyone to the openings. (Mason Dep. at 43). Captain Baker testified that she spoke with Defendant Wickersham regarding these midyear openings and he instructed her not to fill the positions but rather assign the midnight deputies on a rotating basis to be "fair to all". (*Id.*). She relayed this information to Lt. Michalke who wrote it down on the email from Sgt. Mason. (*Id.*). The policy of rotating deputies into openings at substations was not uniform; Defendant Wickersham noted that he had "no idea" why a specific deputy was assigned to a midyear opening at the Harrison substation rather than having deputies rotated. (Wickersham Dep. at 174:16).

Sergeant Willis testified that after the 2013 assignments came out he coined the term "no fly list" to describe to Plaintiffs his personal belief that their support of Stone had kept them from receiving substation assignments. (Willis Dep. at 32).[5] Other officers testified to their personal belief that such a consequence for political support of an unsuccessful candidate for sheriff was unsurprising and well known. (*See* Ex. BB, Bondy Dep. at 33 "if you back the wrong candidate... then you will end up probably on the short end of the stick."; Ex. DD, O'Brien Dep. at 39 "I felt the manner in which they were becoming vocal could potentially be damaging to their careers.").

F. Plaintiffs' Employment and Job Performance
**\*6** Both Plaintiffs and Defendants spill significant ink over the qualifications and employment records of Plaintiffs. It is clear that all of the Plaintiffs appear to have solid employment records with some discipline actions in the past. However, Plaintiffs appear to be generally regarded by their supervisors as good and hardworking deputies. Sergeant Willis described them as the "top guys" in the midnight substation shift. (Willis Dep. at 32).

Defendants admit that Plaintiffs' disciplines and/or job performance were not the motivation for their removal from their substations. (ECF No. 81, Defs.' Reply, at 13 n. 6 "Defendants, did not raise Plaintiffs' prior disciplines as a reason for the action at issue in this case, but rather, to show that Plaintiffs were not consistently the high achievers that they contend to be."). Given this admission, the only significance regarding Plaintiffs' job performance would be to support the Plaintiffs' proposition that they were all replaced with deputies who had less experience or who were not known to be hard workers. However, this point has little relevance where Defendants claim that the point of moving Plaintiffs from their substations was to provide less experienced deputies with an opportunity for the positions.

G. 2014 Positions
In 2014, for the first time "in history" the administration accepted all of the shift sergeants' recommendations for assignments. (Likins Dep. at 206). Plaintiff Likins was assigned to midnights at Lenox Township Substation, which was not his first choice but one of the assignments on his wish list. (Pls.' Mot. Ex. J, 2014 Shift Assignments at 4; Likins Dep. at 205-06). Plaintiff Burbeula and Baker have both been reassigned to midnights at the Mt. Clemens substations, the position they held prior to 2013. (Ex. J, 2014 Shift Assignments at 4). Plaintiff Tabor was assigned to a county car which is a position with which he testified he does not like but does prefer to being in the general pool. (Tabor Dep. at 222-23). Plaintiff Tabor admits that he was not recommended for any position in 2014 but notes he did not ask for any recommendations believing that he would not receive an assignment. (Tabor Dep. at 223). Defendant Roberts testified that Defendant Wickersham made a personal decision to place Plaintiff Tabor in a county car despite the fact he had not received a recommendation for that position. (Roberts Dep. at 57).

Defendant Wickersham maintains that Plaintiffs' placements in 2014 were not influenced by this litigation.

### III. STANDARD OF REVIEW

Both Defendants and Plaintiffs have moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure. This rule provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact." *Id.* at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

**\*7** A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## IV. ANALYSIS

A. Violations of the Michigan Constitution (Count II)
As an initial matter, the Court finds that Plaintiffs' claims seeking damages based on violations of the Michigan Constitution are barred pursuant to *Jones v. Powell*, 462 Mich. 329 (2000) (per curiam).

It is well settled under Michigan law that a court may infer a damages remedy for a violation of the Michigan Constitution against the State or against State officials sued in their official capacities. *Smith v. Dep't of Public Health*, 428 Mich. 540 (1987), *aff'd sub nom Will v. Dep't of State Police,* 491 U.S. 58 (1989). However, in *Jones v. Powell*, 462 Mich. 329 (2000), the Michigan Supreme Court held that a court could *not* infer a damages remedy for a violation of the Michigan Constitution in an action against a municipality or a government official sued in his or her individual capacity. *Id.* at 335-36. The Michigan Supreme Court concluded that while *Smith* "recognized a narrow remedy against the state on the basis of the unavailability of any other remedy" those concerns were "inapplicable in actions against a municipality or an individual defendant" because remedies would be available against both municipalities and those individual defendants for violations of federal constitutional rights pursuant to 42 U.S.C. § 1983. *Id.* at 336; *see also Bennett v. Detroit Police Chief*, 274 Mich. App. 307, 315-16 n. 3 (2006) (citing *Jones* and recognizing that "our Supreme Court has held that there is no cause of action for damages against entities other than the state for a violation of state constitutional rights.").

In the present case, Plaintiffs have not brought suit against the State of Michigan, but rather have sued a county and individual officials (a sheriff and his chief of staff) for violations of their rights to free speech and association. Plaintiffs themselves admit in their briefing that such rights under the Michigan Constitution are "coterminous" with their rights arising under the First Amendment of the United States Constitution and have also pursued claims against these same entities under Title 42 U.S.C. § 1983. Therefore, as this suit is not against the state and "[b]ecause another avenue of relief is available to obtain damages from the county and its officials, under *Jones*, Plaintiff[s'] state constitutional claims [for damages] are barred." *Evans v. Wayne County*, No. 10-11275, 2011 WL 5546230, at *12 (E.D. Mich. Nov. 10, 2011) (Rosen, C.J.).

*8 Plaintiffs contend that their claims under the Michigan Constitution should go forward inasmuch as they are seeking declaratory and injunctive relief. To the extent that Plaintiffs seek an "injunction out of this Court prohibiting any further acts of wrongdoing" this request is not barred by *Jones*. *See Patriot Ambulance Serv., Inc. v. Genesee County*, 666 F.Supp.2d 712, 717 (E.D. Mich. 2009) (Battani, J.) (dismissing the plaintiff's claims for damages against the defendant county, board of commissioners, and individual commissioners for Michigan Constitutional violations, but holding that to the extent that "Plaintiffs are not seeking monetary relief under the Michigan Constitution, the *Jones* case is inapplicable" and allowing the requests for declaratory judgment to proceed.); *see also Evans*, No. 10-11275, 2011 WL 5546230, at *12 n. 17 (recognizing same, relying on *Patriot Ambulance Service*).

Defendants argue, however, that Plaintiffs' request for declaratory judgment is too broad and is not yet ripe for review because this Court would be unable to determine that similar unconstitutional acts would occur again when Defendant Wickersham may not continue to be a decisionmaker after the next election. As examined below, the Court finds that genuine issues of fact remain regarding the claims against Defendant Wickersham such that summary judgment for either party should be denied. Therefore, determining whether Plaintiffs' request for declaratory relief is too broad is inappropriate. Further, this argument is tenuous as elections for sheriff occur every four years and the chance of similar or the same

retaliation may not abate with the election of a different sheriff.

