# Transcript of the Testimony of

# **Johnny Fox**

**Date:**

September 27, 2017

**Case:**

Alonzo Bullman v. City of Detroit

American Reporting, Inc.
Phone:248-559-6750
Fax:248-559-9919
Email:scheduling@american-reporting.com
Internet: american-reporting.com

Johnny Fox                         Alonzo Bullman v. City of Detroit

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


ALONZO BULLMAN, et al,

                                        Case No.:

    Plaintiffs,                         16-cv-12581


vs


                                        Honorable

                                        Arthur J. Tarnow

CITY OF DETROIT, et al,


    Defendants.

_____/


DEPOSITION OF:   JOHNNY FOX

LOCATION:        2 Woodward Avenue, Detroit, MI

DATE:            September 27, 2017

SCHEDULED:       12:30 p.m.


Taken in the above-entitled cause, before James A. Hengstebeck,
Certified Electronic Recorder, CER #4623, and Notary Public for
the County of Oakland.

1

Johnny Fox                            Alonzo Bullman v. City of Detroit

APPEARANCES:

    SOLOMON M. RADNER, ESQUIRE

    Excolo Law PLLC

    26700 Lahser Rd Ste 400

    Southfield, MI 48033-2618

    Appearing on behalf of the Plaintiffs.


    GREGORY PADDISON, ESQUIRE

    Assistant Corporation Counsel

    City of Detroit Law Dept

    2 Woodward Ave Ste 500

    Detroit, MI 48226-3437

    Appearing on behalf of the Defendants.

2

Johnny Fox                          Alonzo Bullman v. City of Detroit

# I N D E X

WITNESS:                                                    PAGE:

JOHNNY FOX

    Cross-Examination by Mr. Radner                           4

    Redirect Examination by Mr. Paddington                  132

    Recross-Examination by Mr. Radner                       140


EXHIBITS:

    Deposition Exhibit Number 1, 2 & 3                       68

    Deposition Exhibit Number 4                              76

    Deposition Exhibit Number 5                              83

    Deposition Exhibit Number 6 & 7                         124

3

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1                              Detroit, Michigan
 2                              September 27, 2017 - 12:50 p.m.
 3                                  * * * *
 4                         J O H N N Y   F O X,
 5    a defendant herein, after having first been duly sworn,
 6    testified as follows:
 7    BY MR. RADNER:
 8    Q.   Good afternoon, sir.  Please state and spell your name for
 9         the record.
10    A.   Johnny Fox.  J-o-h-n-n-y F-o-x.
11    Q.   And your legal name is Johnny?
12    A.   Yes.
13    Q.   You don't have a middle name?
14    A.   I have a middle name.
15    Q.   What's your middle name?
16    A.   Anthony, A-n-t-h-o-n-y.
17    Q.   All right.  So your full legal name is Johnny Anthony Fox?
18    A.   Yes.
19    Q.   Where are you employed?
20    A.   City of Detroit Police Department.
21    Q.   How long have you been there?
22    A.   Over nine years.
23    Q.   Where were you nine years ago?
24    A.   What do you mean?
25    Q.   Were you employed nine years ago, in school nine years
```

4

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1        ago?
 2   A.   I was employed nine years ago.
 3   Q.   Where were you employed?
 4   A.   I can't remember the name of the company.
 5   Q.   Was it security or law enforcement?
 6   A.   No.
 7   Q.   What was the nature of your employment?
 8   A.   Factory worker.
 9   Q.   And how long were you in that factory position?
10   A.   I want to say, like, a year, year and a half.
11   Q.   Before that, where were you?
12   A.   I can't remember.
13   Q.   How old are you?
14   A.   35.
15   Q.   When did you graduate high school?
16   A.   I didn't.
17   Q.   How high did you go in school?
18   A.   11th grade, then I got a GED.
19   Q.   What did you do after 11th grade?  College or work?
20   A.   Work.
21   Q.   Where did you work, if you remember?
22   A.   My first job after I got my GED was OUT in Canton, I
23        believe, Meisel Sysco.
24   Q.   What kind of work did you do?
25   A.   IT was an order selector.
```

5

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   Q.   Okay.  And then, how long were you there?
 2   A.   Eight months to a year.  I can't remember precisely.
 3   Q.   Okay.  And then do you know what you did between that and
 4        the factory job?
 5   A.   Different factory jobs.  Primarily factory jobs.
 6   Q.   What made you want to go into law enforcement?
 7   A.   Always wanted to do it as a kid.
 8   Q.   How long had you been out of high school before you
 9        decided to make a career out of law enforcement?
10   A.   I want to say I was 25 when I got hired, but I had applied
11        previously.
12   Q.   How many times did you apply previously?
13   A.   Once or twice.
14   Q.   And what happened with those applications?
15   A.   I remember one time I failed the physical exam.
16   Q.   Okay.  What about the other time?
17   A.   They hadn't gotten back to me and I had becAme a reserve
18        officer.
19   Q.   For the City of Detroit?
20   A.   Yes.
21   Q.   That's a volunteer position?
22   A.   Yes.
23   Q.   So that was before you started these factory jobs or while
24        you were working in the factory jobs, or was that right
25        before you began your actual law enforcement career, when
```

6

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1          you were doing the volunteer work?
 2     A.   That was while working factory jobs.
 3     Q.   Before you did that, did you have to go to any sort of
 4          police academy or training?
 5     A.   What do you mean?
 6     Q.   The volunteer work.
 7     A.   Yes, they send you through a small academy.
 8     Q.   When you say small academy, what do you mean?  How does it
 9          compare to a regular academy?
10     A.   It's not as long.  I think it's, like, 12 weeks and it's
11          only a few hours a day, certain days.
12     Q.   Not as long as the regular academy?
13     A.   Regular academy, when I was in academy, we were there for
14          eight months.
15     Q.   And that's every day?
16     A.   Yes.  Well, Monday through Friday, primarily, it was.
17     Q.   Why did you become a police officer?
18     A.   Something I wanted to do from a child.
19     Q.   Why did you want to do it?
20     A.   Because that's -- I wanted to become a police officer.
21     Q.   There was no reason other than you wanted to become a
22          police officer or was there something in particular
23          driving that desire?
24     A.   I wanted to become a police officer and do something
25          positive.
```

7

Johnny Fox                              Alonzo Bullman v. City of Detroit

 1   Q.   Okay.  Do something positive like keep the streets safe,
 2        put bad guys in jail, that kind of thing?
 3   A.   Just help out my community.
 4   Q.   And obviously, you believe that being a police officer
 5        helps the community?
 6   A.   It's a start, yes.
 7   Q.   And this might sound like an obvious question, but why do
 8        you think it is that being a police officer helps the
 9        community?
10   A.   Various things.  You get murderers, rapers, different
11        people off the street so they can't harm any people.
12        Sometimes, you are able to just help talk to people, that
13        just helps them, for various reasons.
14   Q.   So, obviously, when you say getting murderers off the
15        street, your goal as a police officer, if there's a
16        murderer, would be to get that murder off the street,
17        right?
18   A.   Yes.
19   Q.   Let me ask you something.  This is a little bit of a
20        speculative question and your attorney is probably going
21        to object.  Maybe he won't.  If, let's say, there's a
22        murderer that the only way you could get him and arrest
23        him would be by violating the Fourth Amendment.  Would you
24        do it?
25             MR. PADDINGTON:  Objection, calls for speculation,

                                                                    8

Johnny Fox                          Alonzo Bullman v. City of Detroit

| | |
|---|---|
| 1 | calls for legal conclusion. |
| 2 | Aside from those objections, you can go ahead and |
| 3 | answer. |
| 4 | THE WITNESS:  What do you mean by violating? |
| 5 | MR. PADDINGTON:  So I won't interrupt here, let's |
| 6 | just put an ongoing to the line of questioning. |
| 7 | MR. RADNER:  Ongoing to the line of questioning is |
| 8 | fair enough. |
| 9 | Q.   (By Mr. Radner)   Assume for a moment that the only way |
| 10 | you could get into somebody's house is without a warrant, |
| 11 | there's no probable cause, but you know that the guy's a |
| 12 | murderer and that there's evidence in there that will |
| 13 | prove he's a murderer.  Would you go and arrest him and |
| 14 | violate the Fourth Amendment or would you not? |
| 15 | A.   Not.  There's protocols. |
| 16 | Q.   So would you agree with me that the Fourth Amendment is |
| 17 | bigger than one murder case? |
| 18 | A.   It's the law. |
| 19 | Q.   What I'm saying is you have two laws, you have a law that |
| 20 | outlaws murder and you have a law that police officers |
| 21 | have to follow the Fourth Amendment. |
| 22 | A.   Yes. |
| 23 | Q.   What I'm asking you is which one is more important? |
| 24 | A.   They're both important. |
| 25 | Q.   Neither one is more important than the other? |

9

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   They are both important.  As a police officer, my job is
 2        to uphold the law, so I have to uphold the law.
 3   Q.   If you can only follow one of those laws, for some reason
 4        they are at odds with each other, which one would you say
 5        is more important or can you not say?
 6   A.   I can't say.  They are both the law, so I have to follow
 7        them.
 8   Q.   I'm going to venture a guess that you might agree with me
 9        that particularly in recent times, police officers
10        nationally have seem to be getting a bit of a bad rap.
11             MR. PADDISON:  Objection, form, foundation, calls for
12        speculation.
13             Go ahead and answer.
14             THE WITNESS:  Yeah.  Police officers have been
15        getting a bad rap.
16   Q.   (By Mr. Radner)  And that probably upsets you?
17   A.   Everybody is entitled to their own opinion.
18   Q.   I understand that, but, I mean, for example, if everybody
19        thought that lawyers were unethical dirty liars.  I
20        certainly would be offended.  Probably I wouldn't be.
21        There's certainly enough lawyer jokes out there.  I would
22        imagine that as somebody, you know, most law enforcement
23        officers, I would imagine, are unhappy by the climate out
24        there when it comes to law enforcement and the view
25        towards law enforcement.  Wouldn't you agree with that?
```

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1              MR. PADDINGTON:  Renewed, ongoing.
 2              Go ahead and answer.
 3              THE WITNESS:  Everybody's entitled to their own
 4       opinion.  If your belief is your belief, it's your belief.
 5    Q.  (By Mr. Radner)  There are opinions that upset me.  For
 6       example, I'm Jewish, and there are people who believe that
 7       Jews don't have a right to live.  Those opinions upset me.
 8       I am aware that they have the right to those opinions, but
 9       I would still freely say that anybody who believes I don't
10       have the right to exist offends me.  They are entitled to
11       it, but it offends me.  What I'm asking you is, yes, they
12       are entitled to their own opinions.  We're not going to
13       get into the NFL kneeling and rights to your own opinions,
14       but we all agree, obviously, that you are entitled to your
15       own opinions.  What I'm asking you is:  Considering the
16       climate that we have right now and the bad rap that law
17       enforcement seems to be getting, does that upset you?
18    A.  No, not really.
19    Q.  Would you agree with me that the vast majority of law
20       enforcement officers are heroes?
21    A.  To some point, yes.
22    Q.  What do you mean by to some point?
23    A.  Some people are heroes.  Some people do some very
24       courageous stuff to save people's lives.  Those are
25       heroes.
```

11

Johnny Fox                                    Alonzo Bullman v. City of Detroit

1    Q.    Right.   And I would go so far as to say, and tell me if
2          you agree with this, that the vast majority of the law
3          enforcement officers who put on a badge, a bulletproof
4          vest and a utility belt every day and are willing to put
5          their lives on the line to protect the public, even if
6          they don't have to risk their lives on any given shift, I
7          would say just by doing that, they are heroes.   Would you
8          agree with me on that?
9    A.    To a point, yes.
10   Q.    And there's a very small minority, a small fraction of law
11         enforcement officers, who are, for lack of a better term,
12         dirty cops.   Fair enough?
13   A.    Okay.
14   Q.    Do you agree with that?
15   A.    It's a possibility.
16   Q.    What do you mean?  So you don't agree with it?
17   A.    I'm not the one judging or jurying them or doing that, so
18         they say they are dirty cops, okay.   There's bad apples in
19         everything.
20   Q.    A hundred percent.   What I'm asking you is what would you
21         do if you would see a police officer act in a way that was
22         inappropriate?
23   A.    I have to go through the steps that I have to go through.
24   Q.    What are those steps?
25   A.    You have to notify your supervisor, go through those

12

Johnny Fox                          Alonzo Bullman v. City of Detroit

| | | |
|---|---|---|
| 1 | | motions. |
| 2 | Q. | So if you would see a law enforcement officer, for |
| 3 | | example, plant evidence on somebody, you would go to your |
| 4 | | supervisor? |
| 5 | A. | Immediately, and if my supervisors didn't take care of it, |
| 6 | | go steps further. |
| 7 | Q. | Okay. If you would see a police officer damage somebody's |
| 8 | | property, you would immediately report that, right? |
| 9 | A. | It matters on how the damaging of the property is. |
| 10 | Q. | Well, I'm not talking about breaching a door if, you know, |
| 11 | | you need to during a raid or throwing somebody down if |
| 12 | | he's fighting with the police and he rips his jeans. I'm |
| 13 | | talking about if a law enforcement officer pulls somebody |
| 14 | | over and as he's walking back to his car, he takes out his |
| 15 | | stick and breaks the rearview mirror or bashes the |
| 16 | | taillight. |
| 17 | A. | In that instance, yes, you have to notify them. |
| 18 | Q. | And you would notify your supervisor in such a case? |
| 19 | A. | Yes. |
| 20 | Q. | Have you ever done that? |
| 21 | A. | Done what? |
| 22 | Q. | Notified your supervisor of a law enforcement officer |
| 23 | | doing something inappropriate? |
| 24 | | MR. PADDISON: Objection, relevancy. |
| 25 | | You can go ahead and answer. |

13

Johnny Fox                              Alonzo Bullman v. City of Detroit

1              THE WITNESS:  Not that I can recall.

2    Q.   (By Mr. Radner)  You've been a law enforcement officer for

3         the City of Detroit for nine years, you said?

4    A.   Yes.

5    Q.   And in nine years, you have never seen anything

6         inappropriate; is that a fair assumption to make?

7    A.   Not that I can recall, yes.

8    Q.   You would recall if you had to, for lack of a better term,

9         snitch on one of your colleagues, wouldn't you?

10   A.   Yes.

11   Q.   So if you don't recall ever doing so, is it fair for me to

12        conclude that in the nine years that you've been a police

13        officer, you've never seen anything inappropriate from any

14        law enforcement officer?

15   A.   Yes.

16   Q.   I want to take you to the case that brings us here today.

17        Have you had a chance to review the complaint in this

18        matter?

19   A.   Somewhat.

20             MR. PADDISON:  Just a point of clarification.  We are

21        talking about the complaint filed by your office, the

22        preliminary complaint?

23             MR. RADNER:  Good point.

24   Q.   (By Mr. Radner)  Looking through my documents here, I know

25        I have it.  I've just got to find it.

14

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1              If my phone doesn't stop vibrating, I am going to
 2       turn it off, because it is beginning to annoy me, too.
 3              What did you do, if anything, to prepare for today's
 4       deposition?
 5   A.  Nothing really.  I spoke with --
 6              MR. PADDINGTON:  Objection to the extent it calls for
 7       attorney-client privilege.  I am instructing my client not
 8       to discuss any conversations he and I had.
 9              Aside from that objection, you can go ahead and
10       answer.
11              THE WITNESS:  Nothing.  Spoke with my attorney.
12   Q.  (By Mr. Radner)  Did you review any documents?
13   A.  Yes.
14   Q.  What documents did you review?
15   A.  My PCR and the search warrant.
16   Q.  Your PCR, which is the preliminary complaint report
17       record?
18   A.  Yes.
19   Q.  And the search warrant?
20   A.  The affidavit.
21   Q.  The affidavit that you signed.  I also see that you have
22       over there your responses to my interrogatories?
23   A.  Yes.
24   Q.  And you had a chance to review those responses?
25   A.  Yes.
```

15

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   Q.   And were they all true and accurate at the time you signed
 2        them?
 3   A.   Yes.
 4   Q.   And having had a chance to review them today, are the
 5        answers still full, accurate, true and complete today?
 6   A.   Yes.
 7   Q.   You also had a chance to review your PCR, you said?
 8   A.   Yes.
 9   Q.   Everything in there was true, accurate and complete at the
10        point when you wrote it?
11   A.   Yes.
12   Q.   And it's still true today?
13   A.   Yes.
14   Q.   Is there anything in it that you wish to correct?
15   A.   No.
16   Q.   So everything in there is true?
17   A.   Yes.
18   Q.   You also had a chance to review your affidavit?
19   A.   Yes.
20   Q.   Everything in there was true and accurate when you wrote
21        it?
22   A.   Yes.
23   Q.   Still true now?
24   A.   Yes.
25   Q.   All right.  Let's talk about your affidavit for a moment.
```

16

Johnny Fox                          Alonzo Bullman v. City of Detroit

1        This was previously marked on 5-17-17 as Exhibit Number

2        12.

3              MR. RADNER:   Unless you have an objection,

4        Mr. Paddison, I'm just going to leave it marked like that.

5              MR. PADDISON:  No objection.  Just as a point of

6        clarification, whose deposition was that?

7              MR. RADNER:  I don't know.  I think we took several

8        depositions that day, and that's why we just labeled it

9        5-17-17, and it's actually Exhibits 12 and 13, because

10       it's two pages.

11             MR. PADDINGTON:  Correct.

12   Q.  (By Mr. Radner)  Looking at this affidavit, I have a

13       number of questions for you.  I want to go through it

14       slowly line by line.

15             In paragraph number one, you indicate that you are a

16       sworn police officer for the DPD, been so employed for

17       almost seven years, currently assigned to Major Violators

18       Unit.

19   A.  Which one are you looking at?  Oh, right here.  Okay.

20   Q.  Oh, you were looking at the actual warrant?

21   A.  Yeah.

22   Q.  All right.  I'm looking at the affidavit.

23   A.  Okay.

24   Q.  And again, the affidavit, just for clarification of the

25       record, the affidavit was marked as Exhibit 12 and 13.

17

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1          Currently assigned to Major Violators.  What is Major
 2          Violators?
 3    A.    Major Violators is also Narcotics.  It's just what the
 4          Department has named our unit.
 5    Q.    Why was the name changed from Narcotics to Major
 6          Violators, do you know?
 7    A.    That's above my pay grade.
 8    Q.    You don't know the answer?
 9    A.    I didn't change the name.  That came from the chief.
10    Q.    Okay.  But do you know or not know?
11    A.    I don't know.
12    Q.    You don't know why they ceased the existence of the
13          Narcotics Unit?
14    A.    There's speculation, but I don't know.
15    Q.    Do you know whether or not any members of the Narcotics
16          Unit were indicted by the federal authorities?
17              MR. PADDISON:  Objection, relevance, calls for
18          speculation.
19              Go ahead and answer, if you know.
20    Q.    (By Mr. Radner)  Only if you know.  I am not asking you to
21          speculate.
22    A.    It was on the news.  There was two officers.
23    Q.    Do you know which two?
24    A.    I don't remember their names.
25    Q.    At the time when you saw that in the news, did you think
```

18

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1          to yourself, my oh my, I worked with those guys?
 2               MR. PADDISON:  I'll just place an ongoing as to
 3          relevancy.
 4               Go ahead and answer.
 5               THE WITNESS:  I never worked with them.
 6    Q.    (By Mr. Radner)  Oh, okay.  So you remember at the time
 7          that you specifically did not work with those two?
 8    A.    When they changed it over to Major Violators, it was all
 9          new people.
10    Q.    Okay.  So nobody went from Narcotics to Major Violators,
11          as far as you know?
12    A.    That I know for sure, no.  I don't know.  I wasn't there
13          in the beginning.
14    Q.    Fair enough.  Where were you before that?
15    A.    I was assigned to Eastern District Special Operations.
16    Q.    And what kind of work did you do there?
17    A.    It was the plainclothes unit at various work.
18    Q.    Undercover things?
19    A.    Sometimes, but it was all various, day-by-day.
20    Q.    Did you do drugs then?  Let me rephrase that.
21               MR. PADDINGTON:  Thank you.
22    Q.    (By Mr. Radner)  I'm not asking you if you do drugs.  Did
23          you work on drug crimes then?
24    A.    Yes, I did make narcotic arrests then.
25    Q.    And as a plainclothes officer, did you ever do undercover
```

                                                                    19

Johnny Fox                          Alonzo Bullman v. City of Detroit

1          work, including, but not limited to purchases?
2     A.   No, no, I didn't then, no.
3     Q.   But you did other undercover work?
4     A.   Surveillance and following people and different aspects,
5          yeah.
6     Q.   When you do surveillance, do you keep records of your
7          surveillance?
8     A.   Sometimes yes, sometimes no.
9     Q.   Do you keep daily activity logs of your surveillance?
10    A.   What do you mean?  We have a daily activity log every day
11         that we work, yes.
12    Q.   What I'm asking you is:  Let's say you conduct
13         surveillance at 123 Main Street between four and six p.m.
14         Would you write in your daily activity log something to
15         the effect of conducted surveillance at 123 Main Street
16         between four and six p.m.?
17    A.   You put that you did surveillance.
18    Q.   So it would be reflected in your daily activity logs that
19         you did surveillance?
20    A.   Yeah, I think so, yeah.
21    Q.   Would the subject property of the surveillance be listed
22         in the daily activity logs, as well?
23    A.   What do you mean?
24    Q.   Would you say conducted surveillance or would you say
25         conducted surveillance at 123 Main Street?