To the extent that Plaintiffs are seeking injunctive relief, it appears undisputed that as of 2014 none of the Plaintiffs are assigned to the "general pool", and all of the Plaintiffs are either in substation positions that they held in 2012 prior to the transfer at issue or in other positions that they prefer over the general pool. However, Plaintiff Tabor and Plaintiff Likins claim that they do not like their current positions as much as their substation assignments. Accordingly there is a potential dispute regarding whether they are still not in substation assignments due to the retaliation alleged in this action.

Given these facts, the Court finds that Defendants' argument of mootness to be premature.

### B. Official Capacity claims and County of Macomb's Liability under 42 U.S.C. § 1983

Defendants contend that Plaintiffs' claims against Defendants Wickersham and Roberts in their official capacity should be dismissed as duplicative of the claims against County of Macomb.

For a municipality to be liable for a constitutional violation under 42 U.S.C. § 1983, the violation must be a result of a policy or custom of the municipality. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978). "That is to say, the liability of counties and other local governments under § 1983 depends solely on whether the plaintiff's constitutional rights have been violated as a result of a 'policy' or 'custom' attributable to the county or local government." *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). There are four general paths a plaintiff may take to "prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency polices; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted).

In the instant action, Plaintiffs take the second path and allege that Sheriff Wickersham's decision to transfer or assign the Plaintiffs to the general pool in 2013 was an action attributable to the County of Macomb because it was an action taken by an official with "final decision-making authority".

*9 It is generally understood that official capacity claims represent a different way of pleading a cause of action against an entity of which the official is an agent and such a suit is "nothing more than a suit against [the] County itself". *Petty v. Cnty. of Franklin, Oh.*, 478 F.3d 341, 349 (6th Cir. 2007). However, it does not appear that the Sixth Circuit affirmatively requires the dismissal of official capacity claims against an official when the government entity is also a party to the suit. The Sixth Circuit has "approved the dismissal of official-capacity claims against individual defendants where the government entity is a party and the plaintiff fails to demonstrate that a policy or custom of the defendant government entity played a part in the violation." *Baar v. Jefferson Cnty. Board of Educ.*, 476 F. App'x 621, 635 (6th Cir. 2012) (collecting cases).

Here, Plaintiffs argue that the official capacity claims against Defendant Wickersham and Roberts are based on Defendant Wickersham's decision to transfer Plaintiffs to the general pool in 2013 and that decision constituted an official custom or policy on behalf of Defendant County of Macomb because Defendant Wickersham was the final decisionmaker on such matters. Plaintiffs then confusingly argue that the official capacity claims against Defendants Wickersham and Roberts are not duplicative of the claims against Defendant County of Macomb because they have "shown facts of an official policy by Macomb County adopted by Defendant Wickersham and carried out by him with the knowledge and assistance of Defendant Roberts". (Pls.' Resp. at 18). Plaintiffs appear to contend that the claims against the Defendant County of Macomb are separate in some way from the official claims against Wickersham and Roberts. Plaintiffs' arguments are contrived as they fail to set forth any difference between the claims; indeed, the claims against Defendant County, Wickersham and Roberts are all based on the same single decision made by Wickersham to reassign the Plaintiffs in 2013.

Regardless, as discussed *infra* in subsection H, the Court finds that Plaintiffs' § 1983 claim against the Defendant County of Macomb must be dismissed because the Defendant Wickersham did not have final policy making authority in employment matters for the county. Therefore, under Sixth Circuit precedent, it is proper to dismiss the official capacity claims against the individual

defendants as described above. *See Baur*, 476 F. App'x at 635 (collecting cases).

## C. Article VII, § 6 of Michigan Constitution

Defendants also argue that Defendant County of Macomb should be dismissed from this case in its entirety because it cannot be held liable for the acts of Defendant Sheriff Wickersham pursuant to article 7, section 6 of the Michigan Constitution. The Michigan Constitution, Art. 7, § 6, provides:

> The sheriff may be required ~~by law to renew his security~~ periodically and in default of giving such security, his office shall be vacant. The county shall never be responsible for his acts, except that the board of supervisors may protect him against claims by prisoners for unintentional injuries received while in his custody. He shall not hold any other office except in civil defense.

Mich. Const. Art. 7, § 6. The Michigan Court of Appeals has recognized that this provision of the Michigan Constitution "exempts a county from any vicarious liability arising from acts of the county sheriff." *Graves v. Wayne Co.*, 124 Mich. App. 36, 42 (1983).

The Court rejects Defendant County of Macomb's argument to the extent it seeks immunity from a § 1983 claim arising from the acts of its sheriff.

The Michigan Supreme Court has rejected Defendant County of Macomb's exact argument and recognized that a county cannot immunize itself from § 1983 liability through this provision of the Michigan Constitution. *Rushing v. Wayne County*, 436 Mich. 247 (1990). In *Rushing,* the Michigan Supreme Court stated:

*\*10* Initially, we reject the county's claim that it is shielded from § 1983 liability by Const. 1963, art. 7, § 6. The United States Supreme Court has repeatedly emphasized that state law immunities and defenses do not protect persons otherwise subject to § 1983 liability. *Martinez v. California*, 444 U.S. 277, 284 n. 8 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983...cannot be immunized by state law. A construction of the federal

statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise....")...For purposes of § 1983 liability, it is immaterial whether the state-law immunity derives from a statute as in *Martinez*, from the common law as in *Howlett* [*v. Rose*, 496 U.S. 356 (1990)], or from a state constitutional provision as in this case. Thus, the sheriff may not maintain a state constitutional immunity defense to a claim brought under § 1983.

*Rushing*, 436 Mich. at 259-60; *see also Marchese v. Lucas*, 758 F.2d 181 (1985) (rejecting the same argument and holding "[t]he County's reliance on Michigan law to exempt it from liability is clearly inappropriate under *Brandon* [*v. Holt*, 469 U.S. 245 (1985)] and for that matter under the federal Constitution's Supremacy clause".); *see also Greer v. County of Ingham*, No. 295672, 2011 WL 1005111, \*4-5 (Mich. Ct. App. Mar. 22, 2011) (noting that Mich. Const. Art. 7, § 6 precluded a county from being liable for a claim under Elliot-Larsen Civil Rights Act because the termination was effected by the Sheriff, but the provision would not preclude federal liability for those same actions under § 1983, explaining that "[a]lthough the Michigan Constitution can, and does, preclude a county from having liability for the sheriff's actions, the federal government can, and has, imposed such liability for a federal claim. There is nothing impermissible about state and federal law providing different claims and remedies based on the same action.").

Accordingly, Defendants' argument that the Defendant County of Macomb is immune from liability from a § 1983 claim based on immunity derived from Mich. Const. Art. 7, § 6 is without merit. However, the Court finds that to the extent that any Michigan Constitutional claim remains pending against the County of Macomb, such a state law claim is in fact barred by Art. 7, § 6.