20

Johnny Fox                                    Alonzo Bullman v. City of Detroit

 1   A.   You would say conducted surveillance and then give the
 2        answer where surveillance was conducted.
 3   Q.   Okay.  So assuming you did any surveillance, there would
 4        be a daily activity log, assuming you did things properly,
 5        that says you conducted surveillance at the address and
 6        the hours that you were there, true?
 7   A.   Yes.
 8   Q.   Back to Exhibit 12 over here, "...have been assigned for
 9        10 months to investigate narcotic trafficking within the
10        City of Detroit and surrounding areas prior to becoming a
11        member of the Narcotic Enforcement section."  What is the
12        Narcotic Enforcement section?
13   A.   It's basically the same thing as Major Violators, because
14        we are basically doing narcotics enforcement.
15   Q.   Is it an official section within the Major Violators?
16   A.   No, it is us.  Narcotics Enforcement and Major Violators
17        is basically the same thing.
18   Q.   Okay.  So it's basically the same thing, so it's another
19        name for it?
20   A.   You could say that, yes.
21   Q.   Who else uses the term Narcotic Enforcement section with
22        capital letters, other than you?
23   A.   I don't know.
24   Q.   Do you know if anybody does?
25   A.   I don't know.

                                                                    21

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   Q.   Is there an official section within the City of Detroit or
 2        in the Detroit Police Department that's called capital N,
 3        Narcotics, capital E, Enforcement, capital S, Section?
 4   A.   Not that I know of.
 5   Q.   Is there a particular reason that you wrote it with
 6        capital letters that you been a member of the Narcotics
 7        Enforcement section?
 8   A.   No, no particular reason.
 9   Q.   Was it to enhance your credibility in the affidavit?
10   A.   No.
11   Q.   I see you spent four years at the Eastern District
12        assigned to a Special Operation Unit.  Eastern District is
13        capitalized, as well.  What is the Eastern District?
14   A.   It was the Ninth Precinct and the Fifth Precinct, when the
15        precincts were combined together as districts.
16   Q.   So those two precincts together were called the Eastern
17        District, not just by you, but by everybody?
18   A.   Yes.
19   Q.   And you were assigned to a Special Operation Unit, again,
20        Special Operation Unit is capitalized.  Why is that
21        capitalized?
22   A.   Because it was a Special Operation Unit.
23   Q.   It was actually the name of an official unit?
24   A.   Special Operations, yes.  In every precinct they have
25        Special Operations.
```

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1    Q.   "Affiant has received trainings in criminal drug
 2         investigations by the Detroit Police Department."  What
 3         kind of drug investigations, criminal drug investigations,
 4         trainings have you received?
 5    A.   There's various ones.  I can't remember them.
 6    Q.   Tell me about the most recent one you had.
 7    A.   What's the most recent one we had?  I can't even remember
 8         the most recent one we had.
 9    Q.   What kind of things have you learned in these trainings?
10    A.   You learn the different type drugs.  You learn about how
11         to package various things.
12    Q.   Who conducts these trainings?
13    A.   Various trainers.
14    Q.   Law enforcement officers, lawyers, doctors?
15    A.   Yes.  It's an mix.  Law enforcement officers, they bring
16         in the prosecutors, the various different ones.
17    Q.   How long do these trainings last, typically?
18    A.   Some are a few hours, some are days.
19    Q.   When's the last one that you attended that lasted more
20         than one day?
21    A.   Undercover school.
22    Q.   When was that?
23    A.   A few months ago.
24    Q.   Okay.  So that was not as of when you wrote this
25         affidavit, true?
```

23

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   A.   Yeah.
 2   Q.   Okay.  Let's go back to when you wrote this affidavit on
 3        January 27, 2016.  Prior to January 27, 2016, what was the
 4        most recent training you had that exceeded one day?
 5   A.   I don't remember back that far of training.
 6   Q.   Were there any?
 7   A.   Yes.
 8   Q.   "Affiant participated in numerous investigations involving
 9        narcotics trafficking, manufacturing and possession."  I
10        want to ask you about this.  What kind of things do
11        traffickers do to avoid detection and to enhance their own
12        safety?  And you can just speak freely about it.
13   A.   There's various different things that they do.
14   Q.   What kind of things?  And I am not asking for an
15        exhaustive list, just give me some examples.
16   A.   They have other people sell the drugs for them, like they
17        have other people make the sales.  It varies.  You have to
18        give me more specifics.  There's so much variation with
19        that.  They use different cars. There's different things.
20   Q.   And this is a particular experience that you've learned on
21        the job, is what it seems like?
22   A.   Yes.
23   Q.   "Affiant also has participated in the arrest and
24        interrogation of numerous persons involved in the
25        narcotics trade."
```

24

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   Yes.
 2   Q.   "As such, the Affiant has become knowledgeable in the
 3        methods, activities and patterns of persons who traffic
 4        controlled substances."  Right?
 5   A.   Yes.
 6   Q.   Okay.  Methods, activities and patterns.  Give me some
 7        examples of methods, activities and patterns of persons
 8        who traffic controlled substances.
 9   A.   What do you mean by that?  Like, how do they do it?
10   Q.   Well, what I'm asking you is:  This was your sworn
11        testimony that you have become knowledgeable in the
12        methods, activities and patterns of persons who traffic
13        controlled substances, right?
14   A.   Uh-huh.
15   Q.   That's a yes?
16   A.   Yes.
17   Q.   We just need it for the court reporter.  He can't write
18        down uh-huh, huh-uh, shaking the head, things like that.
19        So we need verbal answers.
20            This was your sworn testimony, you told me earlier
21        today under oath that it was all true when you wrote it
22        and that it's still true today.
23   A.   Yes.
24   Q.   What I'm asking you is what you meant.  I don't want to
25        have to give an explanation of what you meant.  I'm asking
```

25

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1        you when you wrote that -- wait, let me finish.  When you
 2        testified that you are knowledgeable in the methods,
 3        activities and patterns of persons who traffic controlled
 4        substances.  I'm asking you what you meant by methods,
 5        activities and patterns?
 6   A.   There are various different methods.  Sometimes they sell
 7        drugs from their household.  Sometimes they tell people to
 8        meet them at the corner.  There's various different
 9        things.  There's short stays.  There is dial a dope.
10        There's a lot of variations of different methods.
11   Q.   Short stays and dial a dope?
12   A.   Dial a dope.  There's various different ones.
13   Q.   Okay.  What is short stay?
14   A.   Short stay is somebody goes to the house, goes in the
15        house for a minute or so, if that long, and leaves the
16        location.
17   Q.   What is dial a dope?
18   A.   Dial a dope is you call the person, you meet at a specific
19        spot and then you do the exchange.
20   Q.   Anything else that you can think of?
21   A.   Those were two quick ones right there.
22   Q.   Okay.  Are there any other methods, activities and
23        patterns that you learned through your vast experience?
24   A.   There is a lot of them.
25   Q.   Okay.  Can you give me a few more?
```

26

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   There's slot deals.

 2   Q.   What's a slot deal?

 3   A.   Were you go to the house, knock on the door, the person

 4        opens a slot, you hand them money, they hand you the

 5        narcotics.

 6   Q.   Sounds pretty similar to a short stay, except that it's

 7        done through a slot, true?

 8   A.   Yeah.

 9   Q.   Okay.  Any more that you can think of?

10   A.   There's a lot more.  There is exchanges in the street or

11        just at a store.

12   Q.   And that's where somebody would go over to somebody at a

13        store and just, here's a 20, here's a baggie, and then

14        they go on their merry way?

15   A.   It's you walk into a store and make a, hey, I got weed,

16        and they offer to sell it to them, the person buys it and

17        they both go their separate ways.

18   Q.   I don't mean to offend you with this, but I'm asking this

19        out of true sincerity.  How much actual training did it

20        have to take to learn those things that you just

21        described?  Because a lot of it seems pretty simple.  So

22        how long did it actually take of actual on-the-job

23        training and experience to consider yourself knowledgeable

24        in the methods, activities and patterns that you just

25        described?
```

27

Johnny Fox                                    Alonzo Bullman v. City of Detroit

1    A.    Different people take different times.

2    Q.    How long did it take you?

3    A.    I'm a quick learner, so it wasn't that long.

4    Q.    All right.  Like a day?

5    A.    I can't give you an exact time.

6    Q.    You witnessed short stays, dial a dope, slot deals, street

7          exchanges, all of them?

8    A.    Yes.

9    Q.    "Based on my training and experience and conversations

10         with other law enforcement personnel, I am familiar with

11         narcotic traffickers' methods of operation, including the

12         distribution, storage and transportation of narcotics.

13         The collection of proceeds of narcotics trafficking and

14         the methods of money laundering used to conceal the nature

15         of the proceeds."  Did you write this or was this a

16         template?

17   A.    Some of it comes from a template.

18   Q.    I'm going to guess and please correct me if I'm wrong,

19         that the sentence that I just read, you did not write.

20         Somebody wrote that for you?

21   A.    It came off a template.

22   Q.    Okay.  Did you actually have training, experience and

23         conversations with law enforcement personnel that have

24         familiarized you with the money laundering used to conceal

25         the nature of proceeds?

                                                                    28

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1   A.   Yes.

 2   Q.   Describe some, please.

 3   A.   A lot of drug dealers purchase carwashes and a lot of

 4        locations to where they could -- say they were bringing in

 5        more money, because it's all cash.  There's no receipts or

 6        any of that stuff, so that's a form of their money

 7        laundering.

 8   Q.   Okay.  Like, somebody will have a cash business of some

 9        sort, it only makes $1,000, he claims it makes $2,000

10        because it's all cash anyway, and therein he's able to

11        conceal

12        the --

13   A.   Proceeds.

14   Q.   -- funds that way?

15             MR. PADDINGTON:  Let him finish his question.

16             THE WITNESS:  Oh, sorry.

17             MR. PADDINGTON:  No, that's okay.

18   Q.   (By Mr. Radner)  What about storage and transportation of

19        narcotics.  What kind of things did you mean by that?

20   A.   In some operations, a person lived at one location, store

21        their drugs at another location and sell their drugs out

22        of another location.  That way, it could keep -- if one

23        location was to be raided, they try not to link it to the

24        other location.

25   Q.   Okay.  "I have received training and have collaborated
```

29

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1          with other law enforcement officers on investigations
 2          regarding the unlawful importation, possession and
 3          distribution of controlled substances."  What kind of
 4          trainings have you had in the unlawful importation of
 5          controlled substances?
 6   A.     It's different.  Just the normal trainings of when they
 7          talk about how the drugs get transported into Michigan
 8          from out-of-state, the county lines -- not county lines,
 9          just them using the freeway.  How to use -- sometimes they
10          use semi trucks to bring it in, stuff like that.
11   Q.     Okay.  So by importation, you mean into the state and
12          county, not into the United States of America?
13   A.     Yeah.
14   Q.     Got you.  "Affiant knows from his special training and
15          experience the following:  It is common in the purchase
16          and selling and distribution of controlled substances for
17          drug traffickers to front drugs (providing narcotics on
18          consignment) to several clients, causing large debts to be
19          incurred."  You know that through your training?
20   A.     Through training and talking to other officers, yeah.
21          That's -- yeah.
22   Q.     "Often these drugs/debts are paid for in installments,
23          over a period of time, and involve large amounts of
24          currency exchanging hands.  Because of the large amounts
25          of drugs and debts involved, and to prevent discrepancies,
```

30

Johnny Fox                                    Alonzo Bullman v. City of Detroit

1           it is necessary for records, such as, but not limited to,

2           papers, notes, ledgers, journals and logs, to be

3           maintained by these drug traffickers.  Frequently, these

4           records are kept for lengthy periods of time and concealed

5           where traffickers have ready access to them, i.e., homes,

6           garages, safety deposit boxes, offices and automobiles."

7                I want to skip ahead and ask you about the actual

8           raid of Mr. Castro's home.  Did you find any of the items

9           that you just described in this particular paragraph,

10          notes, papers, ledgers, logs?

11     A.   No, I did not.

12     Q.   Did you think you would beforehand, based on your training

13          and experience?

14     A.   I don't know.

15     Q.   You don't know if you thought you would find those things?

16     A.   You never know what you're going to find once you get in a

17          location.

18     Q.   "Drug traffickers commonly maintain address books and/or

19          telephone numbers in books, papers or electronic devices

20          that reflect the identity, addresses, pager number, email

21          address, telephone numbers, or other identifying

22          information for their criminal associates in the drug

23          trafficking organization, even if said items are in code."

24                Did you find any of those items or were any of those

25          items found during the raid of Mr. Castro's home?

31

Johnny Fox                                    Alonzo Bullman v. City of Detroit

1    A.    I didn't find anything, no.

2    Q.    Do you know if anybody else did?

3    A.    Not that I know of.

4    Q.    It would be in somebody's PCR, wouldn't it?

5    A.    Yeah.

6    Q.    And you reviewed the PCRs before coming today?

7    A.    I reviewed mine.

8    Q.    You only reviewed yours, not the other peoples?

9    A.    I didn't pay attention to other peoples.

10   Q.    "C.   That drug traffickers take or cause to be taken

11         photographs and/or videos of themselves, their associates,

12         their drug proceeds or assets derived from the sale of

13         controlled substances.  That these traffickers usually

14         maintain these photographs and/or videos in their

15         possession."  Did you find anything like that?

16   A.    No, I did not.

17   Q.    "On January 26, 2016, Affiant received complaint that

18         narcotics were being sold and stored at both 5437-5441

19         Springwells."  Who did you receive the complaint from?

20   A.    The front office.

21   Q.    Who?

22   A.    I can't remember exactly who.

23   Q.    How did the complaint come through?  Did somebody call

24         you, text you, email you, tell you about it at the

25         station?

32

Johnny Fox                    Alonzo Bullman v. City of Detroit

```
 1   A.   I'm unsure, if that is even -- I can't remember who told
 2        me or who printed it out or what, but it gave the address,
 3        both those addresses.
 4   Q.   It was a printout?
 5   A.   I can't remember if it was a printout or not, but it was
 6        these two addresses.
 7   Q.   When you receive a complaint like this, do you write
 8        anything down?
 9   A.   Yeah, you wrote down the address and what the drug was
10        supposed to be.
11   Q.   Would you write it in your daily activity log?
12   A.   No.  It was just on a separate sheet of paper.
13   Q.   A separate piece of paper that had this address on it?
14   A.   Yeah.
15   Q.   And that's a piece of paper that you wrote or that
16        somebody gave you?
17   A.   I can't remember.
18   Q.   Was it an official piece of paper or was it a little piece
19        of scratch paper?
20   A.   I can't remember.
21   Q.   Do you typically get these on scratch paper or on official
22        paper?
23   A.   Again, I'm not sure if I'm able to talk to you about those
24        complaints.
25   Q.   Was there anything out of the ordinary about this
```

33

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
1        complaint as opposed to the other numerous complaints that
2        I'm going to assume you get on a regular basis?
3   A.   No.
4   Q.   So typically, do you get these papers on some sort of
5        official 8 1/2 by 11 that says, Detroit Police Department
6        on it?  Do you get it on a piece of cut out looseleaf
7        paper?  Do you get it on a napkin that somebody jotted
8        down at Subway or something else?  Typically, what's
9        typical?
10  A.   Again, I'm unsure how the law goes for the anonymous
11       complaints that come in.
12            MR. PADDISON:  A point of clarification.  We already
13       addressed this with the Court.  I'm instructing you not to
14       reveal any information that potentially provides an
15       identification of the specific confidential informant.
16            Mr. Radner, I don't want to hijack your deposition,
17       but it's my understanding you're asking just not from the
18       informant itself, but from the Department what is the
19       process by which from the Department to you do you get the
20       complaint.  Mr. Radner, I --
21            MR. RADNER:  That is exactly what I'm asking.
22            THE WITNESS:  You get a printout of the complaint for
23       a certain area, Southwest Detroit.
24  Q.   (By Mr. Radner)  So it's not a Subway napkin.  It's an
25       actual print out that somebody gives you?
```

34

Johnny Fox                                    Alonzo Bullman v. City of Detroit

1    A.    No, no, but sometimes you write it down on a separate

2          piece of paper if you're only going to that certain

3          address.

4    Q.    But it starts with you getting a printout from somebody?

5    A.    Yes.

6    Q.    So when you wrote on paragraph three on January 26, 2016,

7          Affiant receives complaints, there is a printout somewhere

8          that says the substance of the complaint, true?

9    A.    Yes.

10   Q.    Let's continue.  "That narcotics are being sold and stored

11         at both 5437-5441 Springwells."  Now, based on your years

12         in law enforcement, particularly working on drug cases,

13         that information alone, if you would put that on an

14         affidavit and try to get a warrant, would you get a

15         warrant?

16   A.    No.

17   Q.    Why not?

18   A.    Because it's just a complaint.

19   Q.    Right.  Sometimes an anonymous complaint, right?

20   A.    It was in anonymous complaint.

21   Q.    And that's not enough, is it?

22   A.    No.

23   Q.    So to make sure that you have enough to get a warrant,

24         what would you do?

25   A.    Different --

35

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

1   Q.   Let's just talk typically for now.  Typically, you get a
2        complaint, you think there might be drugs there.  What's
3        your next step?
4   A.   You do surveillance or you attempt to purchase.
5   Q.   And the reason you do surveillance or attempt to purchase
6        is so that you can establish probable cause?
7   A.   Yes.
8   Q.   Because an anonymous complaint in of itself, based on your
9        years of experience, is insufficient to warrant probable
10       cause to the extent that you would get a search warrant,
11       true?
12  A.   Yes.
13  Q.   Okay.  Let's keep going.  "Affiant and crew members
14       working in conjunction with SOI 3030, who has been
15       utilized by crew members of the Major Violators section on
16       numerous occasions, resulting in the confiscations of
17       narcotics, narcotic paraphernalia, money, seizures and
18       firearms."  So SOI 3030 has pretty much proven to be
19       reliable, right?
20  A.   Yes.
21            MR. RADNER:  I'm going to ask questions about SOI
22       3030's involvement.
23            MR. PADDINGTON:  All right.
24            MR. RADNER:  I don't know if you are going to
25       instruct him not to answer.  What I would suggest to do is

36

Johnny Fox                          Alonzo Bullman v. City of Detroit

1    seal this part of the transcript, and then if I am, in
2    fact, in violation of the court order, then it will be
3    sealed.
4         MR. PADDISON:  My only concern there is that in so
5    responding, Officer Fox himself could be violating
6    state/and or federal laws.  My counterproposal, because I
7    know that you have your objection to the Magistrate's
8    order, is that we forgo this line of questioning and I
9    would stipulate to should the Magistrate's instructions
10   change, re-produce Mr. Fox for a continuing deposition on
11   those issues.
12        MR. RADNER:  Okay.  I think that pretty much goes
13   without saying, if my objections are sustained, but I'll
14   tell you what.  Let me try and if I step out of bounds,
15   obviously, you have to protect your client from violating
16   the court order, if I step out of bounds and you feel I am
17   violating the order, then we can address it at a later
18   date.
19        MR. PADDISON:  And, Officer Fox, during this line of
20   questioning, I'd ask that you pause and allow me to
21   process what Mr. Radner is asking you before responding.
22   Q.  (By Mr. Radner)  How long has SOI 3030 been providing the
23   major narcotics, the Major violator section information.
24        MR. PADDISON:  Officer Fox, I'm going to instruct you
25   not to answer that with any degree of specificity.  I

37

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1        think that that information could result in the identity
 2        of SOI 3030 being revealed.
 3   Q.   (By Mr. Radner)  Is SOI 3030 and elderly African-American
 4        gentleman?
 5             MR. PADDISON:  Same objection.
 6             I'll instruct you not to answer.
 7   Q.   (By Mr. Radner)  When you say he has been used on numerous
 8        occasions prior to January 27, 2016, what was the most
 9        recent occasion that SOI 3030 was utilized by crew members
10        resulting in the confiscation of narcotics or narcotic
11        paraphernalia or money seizures or firearms?
12             MR. PADDISON:  Same objection.
13             Instruct you not to answer.
14   Q.   (By Mr. Radner)  Would you agree with me that based only
15        on SOI 3030's information and statements, there would
16        still not be enough to get a warrant?
17             MR. PADDINGTON:  Speaking specifically to this case?
18             MR. RADNER:  Speaking specifically to this case.
19             MR. PADDISON:  You can answer that question.
20             THE WITNESS:  No.
21   Q.   (By Mr. Radner)  You would not agree with me?
22   A.   No.
23   Q.   I'm sorry.  You are answering, no, there would not be
24        enough to get a warrant?
25   A.   Yes, definitely.
```