## D. 42 U.S.C. § 1983 Claim for First Amendment Retaliation

In order to make a claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish a violation of an existing constitutional right by a person acting under color of state law. [6] *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). In the instant action, Plaintiffs claim that they were reassigned or transferred to the general pool in retaliation for exercising their First Amendment rights of

**Baker v. County of Macomb, Not Reported in F.Supp.3d (2015)**

2015 WL 5679838, 2015 L.R.R.M. (BNA) 191,817

political association and free speech. To establish a First Amendment retaliation claim, a plaintiff must prove the following: (1) the plaintiff engaged in protected speech or conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two–in other words, "that the adverse action was motivated at least in part by the plaintiff's protected conduct." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*); *Sowards v. Loudon Cnty., Tenn.*, 203 F.3d 426, 432 (6th Cir. 2000).[7]

*\*11* If the plaintiff meets his or her burden, then the burden shifts to the defendant "to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Eckerman v. Tenn. Dept. of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (citing *Sowards v. Loudon Cnty*, 203 F.3d 426, 431 (6th Cir. 2000). "Once this shift occurs, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* (citation omitted). "Unlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Dye v. Office of the Racing Com'n*, 702 F.3d 286, 294 (6th Cir. 2012).

Plaintiffs in this action claim that their protected conduct was speech as well as their political affiliation with Greg Stone. "Because the analytic tools for adjudicating First Amendment retaliation claims under the Free Speech Clause have been so extensively developed, courts in this and other circuits have tended to import fully that reasoning when litigants have characterized their claims as arising under another First Amendment clause." *Scarbrough*, 470 F.3d at 260 (quoting *Thaddeux-X*, 175 F.3d at 390). Therefore, Plaintiffs' free association claim is also analyzed under the same First Amendment analysis set forth above. Additionally, the parties appear to agree that Plaintiffs' claims rise and fall together as neither party differentiates or addresses Plaintiffs' First Amendment claims separately.

a. Protected Speech/affiliation

"The First Amendment prohibits retaliation by a public employer against an employee on the basis of certain instances of protected speech by the employee." *Scarbrough*, 470 F.3d at 255 (citing *Connick v. Myers*, 461 U.S. 138, 142 (1983)). Courts recognize that the state is "afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Id.* (citation omitted). Accordingly, courts apply a two part inquiry to determine whether a public employee's speech or conduct is protected by the First Amendment. First, whether he or she engaged in speech or association addressing a matter of public concern, *see Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001) and second whether his or her interest "as a citizen, in commenting upon matters of public concern" outweighed the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees". *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

In the instant case, Plaintiffs allege that their "participation in an election and their association with Mr. Stone" were constitutionally protected activities, and the Defendants concede for purposes of both Motions for Summary Judgment that Plaintiffs "engaged in constitutionally protected activity." (Defs.' Mot. at 20; Defs.' Resp. at 15); *see also Sowards v. Loudon Cnty., Tenn.*, 203 F.3d 426, 432 (6th Cir. 2000) ("Support of a political candidate falls within the scope of the right of political association" and holding plaintiff's support of her husband's campaign for Sheriff of Loudon County was an exercise of her constitutionally protected right of political association.). In their Amended Complaint, Plaintiffs specifically allege that their activities included "distributing flyers for [Stone's] election, speaking to County residents in his favor, advertising his candidacy by posting signage on their lawns and vehicles, canvassing, and working polls on the primary date to encourage fellow voters to support Mr. Stone." (Am. Compl. ¶ 36).

b. Adverse Action

*\*12* The term "adverse action" originates from employment case law, and generally includes: "discharge, demotions, refusal to hire, nonrenewal of contacts, and failure to promote." *Thaddeus-X*, 175 F.3d at 396 (citations omitted). The Sixth Circuit has explained that an adverse action, in retaliation cases, also encompasses actions of "lesser severity" when such an action "would

2015 WL 5679838, 2015 L.R.R.M. (BNA) 191,817

deter a person of ordinary firmness from exercise of the right at stake." *Id.* (citation omitted). This inquiry is an objective one, "capable of being tailored to the different circumstances in which retaliation claims arise, and capable of screening the most trivial of actions from constitutional cognizance." *Id.* at 398. Indeed, "while certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id.*

In the present case, Plaintiffs allege that they were transferred or reassigned to the general pool from their substation assignments in retaliation for their First Amendment conduct, i.e. supporting Stone and campaigning on his behalf. It is undisputed that this transfer did not result in a loss of regular salary or benefits. Plaintiffs, however, contend that the reassignment constituted an adverse action for a number of other reasons, specifically that they lost out on overtime or "court time" (Willis Dep. at 62; Baker Dep. at 86; Burbeula Dep. at 167), had more problems scheduling personal time off, or problems with child care (Baker Dep. at 74-75); they had a longer commute, and the jobs themselves were less prestigious and the assignment was career damaging (Burbeula Dep., at 122, 132-34; Tabor Dep., at 109-10; Likens Dep., at 71-72; Ex P., Brossard Dep. at 36, "I guess someone who had a substation could feel a sense of pride, where someone who didn't have a substation might allow themselves to feel less than a person."). Defendants argue that some officers would rather be assigned to the general pool. (*See* Ex. BB, Bondy Dep. at 41 "So, some people who don't really care about their work or what they do at work are willing to take a spot as a field deputy because of hours. The harder thing is, is to work a substation because you will do more work.").

The Sixth Circuit has held that an "involuntary transfer from one job to another is action that 'would likely chill a person of ordinary firmness from continuing to engage in that constitutionally protected activity'" and "an involuntary job transfer, whether neither grade nor salary is affected, qualifies as adverse action for purposes of the First Amendment." *Leary v. Daeschner*, 349 F.3d 888, (6th Cir. 2003); *see also Boger v. Wayne Cnty.*, 950 F.2d 316, 321 (6th Cir. 1991) ("Plaintiff need not have suffered loss of salary, promotional opportunities,

seniority or other monetary deprivations to have a cognizable interest protected by the First Amendment" noting that plaintiff had alleged injuries consisting of "embarrassment, humiliation, extreme mental anguish, and loss of professional esteem".). In *Leary*, the Sixth Circuit noted that the transfer of a teacher from one school to another "can negatively impact their daily experiences including their commute, coworker friendships, and community relationships" and that evidence suggested that the transfer could "cause harm to their reputations". *Id.*

Defendants rely upon *Mills v. Williams*, 276 F. App'x 417 (6th Cir. 2008) to support their argument that Plaintiffs' transfer was not objectively adverse because they suffered no monetary harm and some other officers testified that some officers might prefer a general pool assignment. First, *Mills* is an unpublished three page per curiam opinion. Therefore, it is not binding on this Court. Additionally, while *Mills* affirms a lower court's finding that a job transfer to a position 20 miles away with the same pay and benefits would not deter an ordinary person from exercising their First Amendment rights, the Sixth Circuit affirmed the lower court's decision with no independent analysis or citation to any case law. *Id.* at 418-19. The Sixth Circuit did note that the lower court found plaintiff's failure to provide objective evidence of heightened prestige of her original position contributed to her inability to show she suffered an adverse action. *Id.* Given the complete lack of analysis the Court finds *Mills* unpersuasive.