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
1   Q.   And the reason for that, obviously, is, like you said
2        before, you have to be able to independently establish
3        probable cause, true?
4   A.   True.
5   Q.   Without relying on the credibility of the confidential
6        informant who I can't cross-examine, true?  If you have to
7        rely on the statements and credibility of a witness whose
8        identity is not going to be shared with me or with anybody
9        at any point in time, that would not be enough for a
10       warrant in your mind, true?
11  A.   True.
12  Q.   So you would have to, based on whatever information you
13       receive from the SOI and whatever other things you
14       observed with the SOI, you're going to have to have enough
15       independent knowledge to establish probable cause, true?
16  A.   True.
17  Q.   Okay.  Let's keep going.  "On January 26, 2016, Affiant
18       and crew member met with SOI 3030 to formulate a plan to
19       attempt to make a controlled purchase of narcotics from
20       5437-5441 Springwells.  Crew members searched SOI 3030 for
21       money and narcotics with negative results."  Why is it
22       that you search him for money and narcotics beforehand?
23            MR. PADDISON:  You can go ahead and answer.
24  Q.   (By Mr. Radner)  And this is just standard and I already
25       know the answer, but I'm going to ask it anyway.
```

                                                                39

Johnny Fox                    Alonzo Bullman v. City of Detroit

```
 1   A.   You search them to make sure they don't have no money on
 2        them, no drugs on them, because you are sending them to do
 3        a controlled buy.
 4   Q.   And part of a controlled buy is you have to know that he
 5        has no money and no narcotics, so that if you give him
 6        money or if he is found later with narcotics, and the only
 7        place he's been is at that subject's home, you obviously
 8        know that he got the narcotics from that person.  Is that
 9        pretty much accurate?
10   A.   Pretty much, yeah.
11   Q.   So you search him for money and narcotics and negative
12        results meaning he does not have any money or narcotics on
13        him?
14   A.   Yes.
15   Q.   "Crew members issued a sum of US currency to SOI 3030,
16        which to attempt to make a purchase."  I'm going to
17        assume, please correct me if I'm wrong, that you either
18        photographed the money, took pictures of the money,
19        photocopied the money or wrote down the serial numbers of
20        those funds.  Is that true?
21   A.   No.
22   Q.   Okay.  So you just gave him some currency.  Do you know
23        how much currency?
24   A.   I don't know remember how much we gave him to attempt to
25        buy that day.
```

40

Johnny Fox                                    Alonzo Bullman v. City of Detroit

1    Q.    Was at 20s or hundreds, do you know?

2    A.    I don't remember.

3    Q.    Then how would you know if you find currency in the

4          subject's home later, how would you know if they got that

5          currency from your SOI, or would you not know?

6    A.    You've got me confused here now.

7    Q.    Okay.  My understanding of a controlled buy is you think

8          there's drugs going on at somebody's house, so you do a

9          controlled buy, you go to a confidential informant of some

10         sort, you give them three hundred dollar bills, you write

11         down the serial numbers.  You then give it to that person,

12         he goes to the house, you watch him very carefully.  He

13         goes to the house, comes back with drugs that he did not

14         have on him five minutes ago.  You now know that he got

15         those drugs from that house.  You then search that house

16         and find three hundred dollar bills which match the three

17         serial numbers that you wrote down just moments before.

18         That pretty much conclusively proves what just happened.

19         Do you follow?

20   A.    You are explaining two separate types of actions.

21   Q.    Okay.  Please explain what is it that I just described.

22         My understanding is that I just described a controlled

23         buy.  Please explain what I just described is called.

24   A.    That is a controlled buy also, but normally, with that

25         type of controlled buy where you record the serial numbers

Johnny Fox                          Alonzo Bullman v. City of Detroit

1          of the money and how you basically said you make the buy,
2          the person comes out, gives the drugs and immediately
3          after you go in and search the location.  That's a
4          controlled buy normally with the police officer, where you
5          are also getting a delivery charge.
6    Q.    Okay.
7    A.    This was an SOI controlled buy, where we search the SOI,
8          issue him a sum of money, he goes directly to the location
9          and comes back directly to us either with the currency we
10         issued him or her or the narcotics that he or she
11         purchased at the location.
12   Q.    Got you.  "Affiant observed SOI 3030 go directly to 5437
13         Springwells and knock on the front door."  You observed
14         that yourself?
15   A.    Yes.
16   Q.    Who else was doing surveillance with you, if anybody?
17   A.    Officer Hurd.
18            MR. PADDINGTON:  Are you talking about the
19         surveillance or are you talking about the controlled buy?
20         I think you used the terms interchangeably there.
21   Q.    (By Mr. Radner)  Okay.  Let's clarify that.  How many
22         times did you surveille at 5437-5441 Springwells in any
23         way?
24   A.    Before the attempted controlled buy or after?  Because you
25         are jumping all over the place now.

                                                                    42

Johnny Fox                          Alonzo Bullman v. City of Detroit

1    Q.   I see.  Okay.  Paragraph five you go to the fixed
2         surveillance and over here we are dealing with the
3         controlled buy.  Okay.  So let's talk about this
4         controlled buy.  Who else was there when you tried to do
5         the controlled buy?
6    A.   Officer Hurd.
7    Q.   Was he right next to you the whole time?  Were you guys on
8         different street corners?  How close in proximity were you
9         to each other for the duration of this attempted
10        controlled buy?  Without, I'm sure you can answer that
11        without telling me too much detail about how these are
12        done.
13             MR. PADDISON:  I'm going to instruct you not to
14        answer to the extent that doing so could endanger police
15        procedures during the course of surveillance.  Subject to
16        that objection, you can go ahead and answer.
17             THE WITNESS:  He was with me in the vehicle.
18   Q.   (By Mr. Radner)  The entire time?
19   A.   Yes.
20   Q.   Was he also watching SOI 3030 or was he busy on a
21        computer, playing on his phone, watching a movie?
22             MR. PADDISON:  Objection, calls for speculation.
23             You can answer.
24   Q.   (By Mr. Radner)  If you saw what he was doing.  Did you
25        watch him?

43

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   He was supposed to be watching -- we were both watching,
 2        but also watching around us.
 3   Q.   "Above described seller opened the door and had a brief
 4        conversation with SOI 3030." You watched that
 5        conversation?
 6   A.   I looked over, I saw the SOI speaking with who I believed
 7        to be the seller.
 8   Q.   When you say above described seller, I don't see a seller
 9        described above. Is there a seller described above
10        somewhere?
11   A.   Yes. On the first page, search warrant and affidavit.
12        This page.
13   Q.   Can I see that, please?
14            Okay. This is the actual warrant part, right?
15   A.   Yeah.
16   Q.   The affidavit comes first, doesn't it?
17   A.   No. It's the first page, second page and third page.
18   Q.   So when you signed this affidavit, when you wrote, above
19        seller, above described seller, you were referring to the
20        above described seller that's in the actual warrant part
21        that the Judge signed?
22   A.   Yes.
23   Q.   I'm just going to take a look at this. I'm not trying to
24        be tricky. It's kind of long. Ah, here we go. Also to
25        be searched is white male, 18 to 22, five-nine, 150
```

44

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1         pounds.  That's the above described seller?
 2   A.    Yes.
 3   Q.    Is that a person that you subsequently determined to be
 4         Joel Castro?
 5   A.    No.
 6   Q.    So the above described seller ultimately was not at this
 7         location?
 8   A.    Yes, the above described seller, who I believed the above
 9         described seller was at the location.
10   Q.    And who was that?
11   A.    The Bullman guy.
12   Q.    The Bullman guy.  So the Bullman guy was probably arrested
13         and charged with a crime at some point?
14   A.    No.
15   Q.    So when you watched this above described seller opened the
16         door, the above described seller was the Bullman guy, not
17         Joel Castro?
18   A.    Yes.
19   Q.    Okay.  So the above described seller, the Bullman guy,
20         opened the door and had a brief conversation with
21         SOI 3030.  SOI 3030 then returned to affiant and stated
22         the above seller would not sell to him due to not knowing
23         him.  Any reason to think that SOI 3030 was being
24         untruthful to you?
25   A.    No.
```

45

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   Q.   "SOI 3030 also stated that the seller had a large sandwich
 2        bag containing a large amount of marijuana zip locked in
 3        his hands when he opened the door."  I want to ask you
 4        something about this.  You've been doing narcotic work for
 5        a long time, right?
 6   A.   Uh-huh.
 7            MR. PADDINGTON:  Is that a yes?
 8            THE WITNESS:  Yes.
 9   Q.   (By Mr. Radner)  I'm going to assume that you been
10        involved in hundreds of narcotics operations, true?
11   A.   You could say hundreds, yeah.  I don't know if it's up to
12        that many precisely, but a lot.
13   Q.   If a drug dealer came to the door without knowing who was
14        at the door, holding a large sandwich bag containing a
15        large amount of marijuana zip locks in his hand, isn't
16        that a great way to get killed?
17   A.   They do it all the time.
18   Q.   They do it all the time?
19   A.   Yeah.
20   Q.   So you've actually seen this before?
21   A.   Yes.
22   Q.   Where somebody will come to the door, holding this large
23        sandwich bag containing large amounts of zip lock bags of
24        marijuana when he opens the door not knowing who is there?
25   A.   Yes.
```

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   Q.   Not knowing if it's a police officer, not knowing if it's
 2        the mailman, not knowing if it's a nanny looking for a
 3        different address?
 4   A.   Yes.
 5             MR. PADDINGTON:  Objection, calls for speculation.
 6        He's unable to testify if they know who's at the door.
 7        There are peepholes, there are windows in doors.
 8   Q.   (By Mr. Radner)  Would you agree with me that they have no
 9        way of knowing that this was SOI 3030 coming to the door,
10        that you know of?
11   A.   I can agree with that.
12   Q.   Neither you nor Nico Hurd warned Bullman or Castro that
13        SOI 3030 was going to be coming to buy some drugs, did
14        you?
15   A.   No.
16   Q.   So he comes to the door with a large amount of drugs in
17        his hand, right?
18   A.   A sandwich bag, with --
19   Q.   Right.  That's what SOI 3030 tells you?
20   A.   Yes.
21   Q.   And you believed him?
22   A.   Yes.
23   Q.   Now, you wrote that you saw them having a conversation.
24        You did not write that you saw this above described seller
25        holding a large bag, right?
```

47

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   Yes.
 2   Q.   Is that because you didn't actually see him holding that
 3        bag?
 4   A.   Yes.
 5   Q.   You did see him holding the bag?
 6   A.   No, I didn't see him holding.
 7   Q.   You did not see him holding the bag?
 8   A.   From my angle, I didn't see it, no.
 9   Q.   Were you seeing him from his right, his left or dead on?
10   A.   I don't want to say where I was that exactly, because that
11        could -- no.
12   Q.   Were you able to see the seller at all?
13   A.   Yes.
14   Q.   Were you able to see his hands?
15   A.   I don't remember.
16   Q.   Were you able to see his face?
17   A.   I don't remember.
18   Q.   Were you able to see his body?
19   A.   Part of it.
20   Q.   What part of it?
21   A.   I believe his, like, torso.
22   Q.   You were able to see his torso but not his face?
23   A.   Yeah, from where I was at.
24   Q.   So how do you know that he was this Bullman guy and not
25        Castro?
```

48

Johnny Fox                          Alonzo Bullman v. City of Detroit

1    A.    When the source described him to me, also.

2    Q.    Oh, so when you wrote above described seller opened the
3          door, that's based on something that the SOI told you?

4    A.    Also what I observed.

5    Q.    But you didn't observe the above described seller's face,
6          right?

7    A.    Right at that time, no.

8    Q.    So you didn't know that it was the above described seller
9          who opened the door until SOI 3030 told you, right?

10   A.    Yes.

11   Q.    Because you were only able to see the above described
12         seller's torso?

13   A.    Yes.

14   Q.    And I'm just assuming right now that if he's holding this
15         bag, do you know, did SOI 3030 tell you where the above
16         described seller was holding the bag?  In other words, was
17         he holding it at his side, on his head, on his shoulder,
18         behind his back?  Did he describe to you at all where he
19         was holding it?

20   A.    I remember him saying he was holding it in his hand.

21   Q.    In his hands in front of his body, behind his body, to the
22         side of his body?

23   A.    I didn't ask him that.

24   Q.    If he would've been holding it in front of his body, if he
25         would've said, oh, he was holding a bag like this, and

Johnny Fox                          Alonzo Bullman v. City of Detroit

1        just for the record, I'm holding my hands in front of my
2        stomach, you would have known that he was lying, because
3        you were able to see the torso and you did not see a bag
4        of narcotics, true?
5            Let me describe that again.  Just for the record, I
6        am holding my hands in front of my stomach right now.
7        Now, I am even holding my coffee cup in front of my
8        stomach right now to the extent that it's blocking part of
9        my tie, do you see that?
10   A.   Uh-huh.
11           MR. PADDINGTON:  Is that a yes?
12           THE WITNESS:  Yes.
13   Q.   (By Mr. Radner)  If the above described seller was holding
14        the bag of marijuana like this, the way I'm holding this
15        coffee cup, you would have seen it from your vantage
16        point, wouldn't you have, because you saw his torso?
17   A.   I saw part of his torso, but no, because SOI 3030 was also
18        in front of the person there at the doorway.
19   Q.   Oh, okay.  I think you just told us that you were looking
20        at him dead on, because the SOI was blocking your view of
21        the above described seller's torso.  Am I
22        misunderstanding?
23   A.   Yes, you are.  Because there's various angles you can see
24        a person.
25           MR. RADNER:  And, Mr. Patterson, you are not going to

American Reporting, Inc.
248-559-6750

Johnny Fox                           Alonzo Bullman v. City of Detroit

1          let him describe the angle that he saw?
2               MR. PADDISON:  No.  I believe it could jeopardize
3          police protocols as far as doing drug investigations.
4               MR. RADNER:  I'd stipulate to putting this part of
5          the transcript under seal.  I don't believe the court
6          order limits me from asking this question.
7               MR. PADDISON:  I'd still instruct him not to answer.
8          If we needed to, we can continue, we can take it to the
9          Court, obviously.  We've got some time, so --
10              MR. RADNER:  I'm not asking about protocol.  I'm
11         asking about what he observed.  I'm not even asking him
12         about the identity of SOI 3030.  I simply asked about what
13         he observed.
14              MR. PADDISON:  And he indicated what he observed.  He
15         testified he observed part of the seller's torso and that
16         part of his view of the seller was blocked because the SOI
17         was obstructing his view.
18              MR. RADNER:  Okay.  But just so the record is very
19         clear, you are not going to let him describe the angle
20         that he saw this buy from, if it was from the right, from
21         the left, from the center, or will you?
22              MR. PADDINGTON:  To the extent that it could
23         jeopardize police procedures in conducting these
24         investigations, I am instructing him not to answer.
25              To the extent that it does not jeopardize those

American Reporting, Inc.
248-559-6750

Johnny Fox                    Alonzo Bullman v. City of Detroit

```
 1        procedures, you may answer.
 2   Q.   (By Mr. Radner)  So I want to know, please, the angle that
 3        you saw the above described seller from.  Was it from his
 4        right, from his left or dead on?
 5   A.   I'm not going to answer that due to jeopardizing UC,
 6        undercover stuff.
 7   Q.   Okay.  "SOI 3030 then returned to the Affiant and stated
 8        the above seller would not sell to him do to not knowing
 9        him.  SOI 3030 also stated he had a large amount of
10        marijuana when he opened the door."  Now, again, you never
11        saw the marijuana, right?
12   A.   No.
13   Q.   I mean, what I am saying is true, you never saw the
14        marijuana, true?
15   A.   I never saw it, no.
16   Q.   And Nico Hurd never told you that he saw the marijuana,
17        did he?
18            MR. PADDISON:  Objection, calls for speculation as to
19        what Nico Hurd saw.  You can testify as to what Nico Hurd
20        told you.
21   Q.   (By Mr. Radner)  That's all I'm asking you.
22   A.   I don't remember.
23   Q.   You obviously didn't include in your affidavit, I didn't
24        see any marijuana, but Nico Hurd told me that he saw
25        marijuana, right?
```

52

Johnny Fox                           Alonzo Bullman v. City of Detroit

1    A.    I didn't include that in my affidavit, no.
2    Q.    "Affiant then observed the seller exit 5437 Springwells,
3          enter 5441 Springwells, and then returned to 5437
4          Springwells."  Now, this is something you observed.  Now,
5          you wrote the seller without saying the above described
6          seller or above seller.  Is it the same person?
7    A.    Who I believed to be the seller, yes.
8    Q.    So this is the Bullman guy, not Castro, right?
9    A.    Yes.
10   Q.    "Affiant is aware through training and experience that
11         narcotics sellers will often not sell to people they do
12         not know in order to avoid detection by law enforcement."
13         What is the point of that sentence?
14   A.    It's letting you know sometimes they don't sell -- a lot
15         of sellers, if they don't know you, if you're not their
16         normal customer, if you are not brought to them by their
17         normal customer, they won't sell narcotics to you.
18   Q.    Did you do any investigation at all into whether or not
19         this home potentially was licensed through the State of
20         Michigan for medical marijuana?
21   A.    No, I did not and I did not observe any -- I believe with
22         the licensing for medical marijuana, you have to have
23         signs posted.  I did not observe none of those signs
24         posted outside the location.
25   Q.    So you've actually received some sort of training in this

53

Johnny Fox                                    Alonzo Bullman v. City of Detroit

1           or this is something you know from your own experience?
2    A.    They provided us with some training, and from speaking
3          with other officers, speaking with prosecutors and from
4          experience of going through different stuff.
5    Q.    I'm going to skip ahead for a moment.  Are you aware that
6          Mr. Castro was charged with a crime?
7    A.    Yes.
8    Q.    Were you aware that the crime was subsequently dismissed?
9    A.    Yes.
10   Q.    Are you aware that I represented Mr. Castro in the case?
11   A.    Uh-huh.
12   Q.    You are?
13   A.    You just told me.
14   Q.    Oh, so prior to me telling you, you did not know?
15   A.    I don't remember.
16   Q.    I filed a motion saying that -- well, I filed three
17         motions, but the motion that was granted was the motion to
18         dismiss based on the Medical Marijuana Act.  Did you know
19         that before today?
20   A.    Yes.
21   Q.    How did you know that?
22   A.    Because I asked the prosecutor why was it dismissed.
23   Q.    And how did you know it was dismissed?
24   A.    Because we never got Court on it and we are being sued on
25         it.