**\*13** Indeed, Defendants' reliance on an unpublished per curiam opinion cannot trump a published Sixth Circuit decision that affirmatively holds that a reassignment or transfer with no change in wages or benefits can constitute an adverse action. Moreover, *Mills* is distinguishable from the instant action because Plaintiffs have presented evidence that a substation assignment is a position with more prestige and that a transfer to the general pool could be viewed in a negative light or as a punishment. (*See e.g.*, Bondy Dep. Ex. BB, at 42:14-16 "To be pulled off for no reason, I think it's personally damaging and embarrassing, because if you haven't done anything, why are you being punished?"; Willis Dep. Ex. LL, at 62, stating he believed being moved from the substation was a detriment to their careers; also testified it "was an embarrassment to them"; Tabor Dep. at 109-10). Defendant Wickersham himself testified that "most people feel" that a substation

**Baker v. County of Macomb, Not Reported in F.Supp.3d (2015)**

2015 WL 5679838, 2015 L.R.R.M. (BNA) 191,817

assignment is preferable to being in the general pool, and that he in fact felt that way. (Wickersham Dep. at 67-68).

Therefore, viewing the facts in a light most favorable to Plaintiffs, there is evidence that a reasonable juror could conclude that a position in the general pool was a less prestigious assignment than a substation assignment and that such a transfer was detrimental to Plaintiffs' careers. Additionally, there is testimony that the Plaintiffs have suffered other various harms from the transfer including potential loss of court time (or overtime) and longer commutes. Accordingly, the Court concludes that Defendants cannot carry their burden on this issue at the summary judgment stage.

Finally, in respect to Plaintiffs' cross motion for summary judgement, Defendants have failed to establish a genuine issue of material fact regarding whether an adverse action occurred here under the binding precedent of *Leary*. Defendants rely upon testimony evidence to support their argument that some officers prefer the general pool. However, such testimony is qualified by the statement that deputies who prefer a position in the general pool are those deputies "who don't really care about their work". (Bondy Dep. at 41). Such testimony does not create a genuine issue of fact regarding whether the general pool position is actually a prestigious or coveted position; the testimony merely supports the conclusion that the general pool position was viewed unfavorably within the Sheriff's Department. As discussed *infra*, however, the Court denies Plaintiffs' motion for summary judgment because genuine issues of fact remain regarding whether Defendants would have taken the same employment action in the absence of the protected conduct.

c. Causal connection

Finally, to set forth a prima facie case of First Amendment retaliation, Plaintiffs must show that the speech or conduct at issue was "motivated at least in part by the plaintiff's protected conduct", *Thaddeus-X*, 175 F.3d at 394, or "a substantial or motivating factor in the adverse employment action." *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003). "Specifically, the employee must 'point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Rodgers*, at 602.

Defendants argue that Plaintiff Baker's claim should fail solely because Defendant Wickersham testified specifically that he was unaware that Plaintiff Baker

supported Stone. (Wickersham Dep. at 138). In fact, Defendant Wickersham's testimony on this issue is mixed. Defendant Wickersham testified that it was "common knowledge" who supported Stone (Wickersham Dep. at 95), and at one point in his testimony Defendant Wickersham states that he *did* know that both Baker and Burbeula supported Stone. (*Id.* at 133-35). Then, later, Defendant Wickersham testified that he did not know Plaintiff Baker's political affiliation. (*Id.* at 138). However, there is also circumstantial evidence in this record that Plaintiff Baker was an active campaigner for Stone, that he had large signs on his truck advertising the same, parked his truck at his substation, and attended Stone fundraisers. These facts coupled with Defendant Wickersham's testimony that it was common knowledge who the Stone supporters were is enough for a reasonable juror to conclude that Defendant Wickersham was aware of Plaintiff Baker's political support for Stone even if Defendant Wickersham testified inapposite at some point in his deposition.

**\*14** Defendants also contend in their motion that Plaintiffs cannot establish that their political affiliation and campaigning with Stone was a factor in their transfer to the general pool because their arguments are based on pure speculation and are otherwise irrelevant. Plaintiffs argue on the other hand that Defendant Wickersham's testimony constitutes direct evidence that he transferred Plaintiffs Berbuela, Tabor and Likins from their substations to the general pool for their First Amendment protected activities.

Defendant Wickersham testified in relevant part:

Q: But you picked Jason [Tabor] to come out [of the substation]? A: Yes.

Q: Why?

A. Because he, in my opinion, was close to the Stone campaign. He obviously believed in the corruption, with me. He—you know, obviously there was this other part with Stone going out as far as me sending- or campaign sending some pornographic thing to his kid on Sunday morning, which Mr. Stone knew all about and where it came from. And everybody in that substation was a Stone supporter. So somebody had to go to make room. So, Jason was it.

2015 WL 5679838, 2015 L.R.R.M. (BNA) 191,817

Q: He 'believed in the corruption,' what are you referring to?

A: Well the fact that, you know, Justin Burbeula indicated I was corrupt.

Q: What does that have to do with Tabor?

A: They were together. My opinion was they were –

Q: Okay. You believed that they – Tabor believed what?

A: They were all feeling the same way about me.

Q: All four of my clients?

A: What's that? No. I didn't even know Jared Baker was supporting Stone.

Q: So, Likins, Tabor and Burbeula?

A: Yep.

(Ex. G, Wickersham Dep. at 137-38) (emphasis added). Defendant Wickersham went on to describe how Stone allegedly told "everyone via the Facebook and action in the paper that obviously the Wickersham campaign or Wickersham sent this [picture of a half naked woman to Stone's son's Facebook page], you know, and boy, look at how low they are stooping." (*Id.* at 138). Defendant Wickersham then clarified apparently referring not just to Plaintiff Tabor:

Q: "Okay. And what did that have to do with Tabor?"

A: They're in that–they were working tight with Stone and they probably believed that I did that.

(*Id.*) (emphasis added).

Defendants argue that Plaintiffs have cherry-picked from Defendant Wickersham's testimony and in fact the above passage should only be read to indicate that Defendant Wickersham moved Tabor, Likins, and Berbuela based on their belief that Defendant Wickersham was corrupt or involved in sending a picture of a half naked woman to Stone's son's Facebook page. However, taken in a light most favorable to Plaintiffs, the passage also indicates Defendant Wickersham's decision to deny substation positions to Plaintiffs Tabor and Likins and Berbuela was based at least in part on the fact that they were "close to the Stone campaign" and all felt the same way about him.

Indeed, Defendant Wickersham reiterates that "they were working tight with Stone" as a reason for believing that Plaintiffs Tabor, Likins and Berbuela may have believed he was corrupt. Additionally, there is no dispute that Defendant Wickersham was aware of Plaintiffs Likins, Tabor and Burbuela's active support of his opponent Stone. (Wickersham Dep. at 95, 135-37).