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   Q.   Okay.  So when you got sued on it, that's when you learned
 2        it had been dismissed?
 3   A.   Yes.
 4   Q.   So you called the prosecutor.  You spoke to Mr. Cook?
 5   A.   Yes.
 6   Q.   What did Mr. Cook tell you?
 7   A.   That the Judge said something, I can't remember.
 8   Q.   Mr. Cook was asked by the Court -- I'm going to ask you if
 9        you know this and then I'll show you the transcript.
10        Mr. Cook was asked by the Court, does the extent of the
11        defendant's permission under the Medical Marijuana Act
12        encompass the particular facts of this case?  And
13        Mr. Cook's answer was, it does, Your Honor, and I was
14        shown documentation this morning indicating that the
15        defendant is a registered caregiver for two patients and
16        based on my understanding of the Michigan Medical
17        Marijuana Act, he would have been entitled to have at
18        least the possession of 36 plants.
19             Did you know that the prosecutor said that?
20   A.   No, I did not know that.
21   Q.   Does it surprise you that the prosecutor was admitting
22        that the defendant's permission under the medical
23        marijuana act encompassed the particular facts of this
24        case?
25   A.   He's speaking of how many plants your client was allowed,
```

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1        but also, the law does state they have to be separated by
 2        each patient.
 3   Q.   Now, I am going to show you the transcript, because I just
 4        told you a moment ago I would, and I don't have any
 5        questions, but I promised I would show it to you, so I'm
 6        going to.  This is the transcript of Monday, May 23, 2016,
 7        People of the State of Michigan versus Joel Castro, case
 8        number 16-2194 in front of the Honorable
 9        Catherine L. Heise, and it's page four.  I didn't want you
10        to think that I was misleading you.  You can take a minute
11        to read that, if you want, and if there's anything you
12        want to clarify, I will let you, otherwise I will proceed
13        when you're ready.
14   A.   Okay.
15   Q.   All right.  Now, I don't have any additional questions
16        about that, but obviously, there was nothing said by the
17        prosecutor about this sign thing that you are telling me,
18        right?
19   A.   Uh-huh.
20   Q.   Is that a yes?
21   A.   It's yes, but there are also -- okay.
22   Q.   Did you ask Mr. Cook, hey, wait.  There was no sign.  He
23        violated the law.  Why did you let it get dismissed?
24   A.   No, I didn't ask Mr. Cook that.
25   Q.   Why not?
```

56

Johnny Fox                          Alonzo Bullman v. City of Detroit

 1    A.    Because I didn't ask Mr. Cook that.

 2    Q.    Were you upset that you were getting sued?

 3    A.    No.

 4    Q.    Have you been sued many times in the past?

 5          MR. PADDINGTON:  Objection, relevance.

 6          Go ahead and answer.

 7          THE WITNESS:  I've been sued previously, yes.

 8    Q.    (By Mr. Radner)  More than 10 times?

 9    A.    How many?

10    Q.    More than 10 times.

11          MR. PADDINGTON:  Ongoing.

12          Go ahead and answer.

13          THE WITNESS:  No.

14    Q.    (By Mr. Radner)  Were you sued in your capacity as a

15          Detroit Police Department officer?

16    A.    Yes.

17    Q.    Did you ever go to trial on any of your cases?

18    A.    No.

19    Q.    Now, what you just wrote was that this took place on

20          January 26, 2016, that you attempted this controlled buy?

21    A.    Yes.

22    Q.    Moving on to the second page, which is marked as Exhibit

23          13, also dated 5-17-17 is paragraph five.  "On January 26,

24          2016, Affiant set up a fixed surveillance at 5437-5441

25          Springwells for approximately 45 minutes."  Now, this

57

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1        would have been subsequent to this attempted controlled
 2        buy?
 3    A.  What do you mean?  After?
 4    Q.  Yeah.  Not at the same time.
 5    A.  Yes.
 6    Q.  So first you tried the controlled buy and that didn't
 7        work.  I would imagine at that point in time you let
 8        SOI 3030 go wherever it is that he or she goes when he or
 9        she is not working with you guys?
10    A.  Uh-huh.
11    Q.  Is that a yes?
12    A.  Yes.
13    Q.  And then you returned to 5437-5441 Springwells?
14    A.  Yes.
15    Q.  How long did the attempted controlled buy last?  How long
16        were you in front of the home during the attempted
17        controlled buy?
18    A.  I was about four to five minutes.
19    Q.  Forty-five minutes?
20    A.  Four to five minutes.
21    Q.  Four to five minutes, okay.  Whenever I hear that, I'm
22        never sure if it's 45 or four to five, so --
23    A.  I'm estimating four to five minutes.
24    Q.  Okay.  A few minutes.  How long were you away from the
25        address before you came back?
```

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   I don't remember.
 2   Q.   An hour, two hours, five hours?  Any idea at all?
 3   A.   I don't remember.
 4   Q.   Where did you go in between?  Did you go back to the
 5        station, did you go somewhere else?  Actually, I don't
 6        want you to give anything away.  Let me just ask you this.
 7        Did you go back to the station?
 8   A.   Eventually, yes.
 9   Q.   Before you set up the fixed surveillance?  That's what I'm
10        asking.  I'm asking between this attempted controlled buy
11        and the fixed surveillance, did you return to the police
12        station?
13   A.   I don't remember.
14   Q.   Did you discuss the matter with anybody?
15   A.   I discussed it with Officer Hurd.
16   Q.   And did the two of you decide maybe fixed surveillance
17        should be set up?
18   A.   Yeah, I told him I was going to watch the house some more.
19   Q.   Did the two of you go back together or did you go by
20        yourself?
21   A.   I went by myself.
22   Q.   And this time, in only 45 minutes, you observed what you
23        believed were two illegal drug transactions, true?
24   A.   Yes.
25   Q.   Now, 45 minutes, two transactions.  Isn't that a lot?
```

59

Johnny Fox                           Alonzo Bullman v. City of Detroit

```
 1   A.   It varies.  Some places you could be out there 10 minutes
 2        and see four or five deals.  Sometimes it could be hours.
 3        Different locations.
 4   Q.   When you conducted this surveillance, you were able to,
 5        wherever it was your positioned, you were able to see the
 6        door of the house clearly?
 7   A.   I was able to see the location, yes.
 8   Q.   Were you able to see the door?
 9   A.   See where the door is, yes.
10   Q.   Were you able to see the surveillance cameras above the
11        door?
12   A.   No.
13   Q.   Do you know that there were surveillance cameras there?
14   A.   No.
15   Q.   Still sitting here today, you don't know about the
16        surveillance cameras?
17   A.   From what I'm hearing, there was, but I'm not sure.
18   Q.   Somehow, most of them stopped recording within seconds of
19        you guys arriving.  Any idea how that happened?
20             MR. PADDINGTON:  Objection, foundation.  Calls for
21        speculation.
22             Go ahead and answer, if you know.
23             THE WITNESS:  I didn't disconnect them.
24   Q.   (By Mr. Radner)  Did you see anybody else disconnect them?
25   A.   No.
```

                                                              60

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   Q.   Did you see anybody smash them?
 2   A.   No.
 3   Q.   Did you see anybody snip the wires?
 4   A.   No.
 5   Q.   Did you see anybody do any action that would prevent them
 6        from recording?
 7   A.   No.
 8   Q.   Have you reviewed the surveillance footage?
 9   A.   I saw a snippet, but that's it.
10   Q.   "Affiant observed two white males arrive at 5437
11        Springwells independently and separate of each other.
12        Both white males arrived on foot.  One white male was
13        wearing a blue sweater and blue jeans and the other white
14        male was any other white male was wearing a red jacket and
15        blue jeans."  Take any pictures?
16   A.   No.
17   Q.   Why not?
18   A.   Are you serious?
19   Q.   I mean, you are laughing, but why?  Because now I'm
20        questioning whether this happened.  I want to explain why
21        I'm asking you that.  I'm sitting here cross-examining you
22        because there is testimony that disagrees with your
23        testimony, that contradicts your testimony.  If you would
24        have pictures of these things, then obviously the
25        testimony that I have for my client would be proven false.
```

61

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1        So what I'm asking you is, and please don't laugh and
 2        answer seriously, why didn't you take any pictures or
 3        video?
 4   A.   Taking pictures or video would just be -- you just can't
 5        do it with being in close surveillance.  Somebody would
 6        see you with a camera.  That would jeopardize my safety.
 7   Q.   Have you ever seen any hidden cameras that don't look like
 8        cameras?
 9   A.   Yes.
10   Q.   Have you ever seen cameras that look like key chains,
11        lighters, cans of Pepsi?
12   A.   No, I haven't seen those.
13   Q.   Are you aware that those exist?
14   A.   It's possible, but I haven't seen it.
15   Q.   Have you ever heard of Spy King or Spy Ops, whatever that
16        store is on Southfield Road?
17   A.   I've heard of it, but I've never been to it.
18   Q.   "Affiant observed the described buyers walk up to the
19        front door and knock.  They were both let inside the
20        location, then this seller..."  The seller is who?
21   A.   White male.  The 18 to 22,five-nine, that's who I believed
22        it to be.
23   Q.   Not Castro, that's the Bullman guy, right?
24   A.   I believe the Bullman guy.
25   Q.   Not Castro.  Castro is not white, is he?
```

62

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1    A.    No.
 2    Q.    This is going to sound horrible, but he's brown, for lack
 3          of a better term?
 4    A.    He's Puerto Rican.
 5    Q.    He's Puerto Rican, okay.  So you would not call him white?
 6    A.    No.
 7    Q.    "Affiant observed the described buyers walk up to the
 8          front door and knock.  They were both let inside location,
 9          then the seller would walk out of 5437 Springwells, enter
10          5411 Springwells..."  Which was upstairs, right?
11    A.    It was the other door, yes.
12    Q.    The upstairs door?
13    A.    There was a door to the right.  Eventually it came out
14          that that's the upstairs door, but at that time I didn't
15          know if it was upstairs or downstairs.
16    Q.    "... and then returned to 5437 Springwells, then after 30
17          seconds to a minute, the buyers would exit the location
18          and leave on foot."  And this was two white males?
19    A.    Yes.
20    Q.    Not Arabic or Puerto Rican?
21    A.    I thought they were white males.
22    Q.    Can I ask you if you describe yourself as white male or
23          something else?
24    A.    Something else.
25    Q.    Can I ask you what that is?
```

Johnny Fox                        Alonzo Bullman v. City of Detroit

```
 1    A.   Mixed male.

 2    Q.   Mixed male, okay.  These people that you saw were not

 3         mixed male, they were white males?

 4    A.   From the distance I was at, I thought them to be white

 5         males.

 6    Q.   And you were able to see them clearly?

 7    A.   Clear enough for me to get an observation where I believed

 8         they were white males.

 9    Q.   "With Affiant's experience in prior purchases of

10         narcotics, believes that the activity observed at

11         5437-5441 Springwells was consistent with narcotic

12         trafficking."  Now, you did not arrest either of those two

13         white males as they left the location, did you?

14    A.   No.

15    Q.   You did not ever see them holding any narcotics, did you?

16    A.   No.

17    Q.   You did not see any transaction, did you?

18    A.   No.

19    Q.   You did not ever at any point see any marijuana there,

20         true?

21    A.   True.

22    Q.   The only person who ever saw any marijuana for purposes of

23         this warrant in this affidavit would have been SOI 3030,

24         right?

25    A.   True.
```

Johnny Fox                          Alonzo Bullman v. City of Detroit

1    Q.   Now, you and I were talking earlier today about how if the
2         statements of an SOI or confidential informant would need
3         to be relied upon to obtain a search warrant, then that
4         search warrant should not be granted.  Do you remember
5         that conversation that we had?
6    A.   Yes.
7    Q.   Now, based on what I have in front of me right here, you
8         at no point ever, based on your own information without
9         the SOI's information, had any first-hand knowledge that
10        there was any narcotic activity taking place in this
11        house, true?  Based on your own first-hand knowledge
12        without the SOI's knowledge, without what the SOI told
13        you.
14   A.   Without what the SOI told me I would still believe there
15        was narcotics going on, due to the complaint that I
16        received and my observations.
17   Q.   So again, with the complaint that you received, we talked
18        about this earlier today and you told me you did not think
19        that that was enough and that's why you did the
20        surveillance, true?
21   A.   True.
22   Q.   So what I'm asking you now is without that complaint and
23        without the SOI, in other words, based only on what you
24        observed with your eyes, you did not have enough
25        information to get a warrant, did you, based on your

                                                              65

Johnny Fox                                        Alonzo Bullman v. City of Detroit

```
1        understanding?
2             MR. PADDISON:  Objection, calls for speculation.  He
3        said on the issuance of warrants he answered to the best
4        of his ability.
5             THE WITNESS:  Without the complaint?
6    Q.  (By Mr. Radner)  Without the complaint.
7    A.  I would have never been over in that area.
8    Q.  Here's my question to you:  You told me earlier that the
9        complaint was not enough, in your opinion, right?
10   A.  Yes.
11   Q.  You also told me that in order to get a warrant, you need
12       to have your own observations that establish probable
13       cause of some illegal activity, true?
14   A.  True.
15   Q.  And that if we have to rely on the statements of the
16       confidential informant, that that would not be sufficient,
17       true?
18   A.  True.
19   Q.  Now looking at this warrant, if we disregard the
20       complaint, which was anonymous, and we disregard the SOI's
21       statements to you, how in the world do you believe that
22       there's any narcotic activity taking place at this
23       location?
24   A.  I would've had to do more surveillance.
25   Q.  So you agree with me that if we get rid of the SOI 3030's
```

66

Johnny Fox                          Alonzo Bullman v. City of Detroit

1       statements to you and the anonymous complaint that you
2       received, that you would not have any idea that there was
3       any narcotic activity taking place at this location, true?
4    A. Yeah.  I would've never been there if it wasn't for the
5       complaint.
6    Q. Now, I have over here some daily activity logs from
7       1-27-2016.  Three pages.  What was your shift on January
8       26?
9    A. January 26, I don't remember.
10   Q. Was it a day shift, a night shift, a 24-hour shift?
11   A. I don't remember.
12   Q. Do you ever do 24-hour shifts?
13   A. No.
14   Q. So if you were working January 26 and January 27 in the
15      afternoons, it was not one straight shift?
16   A. No, the 26th is the 26th and the 27th is the 27th.
17   Q. So if I have over here daily activity logs from January
18      27, this is not the daily activity log that would have the
19      mention of the surveillance that you did, right?  Or of
20      the controlled buy that you did?
21   A. No.
22   Q. There would be separate daily activity logs for your
23      January 26, 2016, activities which included the attempted
24      controlled buy and the surveillance, true?
25   A. Yes.

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

1              MR. RADNER:  Now, Mr. Paddison, I will indicate on
2       the record that I have searched my files somewhat
3       extensively and I don't have any activity logs from
4       January 26, 2016.
5              MR. PADDINGTON:  Okay.  I will take a look and see if
6       we can't locate those.
7              MR. RADNER:  Thank you.
8              MR. RADNER:  Can I have a sticker here?  In fact, let
9       me have three.  We are going to go a little crazy here,
10       just so we are very clear about what is what.
11  Q.   (By Mr. Radner)  All right.  I have over here daily
12       activity logs from January 27, 2016, three pages.  I am
13       going to mark the first page Number 1, the second page
14       Number 2 and the third page, no surprises here, Number 3.
15              (Whereupon Deposition Exhibit Numbers 1, 2 and 3 were
16               marked for identification.)
17  Q.   (By Mr. Radner)  I'm going to hand you these daily
18       activity logs and ask you to take a look at them for a
19       moment.
20  A.   Okay.
21  Q.   Now, obviously, there were some daily activity logs that I
22       believe you indicated you wrote based on the attempted
23       controlled buy and fixed surveillance that you did on
24       January 26, 2016.  Did I understand that correctly?
25  A.   Can you repeat that?

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1    Q.    If I understand your earlier testimony correctly, there
 2          were some daily activity logs from January 26, 2016, that
 3          would've encompassed your attempted controlled buy with
 4          SOI 3030, as well as your surveillance?
 5    A.    It should be, yes.
 6    Q.    And you actually typed it up?
 7    A.    No, I didn't type -- I don't believe I did the run sheet
 8          on the 26th.
 9    Q.    Well, you were the only one who did the surveillance,
10          didn't you?
11    A.    Yeah.
12    Q.    So who else would have typed it up?
13    A.    The run sheet?
14    Q.    The daily activity logs.
15    A.    It varies day by day who types the activity logs.
16    Q.    If you do activity, somebody else would write the activity
17          log?
18    A.    Sometimes, if I'm doing it off-duty, something like that,
19          it varies.
20    Q.    Aren't you supposed to write your own daily activity logs
21          if you do something without anybody else?
22    A.    It varies sometimes.
23    Q.    Okay.  Explain to me in what situation it would be proper
24          for you to do something on your own such as a fixed
25          surveillance at this location on January 25, 2016, and for
```

69

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1        you to not write your own activity logs.
 2   A.   If I notify my crew that I'm doing the surveillance at
 3        this location, this is a crew run sheet, it's a crew
 4        activity log, and it can document PO Fox surveillance
 5        here.
 6   Q.   So you would've told somebody else to do the daily
 7        activity log?
 8   A.   Somebody does the daily activity log every day.
 9   Q.   It's assigned?
10   A.   No, it's not assigned.  Somebody does it.
11   Q.   And what if everybody thinks somebody else is going to do
12        it?  Would that be something that's discussed?  Does
13        somebody say, all right, I will do the daily activity log?
14        I pulled the short straw today.  I've got to do the daily
15        activity logs.  How does it work?
16   A.   It varies.  One day I will do it, another day Officer Hurd
17        will do it and another day Officer Galloway would do it.
18        It varies.
19   Q.   There's no policy, procedure and protocol in place, as far
20        she know, that requires any particular person to write
21        daily activity logs?
22   A.   I know it has to be done every -- daily.  I'm not sure of
23        who has to do it daily, but it has to be done daily.
24   Q.   Was it done on January 26, 2016?
25   A.   I believe so, yes.
```

                                                              70

Johnny Fox                          Alonzo Bullman v. City of Detroit

1   Q.   Why is it that you believe so?

2   A.   Because one is done daily.

3   Q.   So one is done every day as a matter of practice?

4   A.   Yes.

5   Q.   You just don't know who did it, but somebody definitely

6        did it?

7   A.   Yes.

8   Q.   And whoever it is that would've done this, you would've

9        told them, hey, I did 45 minutes of surveillance at this

10       address at Springwells?

11  A.   I would have said I did surveillance over here.

12  Q.   Is this something that's typed up with, you know,

13       everybody around the computer talking about what they did

14       during the day or is this something that you'll tell the

15       person, I did some surveillance and he'll jot it down and

16       then later on do the paperwork or something else, perhaps?

17  A.   It varies.  I can't tell you what happened this day or

18       that day.

19  Q.   But it's your job to make sure that whoever it is that's

20       doing the daily activity logs on January 26, 2016, knows

21       about the surveillance that you did, true?

22  A.   Yes.

23  Q.   And knows about the attempted controlled buy that you did

24       with SOI 3030 and Nico Hurd, true?

25  A.   Yes.

71

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1    Q.    And you would have done that in this case, true?
 2    A.    Yes.
 3                MR. RADNER:  It's probably a good time to take a
 4          quick little break.
 5                (Brief recess.)
 6    Q.    (By Mr. Radner)  Let's talk about what happened the
 7          following day, January 27, 2016, the day of the raid.  You
 8          were present for the raid?
 9    A.    Yes.
10    Q.    Was there a meeting beforehand?
11    A.    You brief the crew on the location you're going.
12    Q.    Who was at the briefing?
13    A.    Everybody that was involved with the raid.
14    Q.    Who did the actual briefing, was it you, Hurd?
15    A.    I did.
16    Q.    What did you tell them?
17    A.    I gave them a description of the house and a description
18          of the possible seller.
19    Q.    And you described the Bullman guy, not Castro?
20    A.    Yes.
21    Q.    Let's skip ahead for a minute.  When you got there, both
22          Castro and the Bullman guy were there, right?
23    A.    Yes.
24    Q.    Which was arrested?
25    A.    Castro.
```