As to all of the Plaintiffs, it is relevant to note that Wickersham had no objection to any of the Plaintiffs continuing in their substation assignments in 2011 prior to the election. [8] (*Id.* at 116). Defendants also admit that Plaintiffs' performance was not a motivation for their removal from their substations. Additionally, Defendant Wickersham and Defendant Roberts' testimony regarding the list with hash marks creates the reasonable inference that every deputy's name on Defendant Wickersham's 2012 list was a Stone supporter. The Court notes that there is testimony from sergeants and lieutenants regarding the "common knowledge" that Plaintiffs' transfers were motivated because of who they supported in the recent Sheriff's election. (*See* Ex. BB, Bondy Dep. at 33 "if you back the wrong candidate...then you will end up probably on the short end of the stick."; at 36 "The obvious answer is we know why...we don't have access to those people because they didn't do the right thing politically".; O'Brien Dep. at 39 "I felt the manner in which they were becoming vocal could potentially be damaging to their careers."). Also pertinent, is testimony showing that the people in the assignment meeting were surprised when Defendant Roberts presented the list of deputies who could not receive a substation assignment and that such a list or method of effecting transfers had never been done before even though Defendant Wickersham had been the appointed Sheriff during the previous assignment process.

*15 The present case is analogous to *Sowards v. Loudon County, Tenn.*, 203 F.3d 426 (6th Cir. 2000). In *Sowards,* the plaintiff, a former jailer, claimed she was terminated for her support of her husband's campaign for sheriff. *Sowards,* 203 F.3d at 430. The sheriff denied that he had taken into account the fact the plaintiff was married to his adversary when he terminated her. *Id.* However, the sheriff also testified that had the plaintiff been one of his "staunchest supporters" in the last election he "might" have looked into "the basis for the recommendation of termination rather than just more or less accepting it." *Id.* at 434. Based on the sheriff's equivocation, the Sixth Circuit held that the plaintiff had presented sufficient

**Baker v. County of Macomb, Not Reported in F.Supp.3d (2015)**

2015 WL 5679838, 2015 L.R.R.M. (BNA) 191,817

evidence that a reasonable juror could conclude that her termination was substantially motivated by her protected First Amendment rights. *Id.* The Sixth Circuit also noted that the plaintiff had presented circumstantial evidence that supported finding her termination was motivated by her political affiliation, including her unblemished performance record and the fact that other employees had not been disciplined for similar mistakes. *Id.* at 434-35.

Here, Defendant Wickersham's testimony indicates that his decision to move Plaintiff Tabor was based on the fact he was close with the Stone campaign. Defendant Wickersham then goes on to explain that Plaintiffs Tabor, Likins, and Berbuela "all felt the same way" about him and were all "working tight with Stone". This testimony appears at least as strong as the testimony evidence in *Sowards*, in which the sheriff testified that he "might" have looked more closely at a termination if the plaintiff had been a political supporter. Therefore, the Court finds that Defendant Wickersham's testimony is direct evidence, that taken in a light most favorable to Plaintiffs, could lead a reasonable juror to conclude that his decision to transfer Tabor, Likins, and Burbuela was substantially motivated by their political activities. Additionally, as set forth above, Plaintiffs have provided ample circumstantial evidence that would support the fact that Defendant Wickersham's motivation for denying *all* of the Plaintiffs substation positions was politically motivated.

To the extent that Defendants argue that Plaintiffs' claims fail because Defendant Wickersham had sole discretion to fill the substation positions such an argument is without merit. In *Boger*, the Sixth Circuit found a plaintiff could make a First Amendment claim based on her transfer even when the collective bargaining agreement allowed management sole discretion to transfer employees. *Boger*, 950 F.2d at 321. The Sixth Circuit explained that entitlement to a transfer or promotion was not an element of a First Amendment claim because *"there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests–especially, his interest in freedom of speech."* *Boger*, 950 F.2d at 321-22 (quoting *Rutan v. Rep. Party of Il.*, 497 U.S. 62 (1990) (emphasis in *Boger*)). Stated another way, ("an act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper."). *Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir. 1998). Moreover,

Defendants' arguments that Plaintiffs' claims cannot show that all Wickersham supporters received the positions they coveted or that other Stone supporters were punished is irrelevant for the same reasons. The pertinent inquiry is merely whether Plaintiffs can show a causal connection between their own First Amendment activities and the reason they were moved to the general pool.

Therefore, Plaintiffs have carried their burden in setting forth a prima facie case of a First Amendment retaliation violation.

### d. Evidence of Pretext

As Plaintiffs established a prima facie case, the burden then shifts to the Defendants, who must demonstrate by a preponderance of the evidence that "the employment decision would have been the same absent the protected conduct." *Eckerman*, 636 F.3d at 208 (citation omitted) (citation and internal quotation marks omitted). However, "in the First Amendment context, '[a] defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury.'" *Dye v. Office of the Racing Com'n*, 702 F.3d 286, 308 (6th Cir. 2012) (finding that a defendants' evidence in support of their proffered reason was insufficient to show no reasonable juror could find in favor of the plaintiff) (quoting *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir. 2010)); *see also Rodgers*, 344 F.3d at 603 (noting same). As noted *supra*, once the burden shifts to defendant to show pretext, "summary judgment is warranted if, in light of the evidence viewed in the light most favorable to plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman*, 636 F.3d at 208 (citation omitted).

**\*16** Defendants claim that they can establish that Defendant Wickersham would have taken the same action in the absence of the protected activity. Defendants point to the fact that: 1) Defendant Wickersham desired to restructure the organization and let deputies with less experience try their hands in the substation; 2) Plaintiff Baker's "humiliation" of Defendant Wickersham by failing to attend an awards reception; 3) Plaintiff Burbeula and Likins were critical of the administration "or worked closely alongside those who did so and spoke of running inept people out of the Department." (Defs.' Resp. at 28).

Given the record in this case, the Court finds that Defendants cannot carry their burden in showing that

there is no genuine issue of fact regarding whether Defendant Wickersham would have made the same decision absent the protected conduct. As to whether Defendant Wickersham's belief that Plaintiff Baker had humiliated him by politely declining to attend an awards ceremony in which he was to be given an award, a reasonable juror could find such a story not compelling and unpersuasive given the fact that Defendant Wickersham never spoke to Plaintiff Baker about the incident and never wrote him up or cited him for the behavior. Additionally, Plaintiff Baker testified he declined to attend the ceremony because his wife was pregnant at the time and the ceremony was far away.

The evidence in this action also indicates that there are genuine issues of fact over whether Defendant Wickersham had actually formulated a plan to have less experienced officers assigned to the substations when he admitted that he had not discussed his plan with anyone and failed to direct Defendant Roberts that inexperienced officers should in fact be assigned to the openings in the substations.

Finally, Defendants' argument that Plaintiffs were transferred or denied their preferred positions because they spoke critically of the current administration "or worked closely alongside those who did so" does not help Defendants' position but merely begs the question of whether their affiliation with Stone was, at bottom, a substantial or motivating reason the list was created.

In sum, the Court finds that there are genuine issues of fact regarding whether the employment decisions would have been the same absent the protected conduct that preclude summary judgment for Defendants. Further, these same genuine issues of material fact bar Plaintiffs' motion for summary judgment as a reasonable juror could conclude that Defendants would have transferred the Plaintiffs in the absence of their protected conduct. Accordingly, the Court denies summary judgment to both Plaintiffs and Defendants.