72

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1   Q.   He was charged with a felony?
 2   A.   Yes.
 3   Q.   Why was Bullman not arrested?
 4   A.   Castro claimed possession of the marijuana.
 5   Q.   But you personally observed the Bullman guy do the sale,
 6        didn't you?
 7            MR. PADDINGTON:   Objection, mischaracterizes his
 8        testimony.
 9            MR. RADNER:   I'll rephrase the question.
10   Q.   (By Mr. Radner)  Did you not personally observe the day
11        before the Bullman guy conducting narcotic sales?
12   A.   What I believed to be possible -- conducting what I
13        believed to be possible narcotics sales, yes.  I believed
14        it to be Bullman.
15   Q.   Why did you not arrest Bullman?
16   A.   Due to the fact that immediately Castro claimed possession
17        of the marijuana.
18   Q.   So even though you personally observed Bullman do these
19        alleged sales, since Castro claimed ownership, rather than
20        arrest both, you decided to not arrest Bullman at all.  Do
21        I understand it correctly?
22   A.   My observation was of Bullman.  I didn't see him hand
23        anybody marijuana or something like that, so it was inside
24        the house.  I can't say he did the transaction, but that's
25        why I believed the seller to be.
```

73

Johnny Fox                          Alonzo Bullman v. City of Detroit

1    Q.    When we were talking about your experience, one of the
2          things that you mentioned, if I recall correctly, was that
3          sometimes sellers will have other people sell their drugs
4          for them.  Do you remember that?
5    A.    Yes.
6    Q.    Is that a fair characterization of what you said?
7    A.    Yes.
8    Q.    And Castro complained ownership of these plants and you
9          personally observed Bullman conduct the alleged sales.
10         Isn't this a perfect example of that description that we
11         just talked about?
12   A.    Yes.
13   Q.    That being the case, Castro accepting ownership of the
14         plants and you know that Bullman is selling them, why
15         weren't they both arrested?
16   A.    Because Castro claimed ownership of the marijuana.
17   Q.    Is it ever possible that two people can be charge for one
18         crime?
19   A.    Yes.
20   Q.    Is it very common in drug cases for two people to be
21         charged with one crime?
22   A.    Sometimes, yes.
23   Q.    Particularly with delivery and manufacturing type crimes,
24         right?
25   A.    Sometimes, yes.

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1    Q.    And yet, in this case, for some reason, despite your
 2          observations that you made, Bullman was not arrested, was
 3          not charged.  Nobody even interrogated him, right?
 4    A.    No, he wasn't talked to, no.
 5    Q.    Nobody said, hey, did you sell anybody drugs yesterday?
 6    A.    No.
 7    Q.    Why not?
 8    A.    Because Castro immediately took ownership of the
 9          narcotics.
10    Q.    Assuming that your training and experience that you talked
11          about earlier is correct, that sometimes people have other
12          people sell drugs for them, isn't this a classic example
13          of somebody having somebody else claim responsibility for
14          their actions?
15    A.    Possibly.
16    Q.    I mean, based on what you observed and based on what
17          Castro was saying, honestly, I can't think about a better
18          example of somebody using somebody else to commit a crime.
19          Can you?
20    A.    Not off the top of my head.
21    Q.    So it was pretty clear from your observations, as well as
22          Castro's statements that they were partners in crime,
23          right?
24    A.    Castro's statement was that the drugs were his, so --
25    Q.    I understand that.  Are you aware if Bullman was on
```

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

1      probation at the time?

2  A.  No, I'm not aware of that.  I know Castro was on

3      probation.

4  Q.  Castro was on probation.  Are you aware whether or not

5      Bullman had any prior convictions?

6  A.  No, I'm not aware of that.

7          MR. PADDINGTON:  Please clarify which Bullman we are

8      talking about.

9          MR. RADNER:  The Bullman guy at the house.

10         MR. PADDINGTON:  In the house.

11         MR. RADNER:  The Bullman who was stopped, we are not

12     there yet.

13 Q.  (By Mr. Radner)  Let's talk about this raid.  Looking at

14     your police report, which somehow was never marked as an

15     exhibit.

16         Now, I see here that it's two pages, but the second

17     page only says, oh, hyphen, the above facts, none, page

18     two and preliminary complaint record DPD 108.

19         MR. RADNER:  I am not going to mark that part as an

20     exhibit, unless you feel is necessary?

21         MR. PADDINGTON:  No problem.

22 Q.  (By Mr. Radner)  I'm going to mark the first page of the

23     PCR written by PO J. Fox as Exhibit 4.

24         (Whereupon Deposition Exhibit Number 4 was marked for

25         identification.

76

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   Q.   (By Mr. Radner)  And I see you have a copy of it, as well?
 2   A.   Yes.
 3   Q.   Let's take a look.  Place of occurrence is 5437
 4        Springwells, right?
 5   A.   Yes.
 6   Q.   Occurred on or between 1-27-16, time 12:50.  That's the
 7        raid that you're talking about, right?
 8   A.   Yes.
 9   Q.   Complainant's name is PO Fox and crew and is this a crew
10        that you work with often?
11   A.   At that time, yeah.
12   Q.   How long have the crew been together?
13   A.   I believe Sergeant Severy, which not our normal boss.
14        Muhammad was part of another raid team, but the rest of
15        us, I believe, normally worked together.
16   Q.   Let's look at the method of entry.  What does method of
17        entry mean?
18   A.   Where are you at?
19   Q.   There's a box underneath that says UNK.  Right over there.
20   A.   I'm unsure.
21   Q.   What about method of escape, what does that mean?
22   A.   I am unsure.
23   Q.   Describe weapon?
24   A.   I'm unsure.
25   Q.   Number of perpetrators?
```

77

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1    A.    How many people were arrested.

 2    Q.    One male adult, black.

 3    A.    Uh-huh.

 4    Q.    Was a black person arrested?

 5    A.    No.  Mr. Castro is Puerto Rican.  If you get into

 6          ethnicities, Puerto Ricans commonly are more described as

 7          black because they are darker-skinned normally, so if you

 8          have to pick only between black or white, it was put

 9          black.  It should have been other.

10    Q.    It says other, and you could have written H, right?

11    A.    That is possible, yes.

12    Q.    Okay.  Who wrote this report, you or somebody else?

13    A.    Initially, Bray started it and then I fixed everything for

14          my observations.

15    Q.    Okay.  When you say initially Bray wrote it, what part did

16          Bray write and what part did you write?

17    A.    I believe he did, like, the initial, and then I put in my

18          facts of it.

19    Q.    All right.  So I am not trying to be hard on you, but when

20          you say initial, I need to know what part of this report

21          was written by you and what part was written by him.  So

22          let's talk about the top portion before the big dark bold

23          line that goes across the page.  Everything above that,

24          was that written by you or Bray?

25    A.    Where?
```

78

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   Q.   I'm on this line and up.
 2   A.   Oh, that's Bray.
 3   Q.   Okay.  How about the next part where it says Complainant's
 4        Name?
 5   A.   Bray.
 6   Q.   How about the next part where it says, Number of
 7        Perpetrators and so on?
 8   A.   Bray.
 9   Q.   And then the next box area, Were the Following Solvability
10        Factors Present in This Incident?
11   A.   Bray.
12   Q.   How about the next part where it starts with, number one,
13        Joel Castro and ends with NIC in parentheses?
14   A.   Bray.
15   Q.   Okay.  Now, I don't want to try to trick you here, but I
16        just said all the way from here and all the way till where
17        it says NIC.  So from where it says, A, Number 1, to NIC.
18   A.   Oh, I apologize.
19   Q.   Okay.  So I didn't think that's what you meant.  So let's
20        go through this one line at a time.  The first line where
21        it starts with, "Joel Castro, Hispanic male 32, date of
22        birth 5-30-83 of 5437 Springwells, arrested and charged
23        with VCSA, no forced used."  That was written by Bray?
24   A.   Yes.
25   Q.   What is VCSA?
```

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1    A.   Violation of the Controlled Substance Act.
 2    Q.   Okay.  S, Search Warrant Execution.  You or Bray?
 3    A.   Bray.
 4    Q.   Okay.  The next part, you or Bray?  That big paragraph.
 5         That big, long paragraph?  Or did he write some of it and
 6         you wrote some of it?
 7    A.   He wrote some of it, I wrote some of it, because I was
 8         assigned to the entry team for the execution of the search
 9         warrant right there.  "Crew announced presence and purpose
10         after no answer was found from inside.  OIC ordered crew
11         to force injury."  I believe that was Bray.  "Once the
12         door was forced allowing PO Bray (shotgun man) and entry
13         team inside."  And then it's me, I wrote, "I then observed
14         PO Bray order the defendant and Mr. Bowman to the ground
15         and he turned over to the crew.  The defendant started
16         yelling, all I got is some weed upstairs, don't kill my
17         dog.  I then observed PO Galloway detain the defendant and
18         Mr. Bowman in the living room while PO Bray continued to
19         clear the location."
20    Q.   You or Bray?
21    A.   Me.
22    Q.   Oh, this is all you, okay.  Keep going.
23    A.   "PO Bray encountered two large vicious pit bulls in the
24         kitchen attempting to attack him and crew members."
25    Q.   You or Bray?
```

80

Johnny Fox                          Alonzo Bullman v. City of Detroit

1    A.    Me.  And "PO Bray fired several shots putting both dogs
2          down, and once the lower flat was cleared, I assisted with
3          execution of the search warrant for the upstairs.  Upon
4          entry of the upper flat I observed 26 marijuana plants in
5          the front room.  Once the upper flat was safe and secure,
6          I made no confiscations.  The defendant was released at
7          scene."
8    Q.    Okay.  Those things were written by you or Bray?
9    A.    I can't remember.
10   Q.    So it sounds like in the beginning -- in the middle, at
11         least, and I want to be very clear about this, the part
12         where you wrote:  I then observed PO Bray.  That was you?
13   A.    Yes.
14   Q.    All the way until -- where is it that you know for sure
15         that you wrote, starting with, I then observed PO Bray
16         till where?
17   A.    Until "...continued to clear the location.  PO Bray
18         encountered two large vicious pit bulls in the kitchen."
19         I'm not sure if it was me or Bray now.
20   Q.    Okay.  Until location, before PO Bray then encountered two
21         large pit bulls?
22   A.    Yes.
23   Q.    Okay.  Now, if Bray wrote the next part, "PO Bray then
24         encountered two large pit bulls," you obviously were
25         agreeing with it if you signed your name at the bottom,

81

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

1       right?

2   A.  Yes.

3   Q.  But if I understand your testimony correctly, you wrote, I

4       then observed all the way until location.  Right?

5   A.  Yes.

6           MR. RADNER:  Now, what I am going to do.  I'm just

7       going to make a record of this.  On the actual one that's

8       marked as an exhibit, I am going to put brackets around

9       the part that he just identified, and I'll show it to you.

10          MR. PADDINGTON:  Just to clarify.  These are parts

11      that he's certain he identified.  There are portions that

12      he said he can't recall.

13          MR. RADNER:  I understand, right.

14  Q.  (By Mr. Radner)  But you, just so we are very clear about

15      this, you wrote, I then observed PO Bray until the word

16      location.  That's what you just said, right?

17  A.  Yes.

18  Q.  What I'm going to do is I'm going to put parentheses, and

19      I'm going to show you, because I just marked the exhibit.

20      I put parentheses over there until there.  Okay?  That's

21      the part that you wrote?

22  A.  Positively, yeah.  I think I wrote more, but I can't

23      remember for sure.

24  Q.  Okay.  I'm going to show you Cheryl Muhammad's report.

25          MR. RADNER:  I need another marker, please.

82

Johnny Fox                          Alonzo Bullman v. City of Detroit

1                And this is going to be marked as Exhibit 5.

2                (Whereupon Deposition Exhibit Number 5 was marked for

3                identification.)

4    Q.    (By Mr. Radner)  Do you see where it says, I then observed

5          PO Bray?  Do you see that, in the middle?

6    A.    I then observed PO --

7    Q.    Yeah.  So I want you to read, please --

8    A.    I then observed PO Bray --

9    Q.    -- out loud from there until I say stop, okay?  Go ahead.

10   A.    "I then observed PO Bray ordered defendant and Mr. Bullman

11         to the ground, turned over to crew.  The defendant then

12         started yelling, all I've got is some weed.  Don't kill my

13         dog.  Then observed PO Galloway and Mr. Bullman in the

14         living room while PO Bray continued clearing location.  PO

15         Bray...".

16   Q.    Okay.  That's enough.  What you just read is a direct

17         quote in the report that you wrote that was marked as

18         Exhibit 4.  Let me ask you something.  Did you write this

19         for Muhammad?

20   A.    No.

21   Q.    Did she write it for you?

22   A.    No.

23   Q.    Do you know who wrote it first, you or Muhammad?

24   A.    No, I don't remember.

25   Q.    Do you know if somebody copied off the other person?

83

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   A.   I don't remember.
 2   Q.   Do you know if really Bray wrote the whole thing and
 3        everybody just signed their name for him?
 4   A.   No.
 5   Q.   Can I have that back, please.  Why is it that Bray wrote
 6        the report, if you were the -- you were the OIC on the
 7        case, what you?
 8   A.   I was the affiant on the search warrant.
 9   Q.   Were you the OIC?
10   A.   OIC is going to be Lieutenant Severy now.
11   Q.   Why is it that Bray wrote the report and not you?
12   A.   Because Bray wrote the reports.
13   Q.   I'm not asking if you wrote the report.  I'm asking you
14        why it is that he wrote the report and not you.
15   A.   Because he did.  I can't say why.  He just did that day.
16   Q.   Is it common for the person who kills the dogs to write
17        the report?
18           MR. PADDINGTON:  Objection, form, foundation,
19        argumentative.
20           You can go ahead and answer.
21   Q.   (By Mr. Radner)  He's the one that killed the dogs, right?
22   A.   He's the one that had to shoot the dogs, yes.
23   Q.   Well, he killed them?
24   A.   He had to shoot them.
25   Q.   Yeah, but he killed them, didn't he?
```

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1   A.   Unfortunately, they did expire, but he had to shoot them.
 2   Q.   Is there a reason you are not willing to say he killed
 3        them?  Do you not like saying that he killed them?  He did
 4        kill them, didn't he?
 5   A.   They did die and he had to shoot them, yes.
 6   Q.   They died as a result of gunshot wounds that he inflicted
 7        on them, right?
 8   A.   Yes.
 9   Q.   And isn't that called a killing?
10   A.   It's called a dog shooting to me.
11   Q.   I'm not calling it a murder just yet.  Right now, I'm
12        calling it a killing.  There's all kinds of killings.
13        There is unlawful killings, there's justified killings.
14        There's all kinds of killings, right?
15   A.   Yes.
16   Q.   There's hunters that kill animals?
17   A.   Yes.
18   Q.   Is Bray a hunter?
19   A.   I don't know.
20   Q.   Are you a hunter?
21   A.   No.
22   Q.   Is Galloway a hunter?
23   A.   I don't know.
24   Q.   Is Nico Hurd a hunter?
25   A.   I don't know.
```

85

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   Q.   Do any of these guys ever talk about the thrill they get
 2        when they kill an animal?
 3   A.   Nobody gets thrilled with killing animals, to my
 4        knowledge.
 5   Q.   Do any of them ever talk about the thrill they get when
 6        they kill an animal?
 7   A.   Not that I know of.
 8   Q.   You've never heard of any of them talk about the thrill
 9        that they get when they kill an animal?
10   A.   No.
11   Q.   When they shoot a shotgun?
12   A.   No.
13   Q.   Have you ever shot a shotgun?
14   A.   Yes.
15   Q.   Feels pretty powerful?
16   A.   It's a gun.
17   Q.   Is there any reason that you can think of that Bray
18        would've been the one to write this report and not
19        somebody else?
20   A.   No.
21   Q.   Let ask you something in this particular crew with Bray.
22        Do you know how many dogs Bray has killed?
23   A.   No.
24   Q.   Do you know how many dogs Galloway has killed?
25   A.   No.
```

86

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1    Q.   Do you know how many dogs Hurd has killed?
 2    A.   No.
 3    Q.   If I told you that between the three of them, they have
 4         killed dozens and dozens of dogs, would you know if that's
 5         true or false?
 6    A.   I know they've all unfortunately had to shoot dogs
 7         executing search warrants, yes.
 8    Q.   Do you know if between the three of them, they've exceeded
 9         50 dog shootings?
10    A.   I don't know.
11    Q.   Do you know if they have exceeded 100?
12    A.   I don't know.
13    Q.   Is it possible that they have exceeded 100?
14    A.   I don't know.  I can't tell you how many.
15    Q.   Well, how about a thousand?
16    A.   I doubt a thousand.
17    Q.   How about 100?
18    A.   I don't know.
19    Q.   So you are willing to doubt a thousand, but you are not
20         willing to doubt 100?
21    A.   You are saying --
22    Q.   I'm not asking you to speculate.  I'm asking you what you
23         are willing to say as a matter of fact.  Obviously, a
24         thousand, you feel more comfortable saying no than a
25         hundred, right?
```

87

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   I'm saying -- you said between all three individuals.
 2        There's three different individuals.  I don't know how
 3        many dogs they've had to shoot.
 4   Q.   Do you know how many Severy has killed?
 5   A.   I do not know.
 6   Q.   Have you ever seen Hurd, Galloway or Bray kill a dog
 7        unnecessarily?
 8   A.   No.
 9   Q.   Every killing you've ever seen any of them do was
10        necessary and required?
11   A.   Yes.
12   Q.   And what makes it a requirement to kill a dog?  What makes
13        it necessary to kill a dog during a raid?
14   A.   For our safety.
15   Q.   Okay.  I believe there's a Detroit policy that requires
16        that you kill dogs if they pose an imminent threat.  Is
17        that true?
18   A.   If it's posing an imminent threat to you, yes, you are
19        allowed to destroy the animal.
20   Q.   I would think you are more than allowed to.  I would think
21        you are probably required to, wouldn't you be?  I mean,
22        you're not -- I can't imagine that there's a policy that
23        says you can consider letting a dog bite you, right?
24   A.   I mean, I am not going to get bit by a dog, no.
25   Q.   okay.  So Detroit Police policy allows the killing of a
```

88

Johnny Fox                                Alonzo Bullman v. City of Detroit

```
 1        dog if it poses an imminent threat, right?
 2   A.   Yes.
 3   Q.   I want you to assume for a moment that we are all on this
 4        side of the room.  I want you to assume for a moment that
 5        there is a chain-link fence coming down on the this half
 6        of the room, a chain-link fence that goes wall-to-wall,
 7        floor-to-ceiling, and there are three extremely vicious
 8        pit bulls on the other side that haven't eaten for days,
 9        that are foaming at the mouth and they are barking worse
10        than you can imagine, but this chain link fence is solid.
11        Can you kill the dogs?
12            MR. PADDISON:  We are talking about this room right
13        here?
14            MR. RADNER:  This room right here, right now.
15   Q.   (By Mr. Radner)  Could you shoot through the chain-link
16        fence and kill the dogs or do they not pose an imminent
17        threat?
18   A.   You have to give me more circumstances.
19   Q.   Why don't you give me circumstances in which you can and
20        then in which you cannot kill those dogs.
21   A.   If it's just right there and there's a wall behind them,
22        there's no rooms that I have to enter clearing out the
23        location, then I personally -- and I see were the dogs
24        are, it's plain, then I personally might not shoot the
25        dogs, but if I have to go into rooms that the dogs are
```

89

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1        protecting and go search that area, then I possibly would
 2        have two shoot the dogs.
 3   Q.   So if there's rooms back there that you have to clear,
 4        then it would be okay to shoot the dogs?
 5   A.   You have to clear it.  A person could be hiding back there
 6        with a gun.  There's so many various options, you never
 7        know, so I have to finish executing my job.
 8   Q.   But based on your understanding of the policies,
 9        procedures and protocol of the City of Detroit Police
10        Department, in the scenario that I just described, if
11        there's a door back there that goes to a room and you need
12        to clear that room, these dogs pose a sufficient imminent
13        threat that you would shoot them, enter the area and clear
14        the room.  Do I understand it correctly?
15   A.   Yes.
16   Q.   Okay.  What if the owner of the dog tells you, I can take
17        care of them.  Would you let the owner go in there first
18        and calm the dog down or perhaps barricade them into a
19        different room?
20   A.   Different situations occur.
21   Q.   Okay.  Let's talk about this particular situation.  As you
22        approach the house -- let's go through the report.  "I was
23        assigned to entry team for the execution of this search
24        warrant...", and I am on Exhibit 5 right now, "...at 5437
25        Springwells.  Crew announced presence and purpose."  Is
```