**E. Claims against Captain Roberts**
To establish causation in retaliatory claims is considered a "two part inquiry: A plaintiff must show both (1) that the adverse action was proximately caused by an individual defendant's acts, but also (2) that the individual taking those acts was 'motivated in substantial part by a desire to punish an individual for exercise of a constitutional

right." *King v. Zamiara*, 680 F.3d 686, 696 (6th Cir. 2012) (internal citations omitted).

In the present case, there is no argument that the assignments of Plaintiffs to the general pool were caused by Defendant Wickersham as he was the final decisionmaker regarding Plaintiffs' substation assignments and more particularly the creator the list of deputies who could not have a substation position (which included Plaintiffs' names). Additionally, there does not appear to be a dispute that Defendant Roberts' actions in delivering the list and directing the officers during the assignment meeting who could not have a substation assignment was also a proximate cause of Plaintiffs' transfer to the general pool.

*17 As to motivation, Defendants appear to argue that Defendant Roberts cannot be liable for the retaliation because he did not make the decision to transfer the Plaintiffs, and he did not know the motive behind the transfer, but merely relayed the message. Plaintiffs, on the other hand, argue that Defendant Roberts is liable for retaliation against Plaintiffs based on a theory of subordinate liability. "Individuals who aid in the implementation of an adverse action at the instructions of a superior will be liable along with their superior if they knew or should have known that the adverse action was unlawful." *Zamiara*, 680 F.3d at 696 (citing *Thaddeus-X*, 175 F.3d at 393). The Sixth Circuit has explained that this type of liability stems from principles of agency law and to establish this type of liability "the plaintiff must establish that the superior intended to retaliate but only that the subordinate knowingly participated in the acts of the superior." *Id.* Therefore, to establish subordinate liability, the Plaintiffs do not need to show that Defendant Roberts himself had a retaliatory motive but only that he knew or should have known that the transfer was unlawful.

Here, there is no dispute that Defendant Roberts took a list created by Defendant Wickersham to the assignment meeting and carried out his order that none of the names on the list should be assigned to a substation position. Defendant Roberts and Defendant Wickersham also both testified that Defendant Roberts did not know why Defendant Wickersham created his 2012 list and Defendant Roberts did not participate in creating the list.

**Baker v. County of Macomb, Not Reported in F.Supp.3d (2015)**

2015 WL 5679838, 2015 L.R.R.M. (BNA) 191,817

Plaintiffs also claim that Defendant Roberts actively kept Plaintiffs from filling midyear positions as evidence of his knowing and on-going participation. However, there is no evidence tying Defendant Roberts to decisions regarding the midyear openings, rather the testimony only indicates that Captain Baker spoke with Defendant Wickersham regarding how the openings should be filled. Therefore, the Court finds this argument unpersuasive.

In the end, Plaintiffs merely argue that Defendant Roberts "should have known" that the list was created to retaliate against those deputies for political reasons because it was common knowledge who supported Stone in the campaign and he would have known that the list included only Stone supporters. However, it is also true that the substations were overwhelmingly Stone supporters. Therefore, merely knowing that the list contained Stone supporters does not raise an inference that retaliation is afoot.

Even taking this record in a light most favorable to Plaintiffs, the Court finds there is no direct evidence and no relevant circumstantial evidence from which a reasonable juror could conclude that Defendant Roberts did or should have known that the transfer was unlawful. Accordingly, the Court finds that summary judgment as to Defendant Roberts must be granted.

F. Qualified Immunity for claims against Wickersham in his Personal Capacity

The doctrine of qualified immunity generally protects "government officials performing discretionary functions...from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009). The purpose of qualified immunity is to "shield the official from suit altogether, saving him or her from the burdens of discovery and costs of trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

A government official is entitled to qualified immunity unless a plaintiff pleads facts showing: "(1) that the official violated a statutory or constitutional right and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, --- U.S. ---, 131 S. Ct. 2074, 2080 (2011) (citation omitted). "But under either prong, courts may not resolve genuine disputes of fact in favor of

the party seeking summary judgment." *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014). "[I]f genuine issues of material fact exist as to whether the officer[s] committed acts that would violate a clearly established right, then summary judgment is improper." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011); *see also King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012), cert. denied, --- U.S. ----, 133 S.Ct. 1473 (2013). Additionally, the order of the inquiry is no longer mandatory and Courts are allowed to use their discretion in deciding which of the two steps of the qualified immunity analysis should be addressed first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

**\*18** Once a government official has raised the defense of qualified immunity, the plaintiff must bear the burden to demonstrate that the defense is unwarranted. *Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2007). A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 896 (6th Cir. 2006) (internal quotations and citation omitted). Further, the court "do[es] not assess the right violated at a high level of generality, but, instead,...must determine whether the right was 'clearly established' in a more particularized, and hence more relevant, sense...." *Myers v. Potter*, 442 F.3d 347, 356 (6th Cir. 2005).

Here, Defendants attempt to construe the right at issue extremely narrowly. However, the Court finds that the more appropriate particularized inquiry is whether a reasonable officer would have known in 2012 that reassigning deputies to less prestigious and unwanted positions in retaliation for their involvement in a political campaign violated the First Amendment. In light of the case law cited above, specifically *Sowards* and *Boger*, the Court finds that such a right was clearly established at least as early as 2000. Therefore, qualified immunity as to Defendant Wickersham is denied.

G. Duty of Loyalty

Defendants argue that even if Plaintiffs can establish that there are genuine issues of fact regarding their § 1983

**Baker v. County of Macomb, Not Reported in F.Supp.3d (2015)**

2015 WL 5679838, 2015 L.R.R.M. (BNA) 191,817

claim, their claims should fail because the position of deputy sheriff falls within what is known as the *Branti, Elrod* exception. *See Hall v. Tollett*, 128 F.3d 418, 427-28 (6th Cir. 1997) (discussing *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion) and *Branti v. Finkel*, 445 U.S. 507 (1980)); *see also Heggen v. Lee*, 284 F.3d 675, 680-81 (6th Cir. 2002) (examining the same).

In *Elrod*, the Supreme Court held "that patronage dismissals, or the practice of discharging employees because they in some fashion support a political party other than the one supported by their employers, violates the First and Fourteenth Amendments". *Heggen*, 284 F.3d at 680 (citing *Elrod*, 427 U.S. at 359). The Supreme Court went on to find that in some instances restraints on First Amendment rights were appropriate, and the "plurality held that such dismissals should be limited to policymaking positions." *Id.* (citation omitted). Later, in *Branti*, the Supreme Court "reaffirmed that employees who are in policy making positions or who hold confidential relationships with their employers may be fired for reasons of political affiliation." *Id.* (citing *Branti*, 445 U.S. at 517). The Supreme Court also went on to broaden the scope of the protection of politically motivated employment decisions to include failures to promote, transfer, rehire or recall. *Id.* (citing *Faughender v. City of N. Olmsted*, 927 F.2d 909, 912-13 (6th Cir. 1991)).

A court must determine upon the record before it "whether the patronage dismissals are appropriate on a case-by-case basis". *Heggen*, 284 F.3d at 686 (citing *Hall v. Tollett*, 128 F.3d 418, 429 (6th Cir. 1997). The Sixth Circuit has explained that "the test established in *Branti* requires courts to look at the responsibilities and duties of each position." *Hall*, 128 F.3d at 427. It is the defendant's burden to show that the position falls within the exception. *Heggen*, 284 F.3d at 682. "To justify a patronage dismissal, the hiring authority ultimately must 'demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.'" *Id.* at 681 (quoting *Hall*, 128 F.3d at 423).