90

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1       that true?
 2   A.  Yes.
 3   Q.  Who announced presence and purpose?
 4   A.  I'm not sure, but I believe it was Sergeant Severy.
 5   Q.  What exactly does Severy typically say when he is
 6       announcing presence and purpose?
 7   A.  Police, search warrant.
 8   Q.  How much time does he typically give somebody to open the
 9       door?
10   A.  I am unsure.
11   Q.  How long in this case?  Then it says, "After no answer
12       from inside, OIC ordered crew to force entry."  Do you see
13       that?
14   A.  Yes.
15   Q.  Okay.  How long was it before the OIC ordered crew to
16       force entry?
17   A.  I can't remember.
18   Q.  Was it more than five seconds?
19   A.  Probably around five to ten seconds.  I'm not sure.
20   Q.  Five to ten seconds.  Is that considered a typical and
21       normal -- typically, is that considered a normal amount of
22       time to get somebody to open the door?
23   A.  Yes.
24   Q.  Did you hear anybody inside saying, I am opening the door,
25       or anything similar to that?
```

91

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   A.   No.
 2   Q.   When you guys attempted to break the door open, did it
 3        open?
 4   A.   Yes.
 5   Q.   On the first bang, or did it take several?
 6   A.   I can't remember.
 7   Q.   Do you recall that there was a piece of lumber blocking
 8        the door that Mr. Castro had to move to let you guys open
 9        the door?
10   A.   I don't recall.
11   Q.   Did you hear Mr. Castro yelling through the door anything?
12        Did you hear him say anything at all?
13   A.   Not that I remember.
14   Q.   You would remember, though, wouldn't you, because this is
15        what you put in your report, there was no answer, right?
16   A.   Yes.  So then I didn't hear him.
17   Q.   So if you would've heard something, you would've said
18        Mr. Castro said he was opening the door when he clearly
19        wasn't, so we had to break the door open or something to
20        that effect?
21   A.   If I would have heard it.
22   Q.   Okay.  So if he claims he was yelling through the door,
23        you didn't hear anything?
24   A.   I didn't hear, no.
25   Q.   OIC ordered crew to force entry.  Who actually forced
```

92

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1        entry, do you know?  Who was the ram man?
 2    A.  I want to say PO Hurd, but I'm unsure.
 3    Q.  "Once the door was forced open allowing PO Bray (shotgun
 4        man) and entry team inside.  I then observed PO Bray order
 5        the defendant and Mr. Bullman to the ground and turned
 6        over to crew."  Did you personally observe that?
 7    A.  Yes.
 8    Q.  What was your position coming into the house?  Obviously,
 9        shotgun man goes first, right?
10    A.  Uh-huh.
11    Q.  So that's Bray.  That's a yes?
12    A.  Yes.
13    Q.  Backup shotgun man goes second, right?
14    A.  I don't know if we had a backup shotgun that day.  I'm not
15        sure.
16    Q.  Okay.  Let me see if I can help you with that.  I don't
17        know if I can, but I'm going to try.  I actually just
18        realized that I've been reading from Exhibit 5, which is
19        Muhammad's report, but you've been following along on your
20        report and was everything the same?  Otherwise --
21    A.  I wasn't following along.  I was listening to what you
22        were saying.
23    Q.  All right.  Let me -- let me see if it's the same.  Word
24        for word, exactly the same.  Okay.  And this is actually
25        the part where we got to your parentheses where you
```

93

Johnny Fox                          Alonzo Bullman v. City of Detroit

1       personally wrote.

2   A.  Uh-huh.

3   Q.  The same words that somehow ended up on Muhammad's report.

4       That's where we are.  I then observed.  Here we go.  I'm

5       going to show you Galloway's report.  It's not marked as

6       an exhibit, but he did say I was assigned to the entry

7       team shotgun backup.  Do you see that?

8   A.  Yes.

9   Q.  Okay.  And you are looking at the report.

10  A.  Okay.

11  Q.  So there was a backup shotgun, so let's try to reconstruct

12      this.  Now, the first person to go in the house was Bray?

13  A.  Yeah.

14  Q.  The second person would have been?

15  A.  Galloway.

16  Q.  Galloway.  Then it would've been the rest of the team?

17  A.  Yes.

18  Q.  Okay.  The last person in would have been the ram man?

19  A.  Possibly the ram man.

20  Q.  So do you know when you went in, if it was after Galloway

21      or after somebody else?

22  A.  I could have been third or fourth in the door.  I'm

23      unsure.  It's a dynamic entry.

24  Q.  Did you have a gun drawn?

25  A.  Yes.

94

Johnny Fox                        Alonzo Bullman v. City of Detroit

```
 1   Q.   What kind of gun?
 2   A.   My department issue .40 cal Smith & Wesson.
 3   Q.   M&P?
 4   A.   Yes.
 5   Q.   The rest of the crew was holding their guns, as well,
 6        except for the ram man?
 7   A.   By the time the ram went in, came in, I believe his gun
 8        should have been drawn also.
 9   Q.   So everybody was carrying guns by the time they got in the
10        house?
11   A.   Yes, you're making an entry.
12   Q.   Okay.  I want to know specifically where you were when you
13        observed Bray order the defendant and Mr. Bullman to the
14        ground and turned over to the crew.  Where were you?
15   A.   Making entry into the location.
16   Q.   Okay.  Were you in the house?  Were you buy the couch?
17        Were you by the kitchen?  Where were you, if you recall,
18        in the house?
19   A.   I can't recall.  I was making entry into the location.
20   Q.   The defendant then started yelling, all I got is some weed
21        upstairs.  Don't kill my dog?
22   A.   Yes.
23   Q.   How many times did he yell, don't kill my dog?
24   A.   Once, maybe twice.
25   Q.   Okay.  Once, maybe twice.  Are you sure he didn't say it a
```

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1        few times?
 2   A.   That's all I can recall.
 3   Q.   Assuming for a moment that at the preliminary examination,
 4        which took place on March 14, 2016, assuming that
 5        Officer Galloway testified, yes, I had heard him say a few
 6        times, please don't shoot my dogs.  All I have is some
 7        marijuana.  You wouldn't contradict that, would you?
 8   A.   No.
 9   Q.   So you would defer to Officer Galloway that he heard
10        Mr. Castro say a few times, please don't shoot my dogs?
11   A.   What Officer Galloway heard if what Officer Galloway
12        heard.  What I heard is what I heard.
13   Q.   What I'm saying, though, what I'm asking you is you're not
14        certain about the one or two times.  If I would ask you
15        what you think is right, you or Galloway, would you defer
16        to Galloway or would you say, no, I'm right, Galloway is
17        wrong?
18   A.   What I'm going to tell you is Officer Galloway is Officer
19        Galloway.  What he heard and what I heard are two -- he
20        might've said it and I didn't hear it properly, because
21        entering the search warrant, you are yelling get down on
22        the ground.  He could have said it when I was saying get
23        on the ground, and I didn't hear it, so it is possible,
24        but what I for sure heard was one time, maybe two times.
25   Q.   Did you just hear the court reporter yell the Detroit
```

96

Johnny Fox                          Alonzo Bullman v. City of Detroit

1           Lions always get screwed by the refs?

2    A.    No.

3    Q.    I didn't, either.  If I were to testify that I did say

4          that, would you dispute my testimony or would you say you

5          heard what you heard, I heard what I heard?

6    A.    I would say you are hearing things.

7    Q.    Would you dispute my testimony if you were asked?  Would

8          you say, no, that's not true.  It's not possible that I

9          heard him say that?

10   A.    I would say, no, I did not hear him say that, because I

11         didn't hear him say that.

12               MR. RADNER:  And just so the record is clear, the

13         court reporter did not just yell that the Lions always get

14         screwed by the refs.  I may have been thinking out loud.

15   Q.    (By Mr. Radner)  As far as shooting the dogs go, you wrote

16         in your report, I then observed PO Bray order the

17         defendant -- I'm sorry.  "The defendant then started

18         yelling, all I got is some weed upstairs, don't kill my

19         dog.  I then observed PO Galloway detain the defendant and

20         Mr. Bullman in the living room while PO Bray continue to

21         clear the location."  Your report continues, "PO Bray then

22         encounter two large vicious pit bulls in the kitchen

23         attempting to attack him and crew members."

24               Is that true?

25   A.    Yes.

97

American Reporting, Inc.
248-559-6750

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   Q.   The dogs were attempting to attack him and crew members?
 2   A.   Yes.
 3   Q.   What were they doing specifically that leads you to
 4        believe that they were attempting to attack him and crew
 5        members?
 6   A.   The aggressive nature of their barking.  I specifically
 7        remember seeing one dog jump up, but then my focus was
 8        focused on the two defendants.
 9   Q.   The ones that Galloway was detaining with the shotgun?
10   A.   Yes.  Just because you're shotgun backup doesn't mean you
11        always have a shotgun.
12   Q.   What did he have, do you know?
13   A.   I am unsure.
14   Q.   Does it mean he has a big nasty scary looking gun of some
15        sort?
16   A.   He could've had a shotgun or he could've had his pistol.
17   Q.   How many police officers were in the house at this time,
18        four, five?
19   A.   I am unsure.
20   Q.   Well, let's go through it.  There's Galloway, there's
21        Bray, there's you, there's Hurd.  I believe Muhammad was
22        outside and there's seven, so it's five, right?  Five
23        officers --
24   A.   Mitchell was outside.
25   Q.   I'm sorry, Mitchell.
```

98

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   Mitchell was outside.  So it's possible all of us were
 2        inside the location.
 3   Q.   So at least five police officers with guns drawn inside
 4        the house?
 5   A.   Yes.
 6   Q.   And did the defendants make any movements that gave you
 7        any concern?
 8   A.   No, they complied.
 9            MR. PADDINGTON:  To clarify, you said defendants.  I
10        believe you're --
11            MR. RADNER:  Yeah, good point.  I'm thinking about
12        the criminal case right now.
13   Q.   (By Mr. Radner)  Did Mr. Bullman or Mr. Castro do anything
14        that gave you any concern?
15   A.   No, they complied.
16   Q.   So when you say that your attention was to these two
17        individuals are being detained, why is it that you were
18        focused on them?
19   A.   Because even if they are complying one minute, it could
20        change at any second.
21   Q.   Okay.  So did you actually observe PO Bray encounter two
22        large vicious pit bulls that were attempting to attack him
23        and crew members?
24   A.   Yeah, when he was walking up to that barrier, that's me
25        observing him encounter them.
```

99

Johnny Fox                          Alonzo Bullman v. City of Detroit

| | | |
|---|---|---|
| 1 | Q. | Now, you just referenced a barrier. |
| 2 | A. | Uh-huh. |
| 3 | Q. | That's a yes, right? |
| 4 | A. | Yes. |
| 5 | Q. | The barrier is not mentioned anywhere in your report, |
| 6 | | right? |
| 7 | A. | No. |
| 8 | Q. | Why not? |
| 9 | A. | Because it isn't. |
| 10 | Q. | Because, perhaps, it would indicate that this was not an |
| 11 | | imminent threat by the dogs? |
| 12 | A. | No. |
| 13 | Q. | "PO Bray fired several shots putting both dogs down." |
| 14 | | Now, were the dogs jumping over the barrier? |
| 15 | A. | I observed one dog, I saw the one dog jump up and then, |
| 16 | | like I said, I focused my attention to Bullman and Castro. |
| 17 | Q. | What exactly did you see when you saw the dog jump up? |
| 18 | | Where was that, first of all? |
| 19 | A. | It was behind that barrier in that kitchen area. |
| 20 | Q. | Right by the barrier or 15 feet away? |
| 21 | A. | I can't give you precise. |
| 22 | Q. | Was it right by the barrier? |
| 23 | A. | I can't give you precise feet.  I saw the dog's head, then |
| 24 | | I focused my attention over there. |
| 25 | Q. | You can't testify whether or not this jumping up was right |

100

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1        near the barrier?
 2   A.   That's what I just said.
 3   Q.   Did PO Bray reach over the barrier to shoot them?
 4   A.   I don't know.
 5   Q.   Did you actually watch PO Bray fire the shots?
 6   A.   No.
 7   Q.   You did say that PO Bray fired several shots?
 8   A.   Yes.
 9   Q.   So this is something that you heard but did not observe?
10   A.   Yes.
11   Q.   Did any of the officers move the barrier before the
12        shooting?
13   A.   I didn't see that, so I don't know.
14   Q.   When you looked over and saw Officer Bray, did you ever
15        look at Officer Bray when he was shooting the dogs at any
16        point?
17   A.   I might have looked back, but my focus was still for the
18        two to be handcuffed.
19   Q.   Was the board moved by an of the officers, if you know?
20   A.   Eventually, it was moved, because we still had to go clear
21        the other rooms.
22   Q.   Before the shooting?
23   A.   Unsure.
24   Q.   Could you say whether or not the first two dogs began to
25        come through the board that was separating the kitchen and
```

101

Johnny Fox                              Alonzo Bullman v. City of Detroit

1        the living room?

2    A.  No, I cannot say.

3    Q.  Do you know whether or not the dogs were trying to move

4        the board?

5    A.  I wasn't standing right there, so I cannot say.

6    Q.  Did you guys discuss this afterwards at all?

7    A.  Not that I recall.

8    Q.  Did you get subpoenaed to testify at the preliminary

9        examination?

10   A.  I was at the preliminary examination.  I didn't get to

11       testify.

12   Q.  So you were just there as a --

13   A.  Just in case I was needed to testify.

14   Q.  Did you get a subpoena from me?

15   A.  Not that I remember.

16   Q.  Do you know if Officer Bray moved the board out of the way

17       and then got charged by the pit bulls or do not know?

18   A.  Again, I do not know.

19   Q.  Did you review any of these transcripts before you came to

20       testify today?

21   A.  No, because they are not my transcripts.

22   Q.  Fair enough.  Now, did Bray tell you whether or not he

23       perceived these dogs as a threat?

24   A.  I'm going to presume he perceived them as a threat due to

25       how they were barking and all that.  I perceived them to

102

Johnny Fox                                    Alonzo Bullman v. City of Detroit

1         be a threat.

2    Q.    Oh, you did perceive them to be a threat?

3    A.    Yes.

4    Q.    And this was based on the fact that you saw one jump up?

5    A.    How they were aggressively barking and then me seeing them

6         jump up.

7    Q.    What's the difference between an aggressive bark and a

8         non-aggressive bark?  Because you said aggressively

9         barking several times.  Can you describe to me the

10        difference between an aggressive bark and a nonaggressive

11        bark?

12   A.    You have to hear it in the dog's tone.

13   Q.    Oh, so based on the dog's tone, you can tell if it's an

14        aggressive bark or a nonaggressive bark?

15   A.    When you are a dog owner, yes.

16   Q.    Are you a dog owner?

17   A.    Yes.

18   Q.    So you know when it's an aggressive bark and when it's

19        not?

20   A.    Yes.

21   Q.    Can I ask what kind of dog you own?

22   A.    Pit bull.

23   Q.    And does your pit bull ever bark at you aggressively?

24   A.    It barks at me playfully.

25   Q.    But never aggressively?

                                                              103

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   A.   No.
 2   Q.   How would you know if it's barking at you aggressively?
 3   A.   When it's barking at other people.
 4   Q.   Oh, so when it barks at other people, then it's
 5        aggressive?
 6   A.   The nature and the tone of the dog's bark.
 7   Q.   Does your pit bull ever bark at other people playfully?
 8   A.   Yes.
 9   Q.   What do you know where the third dog was at the time?
10   A.   It was in the bedroom.
11   Q.   Separate from these other two?
12   A.   Yes.
13   Q.   Were these pit bulls particularly large?
14   A.   Which ones?  All of them --
15   Q.   The ones that were shot.
16   A.   Yes.
17   Q.   Even the puppy?  They were both large or just one of them
18        was large?
19   A.   They were both large.
20   Q.   They were both large, okay.  Do you know if the dogs were
21        able to get through that barrier that you described
22        earlier, or are you not able to say?
23   A.   I'm not able to say, but being a pit bull owner, the dogs
24        would have been able to jump that barrier.
25   Q.   Okay.  They would have been able to jump the barrier?
```

104

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1    A.    I believe so, yes.
 2    Q.    It was not a very high barrier?
 3    A.    I believed they would have been able to jump it.  I can't
 4          remember how high it was precisely.
 5    Q.    Did you see the dogs charge the barrier?
 6    A.    I just told you what I saw with the dogs.
 7    Q.    Is that a yes or no?
 8    A.    No.
 9    Q.    So you did not see the dogs in the kitchen charge the
10          barrier while barking, growling with their hair standing?
11    A.    I didn't see that.
12    Q.    Could you see the heads of the dogs in the kitchen
13          bouncing up and down from behind the barrier as if the
14          dogs were pawing at and banging into the barrier to get
15          through?
16    A.    I told you I saw the one dog's head as it was jumping up,
17          yes.
18    Q.    As if the dogs were pawing at and banging into the barrier
19          to get through?  You could see that?  They were banging
20          into the barrier to try to get through?
21    A.    You got me confused right now.
22    Q.    Okay.  Were you able to see the dogs pawing at and banging
23          into the barrier to get through?
24    A.    No.
25    Q.    Did they present a clear and obvious danger to you?
```

105

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1    A.    I believe so.
 2    Q.    When the dogs were shot, were they very close to the
 3          barrier or some feet away from the barrier or do you not
 4          know?
 5    A.    I do not know.
 6    Q.    Is it policy when a dog shot to do a DOA report?
 7    A.    Destruction of animal report?
 8    Q.    Yes.
 9    A.    The supervisor does that.
10    Q.    Is it policy to have animal control come and pick up the
11          carpet?
12    A.    I am not sure if it's policy or not, but we normally
13          always call for animal control to come and remove that
14          dead animal.
15    Q.    You guys don't ever carry around garbage cans in your
16          truck to throw bodies in there, do you?
17    A.    No.
18    Q.    Do you know if there's any crews in Detroit that do that?
19    A.    No, not that I know of.  We have had to take the dogs with
20          us and take them to animal control.
21    Q.    I'm going to show you what's previously been marked as
22          Exhibit 7 on 5-17-17.  Does that appear to be the barrier
23          that we were just talking about?
24    A.    I don't know who took this picture or for what, so I don't
25          want to comment on that picture because I didn't take that
```

106

Johnny Fox                           Alonzo Bullman v. City of Detroit

```
1         picture.
2    Q.   Okay.  I'm not asking if you took the picture.  I'm asking
3         if the barrier in that picture reflects the barrier you
4         saw at the home, or do you not know?
5    A.   I don't know.  It's possible, but I don't know.
6    Q.   Does that look like a thin piece of plywood they could
7         easily be jumped over by some dogs?
8    A.   Yes.
9    Q.   I'm going to show you here what's previously been marked
10        as Exhibit Number 6.  You'll notice that there's some
11        circles.  I believe those circles were done by Galloway.
12        Maybe they were done by me.  I'm not sure.  There is a
13        transcript somewhere that indicates that.  I know there's
14        a box towards the bottom that has SG in it with a star.
15        Now, do you see that circle part that I circled?
16   A.   Yeah.
17   Q.   What is it that I circled, do you know?
18   A.   No.
19   Q.   Can you take a guess?
20   A.   No.
21             MR. PADDISON:  Objection, calls for speculation.
22             MR. RADNER:  Yeah, it does call for speculation.
23   Q.   (By Mr. Radner)  I'm asking you to speculate, and this is
24        going to be a part of the transcript and this exhibit is
25        going to be part of the record.  I'm asking you to
```