*19 The Sixth Circuit held in *Heggen* and in *Hall* that the position of sheriff deputy did not fall within the *Elrod/Branti* exception. In *Hall*, the position of sheriff deputy was described as "the bottom of the chain of command" in the department, and the primary duty of a deputy was "to patrol the roads of the county, enforcing the

laws of Cumberland County and the State of Tennessee", they carry firearms, responded to crisis situations. *Hall*, 128 F.3d at 429. Based on the record, the Sixth Circuit concluded that the defendant had failed to evidence that the deputies had any "specific duties or responsibilities, or the amount of discretion or policymaking authority, that would make political affiliation an appropriate requirement for employment." *Id.*

In *Heggen*, the Sixth Circuit noted that duties of the sheriff deputies in question were "comprised of road patrol, serving arrest warrants and civil papers, taking complaints, 'working' auto accidents, and transporting prisoners." *Heggen*, 284 F.3d at 684. The Sixth Circuit concluded that similar to *Hall*, the deputy sheriffs involved the same "nonpolicymaking duties" and the fact that the deputies had "some discretion" in performing their duties did not "automatically turn the position into a policymaking position." *Id.* at 684. The Sixth Circuit then held that those duties were not sufficient for the deputy position to fall within the *Elrod/Branti* exception and further found that the defendant could not show that the party affiliation was an appropriate requirement for the position. *Id.*

In the present case, Defendants note that other circuits have held that the position of sheriff's deputy falls within the *Elrod/Branti* exception. Such reliance is misguided as it is neither binding on this court, nor persuasive given the Sixth Circuit's treatment of this issue. Defendants also appear to half-heartedly distinguish the present case from *Heggen* by alleging that in addition to the "typical functions in those cases, Plaintiffs in this matter had additional discretion by virtue of the substation positions that they held in 2012." (Defs.' Mot. at 37). Particularly, Defendants argue that three of the Plaintiffs were on the midnight shift and therefore were more autonomous and had less oversight than the deputies in *Heggen* (or *Hall*).

Defendants do not cite any testimony or any relevant evidence whatsoever to support their argument. Additionally, Defendants have failed in any way to make a showing or an argument that party affiliation was an appropriate requirement for the position of deputy sheriff in Macomb County. The record is clear that deputy sheriff was the lowest position in the command structure (below: lieutenants, sergeants, captains, chief of staff, undersheriff, and sheriff). Further, the mere fact that three of the Plaintiffs worked a shift that less

people worked would not transform their duties into policymaking positions or make a party affiliation more of an appropriate requirement for the position.

Based upon this very limited record, the Court rejects Defendants' argument that the position of deputy sheriff falls within the *Elrod/Branti* exception. The Court, however, finds that awarding sanctions for making the argument is not appropriate and denies Plaintiffs' request for same.

**H. Section 1983 Claim against Macomb County (*Monell* Claim)**

As discussed above, a municipality may be liable under § 1983 when the constitutional violation is a result of a policy or custom of the city. Whether an official has final policymaking authority is a question of state law. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

> [T]he trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur...

**\*20** *Jett v. Dallas Independent Sch. Dist.*, 491 U.S. 701, 737 (1989) (citing *Monell*, 436 U.S. at 661 n. 2 and *Pembaur*, 475 U.S. at 485-87 (White, J., concurring)). "[O]n a single-act theory, a plaintiff must demonstrate that a 'deliberate choice to follow a course of action is made from among various alternatives by the official...responsible for establishing final policy with respect to the subject matter in question.' Moreover, that course of action must be shown to be the moving force behind or cause of the plaintiff's harm." *Burgess v. Fischer*, 735 F.3d 462, (6th Cir. 2013) (quoting *Pembaur*, 475 U.S. at 483, 484-85). Indeed, "municipal liability attaches only where the decisionmaker possesses final authority

to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481.

The Supreme Court cautioned, however, that "[t]he fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Id.* at 481-82 (citation omitted). This distinction is critical to the issue before this Court: whether a sheriff who had the unfettered authority and discretion to transfer deputies is the "official policymaker" of employment practices for the municipality under § 1983.

This distinction was addressed as a hypothetical by the Supreme Court in *Pembaur*. The Supreme Court explained that

> for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decision respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would*

represent county policy and could give rise to municipal liability.

*Id.* at 482-83 n. 12 (emphasis in original). The Supreme Court further addressed this distinction in *St. Louis v. Praprotnik*, 485 U.S. 112, 129-30 (1988). In *Praprotnik*, the Supreme Court rejected the argument that "appointing authorities" who had "the authority to initiate transfers and layoffs, were municipal 'policymakers'". *Id.* at 129. The Supreme Court explained even though the officials' decisions on employment transfers and layoffs were not reviewed by higher supervisory officials, and a Civil Service Commission "decided appeals from such decisions, if at all, in a circumscribed manner that gave substantial deference to the original decisionmaker" such evidence did not suffice to show that those officials were "authorized to establish employment policy for the city with respect to transfers and layoffs". *Id.* Rather, the city charter made clear such authority rested with the Civil Service Commission.

The Sixth Circuit has also spoken to the critical difference between a municipal official who possesses final policymaking authority and an official who has authority to make certain final implementing decisions or take final action: "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official polices of superior officials." *Feliciano v. City of Cleveland*, 989 F.2d 649, 655 (6th Cir. 1993) (citing *Praprotnik*, 485 U.S. at 127); *see also Nelson v. City of Flint*, 136 F.Supp.2d 703, 718 (E.D. Mich. 2001).

**\*21** The present case is analogous to the hypothetical addressed by Supreme Court in *Pembaur* and facts of *Praprotnik* as it presents facts that illustrate the same critical distinction between an official who has the discretion to implement a final decision and an official who possesses final policymaking authority. Plaintiffs have not offered any evidence to support their argument that the Defendant County of Macomb is liable for Defendant Wickersham's decision to transfer Plaintiffs beyond the undisputed fact that he was the "ultimate decisionmaker" on the transfer. Indeed, there is no dispute that Defendant Wickersham, as Sheriff of Macomb County, had *discretion* to transfer deputies to the general pool and in that respect was the "ultimate decisionmaker" of such transfers.[9] (*See* Defs.' Mot. at

18-19, admitting Sheriff was the "ultimate decisionmaker" with respect to the transfers). However, pursuant to Michigan statute, the Civil Service Commission has final authority over employment matters and policy for the Sheriff's Department in Macomb County. (*See* ECF No. 81, Defs.' Reply, Ex. A). Defendant County of Macomb adopted the Civil Service Commission Act, 1966 P.A. 298, as amended 1998, which states:

> An Act to establish and provide a board of civil service commissioners for sheriffs' departments in certain counties; to provide a civil service system based upon examination and investigation as to merit, efficiency and fitness for appointment, employment and promotion of all officers and men or women appointed in the departments; *to regulate the transfer, reinstatement, suspension and discharge of said officers; to provide for referendums; and to prescribe penalties and provide remedies.*

Act 298 P.A. 1966, as amended 1998; MICH. COMP. LAWS § 51.351 (emphasis added). The Civil Service Act explicitly provides the Commission with authority regarding all employment policies, even specifying that

> no person shall be appointed, reinstated, promoted or discharged as a member of the [sheriffs'] department regardless of rank or position, in any manner or by any means other than those prescribed in this act. The positions of undersheriff and departmental heads are exempt from the operation of this act, and the sheriff shall have the sole power an authority to fill such positions.