107

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1        speculate, if you have any idea, if you can take a guess.
 2        If you had to place a wager, what is circled in Exhibit
 3        Number 6?
 4    A.  I don't know.
 5    Q.  I will suggest to you that there's previously been a
 6        suggestion that it's blood.  Does that make sense?
 7    A.  It's possible.
 8    Q.  And there's what appears to be a drag mark of some sort
 9        that goes from the circle to the star.  Do you see that
10        star that was made with a blue Sharpie?
11    A.  Yes.
12    Q.  Now, I want you to assume for a moment that the dogs were
13        shot where that circle is.
14    A.  Where it's circled?
15    Q.  Where the circle is.
16    A.  Okay.
17    Q.  That has that substance that you can't identify.
18    A.  Uh-huh.
19    Q.  I want you to assume for a moment that that is at least 11
20        feet away from the barrier.  I want you to assume for a
21        moment that there's been testimony that the dogs were 11
22        feet away from that board, at least, when they were shot.
23        Assuming all that was testified to, do you dispute any of
24        that?
25            MR. PADDINGTON:  I'll place a number of objections.
```

108

American Reporting, Inc.
248-559-6750

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1          Form, foundation, calls for speculation, mischaracterizes
 2          his testimony.  I think that covers it.
 3               You can go ahead and answer.
 4               THE WITNESS:  So you are saying you believe the dogs
 5          were 11 feet away?
 6   Q.     (By Mr. Radner)  I'm asking you if it's possible that they
 7          were 11 feet away from the board when they were shot.
 8   A.     I don't think so.
 9   Q.     Why not?  Why don't you think so?
10   A.     If this was blood, as you were saying, I would assume the
11          dogs got shot here and ran away.
12   Q.     Oh, so you would say where the trail starts, that that's
13          not animal control lifting up the animals and dragging it
14          away, that's where they were shot and they ran away into
15          the corner to die, and that's where the puddle of blood
16          is?
17   A.     That's what I would believe, yes.
18   Q.     And that's based on what?
19   A.     Previously having shot dogs and they don't just fall right
20          then and there.  They run away.
21   Q.     Why is it that these dogs had to be shot?  Is it because
22          they were an imminent threat or is it because you had to
23          clear the house or is it a combination of the two or can
24          you not say?
25   A.     It's a combination.
```

109

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1    Q.    Let me ask you this.  Did they pose an imminent threat, so
 2          long as that plywood was there?
 3    A.    Yes.
 4    Q.    So whether or not there was another door that had to be
 5          cleared, whether or not there was another room back there
 6          that had to be cleared, in your professional opinion,
 7          these dogs had to be shot because they posed an imminent
 8          threat, true?
 9          MR. PADDINGTON:  Objection, mischaracterized his
10          testimony.  You changed the circumstances.  If you want to
11          ask him if there was no room back there, if that changes
12          circumstances, you can ask him that.
13          MR. RADNER:  Okay.  All right.  I'm going to say the
14          question again, but your objection is noted.
15    Q.    (By Mr. Radner)  What I'm asking is very simple.  If I
16          understand your previous testimony, there's two
17          circumstances that would qualify as the dog posing an
18          imminent threat based on your policy, the City's policy,
19          that would allow you to kill a dog.  One is if you have to
20          clear another room and you can't safely do it.  Two is
21          they are actively threat and they are coming at you and
22          they are about to bite you and you've got to shoot them,
23          right?
24    A.    Yes.
25    Q.    Now, based on my understanding of your testimony, there
```

110

Johnny Fox                              Alonzo Bullman v. City of Detroit

1           was this flimsy little 3 1/2 foot piece of plywood that
2           the dogs could easily jump over.  They were running at the
3           board and aggressively barking and therefore posed an
4           imminent threat right now, true?
5      A.   You mischaracterized my statement.
6      Q.   Let me ask you this.  Did they pose an imminent threat,
7           yes or no?
8      A.   Yes, they did.
9      Q.   Okay.  Let me ask you this.  If there was no other rooms
10          back there that had to be searched, okay, so I mean, you
11          see that there's doors back there, right, there was
12          another room back there, right?
13     A.   Yes, there was a room.
14     Q.   And that room had to be cleared?
15     A.   Yes.
16     Q.   Okay.  What if there was no room back there that had to be
17          cleared.  Did these dogs still have to be shot because
18          they posed an imminent threat?  Yes or no.
19     A.   That's hard to say.
20     Q.   So you can't answer?
21     A.   No, I can't answer that due to the situation.
22     Q.   Oh, okay.  Please explain to me why it is that you can't
23          answer it and feel free to explain.
24     A.   If the dogs are being timid and running away, you're not
25          going to shoot a timid dog.

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1   Q.   What if you have to clear the room in the back?
 2   A.   You just said that there's no rooms there that need to be
 3        cleared.
 4   Q.   Okay.  So if there is a room in the back and the dogs are
 5        being timid, do you have to shoot them, yes or no?
 6   A.   If the dog is aggressively coming at me, yes.
 7   Q.   Does that include timid?
 8   A.   If the dog is timid and running away, we are not going to
 9        shoot the dog because the dog is running away from us.
10   Q.   Okay.  Then let me ask you this.  Let's go back to the
11        example of the house where -- let's just say for a moment
12        that in this case we could prove that the dogs were not
13        barking aggressively, that the dogs were just sitting in
14        the corner 11 feet away minding their own business, that
15        Bray reached over and shot them and the reason that he had
16        to shoot them, assuming that we can prove those facts,
17        would they still have to be shot so that you guys could
18        clear that back room, yes or no?
19   A.   You got me confused right now.
20   Q.   Very simple.
21   A.   Because you are throwing out different conclusions and
22        synopsis.
23   Q.   Nonsense?
24   A.   Different conclusions.
25   Q.   Synopsis, okay.  I wasn't sure what you said.  Okay.
```

112

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   Sorry for not being able to pronounce it properly.
 2   Q.   I just misunderstood what you said.  Okay.  What I'm
 3        asking you is like this:  I'm trying to figure out what it
 4        is that requires these dogs to be killed.  Is it that they
 5        were about to attack somebody or is it that the other room
 6        had to be cleared?  What was the primary reason, if there
 7        is one, that it had to be shot?  And then my follow-up is
 8        going to be:  In what circumstances would these dogs have
 9        not have to be killed, both in a situation where there is
10        a room that has to be cleared and where there's no room
11        that has to be cleared?  So we are talking about a total
12        of four different scenarios.  Let's take them one at a
13        time.
14             Scenario number one, the dogs are being timid in the
15        back corner.  There is a room that has to be cleared back
16        there.  Do they have to be shot in that circumstance, yes
17        or no?
18   A.   If they are being timid and there's a back room, it
19        varies.
20   Q.   Would you let the owner try to control them?
21   A.   It varies.  It matters on the totality of circumstances.
22   Q.   Like what?
23   A.   There's various different circumstances.
24   Q.   Tell me some.  Tell me a situation in which --
25   A.   Okay.
```

113

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1   Q.   Wait.  Let me finish the question -- in which two dogs are
 2        being timid in that corner of that house and there is a
 3        room back there that has to be cleared and they still have
 4        to be shot.
 5   A.   In this location?
 6   Q.   Yes.
 7   A.   Specifically this location.
 8   Q.   Specifically this location.
 9   A.   There was three rooms that need to be entered and cleared.
10   Q.   Okay.
11   A.   The dogs were not timid and running away.  They are
12        aggressively barking and coming toward.  I cannot --
13   Q.   Coming toward you, you said?
14   A.   Coming toward us.
15   Q.   So is not possible that they were 11 feet away when they
16        were shot, true?
17   A.   I do not believe they were 11 feet away, but I'm --
18   Q.   Possible or not?
19   A.   I don't believe it's possible.
20   Q.   So then, let me ask you this:  If they are timid in the
21        corner 11 feet away and there are no other rooms that have
22        to be cleared, okay to shoot them, yes or no?
23   A.   If there is no other rooms --
24   Q.   Right.
25   A.   -- that need to be cleared and they are timid, we wouldn't
```

114

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1        shoot them or I wouldn't shoot them.
 2   Q.   Okay.  Let's go to scenario number two.  They are being
 3        timid back there and there are other rooms that have to be
 4        cleared.  Shoot them or not?
 5   A.   I can't say if I would shoot them or not.
 6   Q.   Let's go to scenario number three.  They are barking
 7        aggressively and there are other rooms out there that have
 8        to be cleared and, again, they are 11 feet away in that
 9        corner, but they are barking aggressively.  Do they have
10        to be shot or not?
11   A.   If they are 11 feet away as you are -- I guarantee you, we
12        can't say.
13   Q.   Scenario number four.  They are barking aggressively and
14        there are no other rooms that have to be cleared in the
15        back, but there is that 3 1/2 foot piece of flimsy wood
16        there.  Do they have to be shot, yes or no?
17   A.   Once they get up to where they could possibly come over
18        it, yes, they would be shot.
19   Q.   But if they are not where they could jump over the board,
20        if they are 11 feet away in the corner?
21   A.   If they are 11 feet away in the corner, I don't believe
22        somebody's going to take the shot on a timid dog.
23   Q.   I want you to assume for a moment, this is a speculative
24        question, if I could prove unequivocally that the dogs
25        were 11 feet away and were being timid in this exact
```

115

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1        scenario, everything else is the same, but I could prove
 2        those two facts, that the dogs were 11 feet away and that
 3        they were being timid.  Was there any reason to shoot them
 4        yes or no?
 5   A.   I didn't shoot them.  I didn't make that decision.
 6   Q.   Was there a reason to shoot them yes or no or can you not
 7        answer?
 8   A.   I can't answer that.  I didn't make that decision.
 9   Q.   Just so we're clear, and please correct me if I'm wrong,
10        as I understand your prior testimony, you cannot say
11        whether or not the dogs were charging the barrier while
12        barking and growling with their hair standing, could you?
13   A.   Where are you at?
14   Q.   I'm not anywhere.  I'm asking you what your previous
15        testimony was.  When you guys entered the home, were you
16        able to see the dogs charging the barrier while barking,
17        growling, with their hair standing?
18   A.   I heard the dogs barking and growling.  I saw the one dog
19        jump up, so that's what -- that's it.
20   Q.   At the time that you guys entered the home, were you able
21        to observe the dogs in the kitchen charge the barrier
22        while barking, growling with their hair standing, yes or
23        no?
24   A.   I just answered your question.
25   Q.   You didn't answer with a yes or no.
```

116

Johnny Fox                           Alonzo Bullman v. City of Detroit

```
 1   A.   I'm telling you what I saw.
 2   Q.   I'm asking you if you can answer that question with a yes
 3        or no?
 4   A.   I can't answer that.  I already told you what I saw.
 5   Q.   Next question.  Were you able to observe the heads of the
 6        dogs in the kitchen bouncing up and down from behind the
 7        barrier as if they were pawing at and banging into the
 8        barrier to get through, yes or no?
 9   A.   I specifically saw the one head of the dog.
10   Q.   You didn't see two?
11   A.   I remember specifically one.
12   Q.   Did you specifically see that dog as if it were pawing at
13        and banging into the barrier to get through?
14   A.   I saw his head jump up, I heard him barking, but then I
15        focused my attention other where.
16   Q.   I'm going to ask you a yes or no question.  Was it as if
17        the dog was pawing at and banging into the barrier to get
18        through, yes or no?
19   A.   I can't tell you yes or no.
20   Q.   okay.  Now, I see that your attorney handed you your
21        response to interrogatory number 11.  It's a rather
22        lengthy answer.
23   A.   Let me see the first page before this.
24   Q.   Take a moment to read it.  Let me know when you've had a
25        chance.  I'm not going to rush you.
```

117

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1              MR. PADDINGTON:  Off the record just a second.
 2              (Discussion off the record.)
 3              MR. RADNER:  Back on the record.
 4              THE WITNESS:  Okay.
 5    Q.   (By Mr. Radner)  I want to ask you, now that you have had
 6         a chance to review this answer, you wrote this answer or
 7         you at least signed that it was true?
 8    A.   Yes.
 9    Q.   At the beginning of the deposition, I asked you if you had
10         a chance to review it and if it was true at the time and
11         if it was still true now.  Do you remember that?
12    A.   Yes.
13    Q.   Would you like to make some corrections based on what you
14         just read your testimony was?
15    A.   No.
16    Q.   As far as the third dog, where was the third dog?
17    A.   The third dog was in the front bedroom, but I do want to
18         refer to a part that you are reading.  It specifically
19         says as if the dogs were pawing and banging into the
20         barrier to get through.
21    Q.   So that part is true?
22    A.   That's not me saying that I observed it.  It saying as if.
23    Q.   Let me ask you a yes or no question.  Was it as if the
24         dogs were pawing at and banging into the barrier to get
25         through, yes or no?
```

118

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1    A.    Yes.
 2    Q.    I think I asked you that exact question earlier and you
 3          said you couldn't say.  Is there an explanation for that?
 4    A.    Because I'm reading what I wrote and didn't remember.
 5          This is reflecting my memory.
 6    Q.    Refreshing your memory?
 7    A.    Refreshing my memory.
 8    Q.    I just wanted to -- it means two different things.  Okay.
 9          As far as that third dog, it was in a bedroom, right?
10    A.    Yes.
11    Q.    A bedroom that had not yet been cleared, right?
12    A.    Yes.
13    Q.    A bedroom that somebody could've been hiding there with a
14          gun, right?
15    A.    Yes.
16    Q.    A bedroom that there could have been drugs there, right?
17    A.    Yes.
18    Q.    There could have been a small army there, right?
19    A.    Yes.
20    Q.    There could have been a grenade that somebody pulled the
21          pin, right?
22    A.    Yes.
23    Q.    There could've been six guys there standing with fully
24          automatic weapons, right?
25    A.    Yes.
```

119

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1    Q.   Yet, somehow that dog was able to be controlled by
 2         Mr. Castro, right?
 3    A.   Yes.
 4    Q.   Why is it that the third dog did not pose at least as
 5         great a threat as the first two that had to be killed?
 6    A.   The third dog was locked in that specific bedroom.  We
 7         cleared the location.  We knew where we could get the dog
 8         put, so we didn't have to destroy the animal.  The dog was
 9         barking and everything in the room.  Sergeant Severy, I
10         believe --
11    Q.   Was it barking aggressively?
12    A.   I believed it was, yes.
13    Q.   So not the nonaggressive kind?
14    A.   No, not --
15    Q.   This was aggressive barking?
16    A.   Yes.
17    Q.   Okay.
18    A.   Sergeant Severy, who was the officer in charge, made the
19         decision to let Castro call the dog to the door.  He
20         immediately grabbed the dog and take the dog to the -- I
21         want to say we let him put it in the bathroom, and then we
22         cleared that room.
23    Q.   Did you agree with Severy's decision or did you think he
24         was being careless and reckless with your safety and the
25         safety of your fellow officers?
```

120

Johnny Fox                         Alonzo Bullman v. City of Detroit

```
 1   A.   I support my supervisor's decision.
 2   Q.   Okay.  I want to know why it is that before you were
 3        saying that the back rooms where there's two dogs that
 4        were killed, those rooms had to be cleared and part of the
 5        reason that they had to be killed was so that those rooms
 6        could be safely cleared.  Did you testify to that?
 7   A.   Yes.
 8   Q.   This bedroom had to be cleared, did it not?
 9   A.   Yes.
10   Q.   There was a dog barking aggressively in that room.  Unlike
11        the kitchen, there was no visibility into that room at
12        all, was there?
13   A.   No.
14   Q.   Yet, this dog did not pose as great a threat as the two
15        dogs that were in the kitchen, right?
16   A.   Yes.
17   Q.   Why not?
18   A.   The dog was locked in the one specific room.
19   Q.   But that room had to be cleared, right?
20   A.   Yes.
21   Q.   How could that room have been cleared without exposing you
22        and the crew to danger?
23   A.   Are you going to let me answer?
24   Q.   Please answer.
25   A.   The dog was locked in one specific room.  The other two
```

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1        dogs were not locked in one specific room.  We already
 2        cleared the whole location.  We knew in that room there
 3        was going to be one dog.
 4   Q.   And possibly five people with fully automatic weapons,
 5        right?
 6   A.   That is possible.
 7   Q.   Now, if I understand correctly, the fear or part of the
 8        reason that the first two dogs had to be killed was that
 9        behind those two doors or one door, as many doors as there
10        were back there that had to be cleared, there may have
11        been five little guys standing there with fully automatic
12        weapons, right?
13   A.   That's possible.
14   Q.   Okay.  And that's part of the reason that these two dogs
15        had to be killed, right?
16   A.   Yes.
17   Q.   Yet, it was the same exact possibility for the bedroom, of
18        which you guys had zero visibility, and yet, that dog was
19        able to be saved, right?
20   A.   No.
21   Q.   That dog was not able to be saved?
22   A.   The dog was able to be saved, but you're saying it's the
23        same --
24   Q.   Explain to me what I am saying wrong, please.  What am I
25        not getting here?
```

122

Johnny Fox                          Alonzo Bullman v. City of Detroit

1    A.    You are explaining two different circumstances.

2    Q.    Explain to me where I'm wrong, please.  I don't

3          understand.

4    A.    Are you going to let me answer, sir?

5    Q.    Take all the time you need to answer.

6    A.    Okay.  The two dogs with three rooms having to be cleared,

7          we had to make dynamic entry and clear those rooms.  The

8          one dog that was in a secluded room, we knew the dog was

9          there, okay.  We knew there was only that small room there

10         due to the size of the house and raiding houses that are

11         similar to this location.  We knew that it was one small

12         bedroom.  If there were people waiting in there, we would

13         have dealt with that when we had to deal with that, but

14         Sergeant Severy made the decision to let him grab the dog

15         and put it in the bathroom.  That's what happened.

16   Q.    What percentage of raids that you're on where you

17         encounter dogs do you or a member of your crew kill those

18         dogs?  More than 50?

19   A.    No.

20   Q.    So in the majority of the cases, you don't have to kill

21         dogs that you encounter?

22   A.    The majority of the cases, yes.

23   Q.    And that's because they are not barking at you

24         aggressively?

25   A.    Because somebody can either grab the dog and put it in a

123

Johnny Fox                          Alonzo Bullman v. City of Detroit

1      cage or something immediately.  There's various
2      situations.
3              (Whereupon Deposition Exhibit Numbers 6 & 7 were
4              marked for identification.)
5   Q.  (By Mr. Radner)  I'm going to show you two affidavits that
6       were signed by Mr. Castro and then I'm going to go through
7       them one sentence at a time and ask you if it's true or
8       false.
9              Exhibit 6 is an affidavit by Mr. Castro that was
10      signed July 7, 2017.  Please read to yourself paragraph
11      number one.  Forget paragraph number one, read to yourself
12      paragraph number two.
13  A.  What about it?
14  Q.  I originally asked you just to read paragraph two.  I
15      believe you read the entire thing, did you not?
16  A.  Uh-huh.
17  Q.  Okay.  We are going to go through this a paragraph at a
18      time.  Is there anything in paragraph two that you believe
19      is not true?
20  A.  He says, "That at no point on January 26, 2016, or January
21      27, 2016, did I sell or deliver marijuana to two white
22      males.  The only individuals I may have sold marijuana to
23      were my legally registered medical marijuana patients."
24  Q.  Okay.  Do you disagree with anything that's there?
25  A.  Yes.

124

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1    Q.    What part?

 2    A.    Yes.

 3    Q.    What parts?  That he did not sell marijuana to to white

 4          males?

 5    A.    Yeah.  Well --

 6    Q.    Okay.  Number three?

 7    A.    Hold on.  Hold on.

 8    Q.    Please explain.  I'm trying to get your attorney out of

 9          here, that's all.

10    A.    I can't say -- he's not -- Mr. Castro is not who I

11          believed to be the seller.