MICH. COMP. LAWS § 51.357.

As the Civil Service Act does not set forth any specific policies regarding the transfers of deputies (although does state it has the authority to "regulate" such matters), it appears arguable that the Sheriff has the discretion to transfer deputies in his department. "Final action,

2015 WL 5679838, 2015 L.R.R.M. (BNA) 191,817

however, does not equate with final policy making authority" and does not suffice to establish liability under § 1983 against the municipality, where Michigan law dictates through the Civil Service Act that employment policy and actions are established and enforced by the Civil Service Commission. *See Binelli v. Charter Tp. of Flint*, 488 F App'x 95, 99 (6th Cir. 2012) (holding there was no municipal liability even when official acted as the "final decision maker" when she transferred and eventually terminated the plaintiff because "most" employment policy in the Township was set by the Board and therefore her authority in employment matter was "thoroughly constrained".); *cf. Marchese v. Lucas*, 758 F.2d 181, 188-89 (1985) (holding the County liable for the Sheriff's failure to train his officers, stating "[t]he Sheriff is, however, the law enforcement arm of the County and *makes policy in police matters* for the County." (emphasis added)). "Discretion to act is not to be confused with policymaking authority; no municipal liability results where an official merely has discretion to act because subjecting a municipality to liability in such a situation would 'indistinguishable' from *respondeat superior* liability." *Feliciano*, 989 F.2d at 656 (citing *Praprotnik*, 485 U.S. at 126). The Court finds that where Plaintiffs have not provided any evidence that Defendant Wickersham had policymaking authority in regards to employment matters or transfers and it is clear that such authority rests with the Civil Service Commission by statute; Defendant Wickersham's single decision to transfer Plaintiffs to the general pool cannot establish municipal liability as to Defendant County of Macomb.

**\*22** Finally, to the extent that Plaintiffs are attempting to argue that § 1983 municipal liability may attach to Defendant County of Macomb based on Defendant Roberts' acts, such a claim fails. First, Plaintiffs fails to even address Defendant Roberts' actions when arguing that Defendant County of Macomb is liable under § 1983 (*see* i.e. Pls.' Mot. at 23) and only contend liability arises from *Defendant Wickersham's* act. Further, it is undisputed that Defendant Roberts had no decisionmaking authority regarding the transfers that could possibly be imputed to Defendant County of Macomb. As Plaintiffs have failed to set forth any other

possible theory on how Defendant County of Macomb could be liable for Defendant Roberts' acts, such a claim, if one is asserted, is also dismissed.

Accordingly, the Court will grant summary judgment to Defendants on Plaintiffs' § 1983 claim against Defendant County of Macomb.

## V. CONCLUSION

For all these reasons, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment (ECF No. 57) and DENIES Plaintiffs' partial motion for summary judgment (ECF No. 59) such that:

(1) Defendants' motion for summary judgment is GRANTED as to all claims against Defendant Roberts and the County of Macomb;

(2) Defendants' motion for summary judgment is DENIED as to the 42 U.S.C. § 1983 claim against Defendant Wickersham in his individual capacity;

(3) Defendants' motion for summary judgment is GRANTED as to the 42 U.S.C. § 1983 claim against Defendant Wickersham in his official capacity;

(4) Defendants' motion for summary judgment is DENIED IN PART and GRANTED IN PART as to the Michigan Constitutional claim such that only claims for injunctive and declaratory relief remain against Defendant Wickersham; and

(5) Plaintiffs' Motion for Summary Judgment as to Defendants Wickersham and County of Macomb is DENIED.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 5679838, 2015 L.R.R.M. (BNA) 191,817

Footnotes

1    Plaintiffs originally filed a response to the Motion for Summary Judgment on September 2, 2014, in conjunction with a request to file a fifty-three (53) page response. (ECF Nos. 69 & 71). The Court granted in part Plaintiffs' request by

**Baker v. County of Macomb, Not Reported in F.Supp.3d (2015)**

2015 WL 5679838, 2015 L.R.R.M. (BNA) 191,817

allowing a forty (40) page response. (Order, ECF No. 75). As a result of this Order, Plaintiffs re-filed their response on September 15, 2014 (ECF No. 77).

2   There are two versions of the CBA that were operative during the time in question. Defendants represent and Plaintiffs do not contradict that the two versions of the CBA contain the same relevant provisions. For ease of reference the Court will collectively refer to both documents as "CBA".

3   For ease of reference, unless otherwise indicated the exhibits cited will refer to the exhibits attached to Defendants' motion for summary judgment.

4   This testimony is at odds with his later testimony that he did not know that Plaintiff Jared Baker was a Stone supporter. (Wickersham Dep. at 137-38).

5   The Court notes that in examining the assignment process it did not rely on any testimony of officers not involved in the assignment meeting or process, as such testimony lacks any foundation and/or because such testimony constitutes hearsay. Plaintiffs drop a single footnote claiming that any testimony by a sergeant or lieutenant regarding what they had heard about the assignment process, or the alleged retaliation should not be considered hearsay under Fed. R. Evid. 801(d)(2)(E), because the statements are admissions against a party. However, such statements relate to the assignment meeting or process of which none of the lower level officers were personally a part of. "[A] statement of an agent or employee may be admissible against the principal...if within the scope of his agency or employment, but a proper foundation must be made for such a statement to show it was within the scope of his agency or employment." *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986). Plaintiffs bear the burden in laying the proper foundation for such statements. *Id.* at 275. Particularly, "[s]tatements by employees are outside the scope of an employee's employment, and therefore not subject to the party-admission rule, when they concern decision-making processes into which the employee has no input, or decision to which they were not a party." *Id.* Plaintiffs fail to lay such a foundation for statements concerning the assignment meeting and process from lower level commanders not involved in the process.

6   In the present case, it is undisputed that the individual Defendants were both operating under the color of state law. Therefore, the Court's inquiry concerns only whether any actionable constitutional violations occurred.

7   To the extent that any Michigan constitutional violation claim survives against Defendants Wickersham and Roberts for injunctive or declaratory relief, Plaintiffs' rights under the Michigan Constitution "essentially track those guaranteed by the United States Constitution, [and] the same analysis that governs their federal constitutional claims applies to their corresponding state claims." *Lucas v. Monroe Cnty.*, 203 F.3d 964, 972 n. 4 (6th Cir. 2000).

8   Defendant Wickersham was elected in 2012, but was serving as an appointed sheriff in 2011.

9   Yet, it appears even this authority was fettered by the positions at issue as the Sheriff did not have total discretion regarding deputies placement in preferred positions under the CBA.

---

**End of Document**                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                          20