12    Q.    Oh, okay.  Fine.  Number three, that during my sentencing

13          hearing --

14    A.    I have nothing to do with that.

15    Q.    Okay.  Number four.  Anything there you disagree with?

16    A.    I have nothing to do with that.

17    Q.    Number five, anything you disagree with?

18    A.    That regardless of who registered both, I've nothing to do

19          with that.

20    Q.    Number six, anything you disagree with?

21    A.    Yes.

22    Q.    What?

23    A.    Of how he's saying the dogs became quiet and all that

24          stuff.

25    Q.    Okay.  You disagree with that?
```

125

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   Yes.
 2   Q.   You dispute his claim that the dogs are being quiet?
 3   A.   Yes.
 4   Q.   Because if they were being quiet, that would be timid?
 5   A.   Yes.
 6   Q.   Which I believe is your word, right?
 7   A.   Yes, they would be timid.
 8   Q.   And that would clearly call into the question whether or
 9        not they had to be executed, right?
10   A.   Not fully.
11   Q.   Okay.  But somewhat, correct?
12   A.   Uh-huh.
13   Q.   Is that a yes?
14   A.   Yes, you could assume that.
15   Q.   Exhibit 7.  Let's just do this a paragraph at a time.
16        Anything that you disagree with in paragraph number two?
17   A.   I didn't read this one.
18   Q.   Right, so this is a new one.  So let's just do this a
19        paragraph at a time and knock it out.  Read through
20        paragraph number two and tell me if there's anything you
21        disagree with there.
22   A.   What date was this on?
23   Q.   This, I believe, was February.
24   A.   February 2017.  What day was that?
25   Q.   This one was July 7, 2017.
```

126

Johnny Fox                           Alonzo Bullman v. City of Detroit

```
 1    A.    Okay.
 2    Q.    All right.  So looking at paragraph number two, is there
 3          anything that you disagree with there?
 4    A.    That's possible.
 5    Q.    Okay.  Anything you disagree with in paragraph number
 6          three?
 7    A.    That was his residence.  It was a two-family flat.
 8    Q.    So we're clear, you never saw the above described seller
 9          in your affidavit, other than his torso, right?  You never
10          saw his face, did you?
11    A.    No.
12    Q.    The only way that you are able to identify that it was
13          Bullman and not Castro is based on what the SOI 3030 told
14          you, right?
15    A.    Yes.
16    Q.    Okay.  Anything you disagree with in paragraph number
17          three?  And we are on Exhibit 7.
18    A.    No, I can't disagree with that.
19    Q.    Anything you disagree with in paragraph four?
20    A.    It's a separate address, but I can't disagree with that.
21    Q.    Anything you disagree with in paragraph number five?  Take
22          your time.
23    A.    That's his wording.
24    Q.    Do you disagree with anything there?
25    A.    That's his wording.
```

127

Johnny Fox                              Alonzo Bullman v. City of Detroit

```
 1    Q.    Is there anything there that you disagree with, yes or no?
 2    A.    I can't disagree with how he's saying he sells drugs.
 3    Q.    Great.  Anything you disagree with in paragraph number
 4          six?
 5    A.    I can't disagree with that.
 6    Q.    Anything you disagree with in paragraph number seven?
 7    A.    That's how he feels.  That's him.
 8    Q.    Anything you disagree with in paragraph number eight?
 9    A.    That's him.
10    Q.    Okay.  Let me have that back, please.
11              Have you been convicted of any crimes?
12    A.    Have I?
13              MR. PADDINGTON:  Objection, relevance.
14    Q.    (By Mr. Radner)  Have you ever been convicted of any
15          crimes?
16              MR. PADDINGTON:  Go ahead and answer.
17              THE WITNESS:  I've never been convicted.
18    Q.    (By Mr. Radner)  Have you ever been charged with any
19          crimes?
20              MR. PADDISON:  Same objection.
21              You can go ahead and answer.
22              THE WITNESS:  Yes.
23    Q.    (By Mr. Radner)  You were charged with a felonious
24          assault, were you not?
25    A.    Yes.
```

128

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   Q.   Was that something you did while you were on duty that
 2        those charges stem from?
 3   A.   No.
 4   Q.   What is it that those charges stem from?
 5   A.   An off-duty incident.
 6   Q.   And were there weapons used?
 7   A.   No.
 8   Q.   What was the nature of the alleged assault?
 9             MR. PADDISON:  It's an ongoing objection.  You can go
10        ahead and answer.
11             THE WITNESS:  An off-duty fight.
12   Q.   (By Mr. Radner)  Between you and somebody else?
13   A.   It was multiple persons involved.
14   Q.   How many people were involved?
15   A.   One, two, three, four.  Four.
16   Q.   And you were arrested and charged with a felony?
17   A.   Yes.
18   Q.   And what ultimately happened?  What was the end result?
19   A.   I was exonerated.
20   Q.   What do you mean by you were exonerated?  Were you found
21        not guilty?
22   A.   Found not guilty.
23   Q.   At a trial?
24   A.   Yes.
25   Q.   Have you ever pled guilty to violating any Detroit Police
```

129

Johnny Fox                    Alonzo Bullman v. City of Detroit

```
 1        policies, rules and regulations?
 2             MR. PADDISON:  Same objection.
 3             You can go ahead and answer.
 4             THE WITNESS:  Yes, stemming from that off-duty
 5        incident.
 6   Q.   (By Mr. Radner)  You pled guilty to failure to report the
 7        use of force or complete a use of force report form,
 8        right?
 9   A.   Yes.
10   Q.   Why is it that you chose to not report the use of force or
11        to complete a use of force report?
12   A.   At that time, when that incident happened, I did complete
13        a police report and it was not policy at that time that
14        you were supposed to complete a use of force report in an
15        off-duty incident.
16   Q.   So you weren't guilty?
17   A.   What?
18   Q.   So you were not guilty?
19   A.   At that time, that's how the policy was written.
20   Q.   So why did you plead guilty?
21   A.   When you are suspended --
22             MR. PADDISON:  I'm going to place an objection,
23        because I don't know if you were represented by counsel or
24        not, but to the extent that it involves communication
25        between you and any attorney or legal representative, I
```

Johnny Fox                              Alonzo Bullman v. City of Detroit

1        would advise you that -- I can't advise you not to answer,
2        but I would advise you that you do have attorney-client
3        privilege and you do not have to answer that question.
4            MR. RADNER:  I'm not asking for attorney-client
5        privilege.
6    Q.  (By Mr. Radner)  I'm asking why you pled guilty.
7            MR. PADDINGTON:  And I'm just saying to the extent
8        that that may involve communications covered under
9        attorney-client privilege, I'm just notifying my client
10       that he does have the right not to answer that.
11           MR. RADNER:  Okay.
12   Q.  (By Mr. Radner)  So why is it that you pled guilty if you
13       were not guilty?
14   A.  I don't have to answer that due to attorney-client
15       privilege.
16   Q.  There's an allegation that you were pointing a pistol at
17       somebody, right?
18           MR. PADDINGTON:  Objection, form, foundation,
19       relevance, but you can go ahead and answer.
20           THE WITNESS:  There was multiple allegations.
21   Q.  (By Mr. Radner)  It wasn't true?
22   A.  There was multiple allegations.
23   Q.  Was it true or not?
24   A.  No, it was not true.
25   Q.  Probably didn't feel good being charged with a crime that

131

American Reporting, Inc.
248-559-6750

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1        you were innocent of, right?
 2   A.   Yes.
 3   Q.   Probably would've felt worse if your dogs were killed in
 4        the process, right?
 5            MR. PADDISON:  Objection, form, argumentative.
 6            You can go ahead and answer.
 7            THE WITNESS:  If I was a drug dealer, then I
 8        wouldn't, but --
 9   Q.   (By Mr. Radner)  He was exonerated, just like you, right?
10        You probably would have felt pretty bad if your dogs were
11        killed during the commission of a non-crime of which you
12        were exonerated, wouldn't it?
13   A.   Don't know.
14   Q.   How do you think you'd feel if your dogs were killed
15        during that assault, during that non-assault that you were
16        falsely accused of?
17   A.   I don't know.
18            MR. RADNER:  I have nothing further.
19                    REDIRECT EXAMINATION
20   BY MR. PADDINGTON:
21   Q.   Officer Fox, just a couple of real quick follow-ups here.
22            Looking at this document that is marked Exhibit 7.
23        Paragraph six is an affidavit of Joel Castro.  It reads,
24        "I recall that on January 26, 2016, an individual knocked
25        on my door requesting that I sell him marijuana.  He was
```

132

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1        not one of my patients and as such, a sale would have been
 2        illegal.  I did not sell that individual, nor did I ever
 3        have any marijuana in my hands while speaking with this
 4        individual."
 5             Now, correct me if I'm wrong, but I believe you
 6        testified that you did not believe the individual and was
 7        involved in the perceived drug transaction was
 8        Mr. Castro, correct?
 9   A.   No.
10   Q.   On January 26, 2016, did you spend that entire day doing
11        surveillance at this location?
12   A.   No.
13   Q.   So is it possible that somebody else that was not one of
14        Mr. Castro's medical marijuana clients knocked on his
15        door?
16   A.   Possibly.
17   Q.   Have you ever observed a dog growl but not bark?
18   A.   Yeah.
19   Q.   Have you ever seen a dog with snarling teeth but not
20        barking?
21   A.   Yeah.
22   Q.   Have you ever seen a dog with it's ears back or it's hair
23        up but not bark?
24   A.   Yes.
25   Q.   So just because a dog wasn't barking doesn't necessarily
```

133

```
 1        mean he was behaving timidly, correct?
 2   A.   Yes.
 3   Q.   When you entered the house, was Mr. Castro left standing
 4        or was he placed on his knees?
 5   A.   He was ordered to the ground.  I don't know if he got on
 6        his -- I can't remember if he got on his knees first, but
 7        we immediately order everybody to the ground, face down on
 8        the ground.
 9   Q.   Do you recall if Mr. Castro was standing at the time
10        Officer Bray fired on the two dogs in the kitchen?
11   A.   No, he was on the ground.
12   Q.   Based on your perceptions, do you believe that he would've
13        been able to look over that barrier and see his dog in the
14        kitchen from where he was?
15   A.   No.
16   Q.   There was some discussion about Officer Galloway's
17        testimony at the preliminary examination, specifically
18        that he recalled hearing Mr. Castro say a few times,
19        asking officers not to kill his dogs.  Do you recall that?
20   A.   What do you mean?
21   Q.   Do you recall discussing today testimony from Mr. Castro's
22        preliminary exam where Officer Galloway said he recalled
23        Mr. Castro saying a few times, please don't kill my dogs?
24        Do you recall that?
25   A.   I recall the attorney talking about that, yes.
```

134

Johnny Fox                    Alonzo Bullman v. City of Detroit

```
 1   Q.   Okay.  Can a few mean four?
 2   A.   Possibly.
 3   Q.   Could a few mean three?
 4   A.   Possibly.
 5   Q.   Could a few mean two?
 6   A.   Yes.
 7   Q.   So when you say that you recall Mr. Castro asking that his
 8        dogs not be killed once or twice and Officer Galloway
 9        saying he asked that a few times, that is not necessarily
10        in contradiction with one another?
11   A.   No.
12   Q.   Officer Fox, are you aware of whether or not marijuana is
13        still legal under federal law?
14   A.   It's illegal under federal law.
15   Q.   So regardless of what the determination was at
16        Mr. Castro's criminal trial in the state of Michigan, by
17        virtue of his possession of marijuana, he was still
18        violating the law?
19   A.   Federal law, yes.
20   Q.   At the time you conducted the raid, did you know how many
21        rooms were in the rear of the house that was separated by
22        the kitchen?
23   A.   While we were in the house -- prior to entering the house,
24        no, but once we got into the house, I believe it was three
25        more rooms.
```

135

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   Q.   Does the threat of being attacked from multiple directions
 2        pose a greater threat than being attacked from a single
 3        location?
 4   A.   Yes.
 5   Q.   So it is a safer scenario for yourself and your fellow
 6        officers where you can isolate a potential threat to a
 7        single room?
 8   A.   Yes.
 9   Q.   You discussed the dog posing an imminent threat.  Is that
10        imminent threat limited strictly to the threat of a dog
11        biting you?
12   A.   Biting me, biting a crew member, biting an innocent
13        person.
14   Q.   Does the fact that a dog that prevents you from clearing a
15        narcotics raid location also pose an imminent threat?
16   A.   Yes.
17   Q.   And how so?
18   A.   Because it's preventing me from entering the rooms where
19        somebody possibly could be hiding or waiting.
20   Q.   There appears to be -- well, there is an allegation that
21        you falsified your search warrant affidavit.  Do you
22        recall that discussion?
23   A.   Yes.
24   Q.   When you submitted your search warrant affidavit, were you
25        hoping the warrant would be signed?
```

136

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1   A.   What do you mean?  Yes.
 2   Q.   Did you want the warrant to be signed?
 3   A.   It was going to be signed, yes.
 4   Q.   Do you think it would've increased the odds that the
 5        warrant be signed if you had indicated in the warrant
 6        truthfully or falsely that the SOI 3030 had been sold
 7        drugs?
 8   A.   If I would've put that he had been sold drugs, there
 9        wouldn't have needed to be any surveillance or anything
10        like that.
11   Q.   So that would increase the likelihood that the warrant be
12        issued?
13   A.   Yes.
14   Q.   In your warrant, you included a mention of possible
15        information connected with narcotics sales and
16        trafficking, including things such as phone numbers,
17        ledgers and so on.  Do you recall that?
18   A.   Yes.
19   Q.   You recall that you testified that you didn't actually
20        recover any books, ledgers, things of that nature,
21        correct?
22   A.   Yes.
23   Q.   But were you provided information related to the sale or
24        trafficking of narcotics?
25   A.   With speaking to him, yes.
```

137

Johnny Fox                          Alonzo Bullman v. City of Detroit

| | | |
|---|---|---|
| 1 | Q. | Speaking to whom? |
| 2 | A. | Mr. Castro. |
| 3 | Q. | What did Mr. Castro tell you? |
| 4 | A. | He started giving me information about another drug |
| 5 | | dealer. |
| 6 | Q. | Did he provide you with any phone numbers? |
| 7 | A. | I gave him my phone number.  He texted my phone, my work |
| 8 | | phone number at the time, and I told him to give me a call |
| 9 | | later and we could talk about it. |
| 10 | Q. | You had indicated that you were a pretty fast learner when |
| 11 | | it comes to spotting possible narcotics transactions, |
| 12 | | correct? |
| 13 | A. | Yes. |
| 14 | Q. | Would you agree that you are better now today than you |
| 15 | | were five years ago? |
| 16 | A. | Yes. |
| 17 | Q. | And better five years ago than you were nine years ago? |
| 18 | A. | Yes. |
| 19 | Q. | Okay.  So your on-the-job training and locating, |
| 20 | | identifying narcotics trafficking has gotten better over |
| 21 | | time? |
| 22 | A. | Yes. |
| 23 | Q. | And there was a discussion about the different methods of |
| 24 | | narcotics dealings.  Do you recall that? |
| 25 | A. | Yes. |

138

Johnny Fox                           Alonzo Bullman v. City of Detroit

```
 1   Q.   And different indicators or factors that you observe when
 2        identifying possible narcotics transactions?
 3   A.   Yes.
 4   Q.   Is it fair to say that every narcotics transaction is, at
 5        least, a little bit different?
 6   A.   Yes.
 7   Q.   So is it fair to say that identifying narcotics
 8        transactions is inherently subjective, meaning it depends
 9        on each individual circumstance?
10   A.   Yes.
11   Q.   You previously testified that you believe the anonymous
12        complaint regarding narcotics activity at Mr. Castro's
13        residence by itself wasn't enough to establish probable
14        cause for a warrant, correct?
15   A.   Yes.
16   Q.   And you testified that you believe that the information
17        provided to you by the confidential informant by itself
18        would not have been enough probable cause for a warrant,
19        correct?
20   A.   Yes.
21   Q.   And your observations conducting surveillance by
22        themselves, would that have been enough to establish
23        probable cause for a search warrant?
24   A.   Just the two?
25   Q.   Just the surveillance by itself?
```

139

Johnny Fox                                    Alonzo Bullman v. City of Detroit

```
 1   A.    No.
 2   Q.    Do you believe that the culmination of the anonymous
 3         complaint, the information provided to you by the
 4         confidential informant and your observations during
 5         surveillance, those three things combined provided enough
 6         evidence to support a probable cause warrant for the
 7         search of the house?
 8   A.    Yes.
 9               MR. PADDINGTON:  I think that's it for me.
10                         RECROSS-EXAMINATION
11   BY MR. RADNER:
12   Q.    I do have some brief follow-up.
13               Did you observe two people talking to your
14         confidential informant by the door or only one?
15   A.    I believe it was only one.
16   Q.    And your confidential informant only told you about one
17         person, right?
18   A.    Yes.
19   Q.    And he described Bullman, not Castro, right?
20   A.    Yes.
21   Q.    Were these dogs that were killed barking or growling or
22         neither?
23               MR. PADDINGTON:  When?
24   Q.    (By Mr. Radner)  When they were killed.  What did you
25         observe?  Were they barking or growling or neither?
```

140

Johnny Fox                          Alonzo Bullman v. City of Detroit

```
 1    A.    I believe they were barking.

 2    Q.    Because your attorney just asked you questions about the

 3          difference between barking and growling, remember?

 4    A.    Yes.

 5    Q.    And he said something about showing their teeth and

 6          growling and having their hair stand up.  Is that what

 7          they were doing or were they barking?

 8    A.    I told you they were barking.

 9    Q.    When you guys came into the house within seconds of you

10          guys arriving at the door, most of the surveillance

11          cameras stopped working.  You have no idea why or how?

12    A.    No.

13    Q.    Is it your job to enforce federal law?

14    A.    My job is to enforce the law.

15    Q.    Is it your job to enforce federal law, yes or no?

16    A.    No.  I'm unsure how you are saying that, because my job is

17          to enforce the law.  The law is the law.  We have city

18          law, state law and federal law.

19    Q.    Is it your job to investigate wire fraud?

20    A.    Wire fraud?

21    Q.    It's a federal crime.

22    A.    No, I haven't investigated wire fraud.

23    Q.    The Economic Espionage Act?

24    A.    I have nothing to do with that.

25    Q.    Tax evasion?
```

141

Johnny Fox                          Alonzo Bullman v. City of Detroit

1    A.    I have nothing to do with that.

2    Q.    It's not your job to investigate or prosecute federal

3          crimes, is it?

4    A.    I'm not a federal officer.

5    Q.    I don't mean to insult you, but is it possible that the

6          things you described about identifying drug activity, you

7          said you were a fast learner, is it equally plausible that

8          the things you described are just not that hard to learn?

9    A.    For some people it's hard, for other people it isn't.

10   Q.    I don't consider myself an expert, but I don't think

11         there's anything that you told me that I probably couldn't

12         identify.  Was there anything that you think was

13         specialized, in terms of the training that you received,

14         anything that you've identified that is something that

15         actually requires significant training?  I mean, watching

16         someone do a hand-to-hand transaction is not that hard,

17         even if it's in a public place or through a mail slot.

18         Wouldn't you agree with that?

19   A.    To a point.

20               MR. RADNER:  I have nothing further.

21               MR. PADDISON:  That will do it.

22               (Whereupon the deposition was concluded at about

23               4:00 p.m.)

24

25

142

Johnny Fox                          Alonzo Bullman v. City of Detroit

CERTIFICATE OF NOTARY – COURT RECORDER

STATE OF MICHIGAN)
                 )
COUNTY OF OAKLAND)

I, James A. Hengstebeck, a Notary Public in and for the above county and state, do hereby certify that the deposition of JOHNNY FOX was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon the foregoing questions were asked and foregoing answers made by the witness which were duly recorded by me; that it was later reduced to written form under my direction and supervision, and that this is, to the best of my knowledge and belief, a true and correct transcript.

I further certify that I am neither of counsel to either party nor interested in the event of this case.

James A. Hengstebeck, CER 4623,
Notary Public, Oakland County,
Michigan
My Commission Expires:  10-30-2022

143

American Reporting, Inc.
248-559-6750