UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALONZO BULLMAN, ET AL.,

          Plaintiffs,

v.

CITY OF DETROIT, ET AL.,

          Defendants.

_____/

Case No. 16-12581

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
ELIZABETH A. STAFFORD

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT [54]; DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT [59]; OVERRULING PLAINTIFFS' OBJECTION TO MAGISTRATE JUDGE'S ORDER ON MOTION TO COMPEL [50]; AND DENYING PLAINTIFFS' MOTION TO AMEND/CORRECT SCHEDULING ORDER [51]

Plaintiffs Alonzo Bullman, Joel Castro, and Nicole Motyka bring this civil rights action under 42 U.S.C. § 1983 against the City of Detroit and several Detroit police officers. This lawsuit arises from a series of events that occurred at Joel Castro's and Nicole Motyka's home on January 26 and 27, 2016. Plaintiffs claim that Defendants violated their civil rights when the police officers executed a forced entry into Joel Castro's and Nicole Motyka's home and killed two of their dogs, and when two of the officers conducted a warrantless search and seizure of Alonzo Bullman and his car without any justification.

This Opinion and Order resolves several pending motions, all of which have been fully briefed. In February 2017, Plaintiffs filed a Motion to Compel [27],

seeking the disclosure of the identities of the anonymous complainant who first tipped off the police about narcotics activity at Joel Castro's home, and SOI[1] #3030, the confidential informant who attempted to purchase marijuana from Joel Castro. The Court referred the motion to the Magistrate Judge, who, in May 2017, denied the motion without prejudice [47]. Plaintiffs filed an Objection to the Magistrate Judge's Order [50] on May 16, 2017. The next day, Plaintiffs filed a Motion to Amend Scheduling Order to Extend Discovery Cutoff by 45 Days [51].

Defendants filed a Motion for Summary Judgment [54] on June 16, 2017. Plaintiffs filed a Motion for Leave to File a Second Amended Complaint [59] on July 20, 2017. A hearing on the pending motions took place on January 23, 2018.

For the reasons stated on the record, and as discussed in depth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment as follows:

- The Motion is **DENIED** as to Joel Castro's Fourth Amendment illegal seizure claim for the killing of his dog, Junior, against Sergeant Matthew Bray, and is otherwise **GRANTED**.
- The Motion is **DENIED** as to Nicole Motyka's Fourth Amendment illegal seizure claim for the killing of her dog, Blanca, against Sergeant Matthew Bray, and is otherwise **GRANTED**.
- The Motion is **DENIED** as to Alonzo Bullman's Fourth Amendment claim for the illegal search of his car and seizure of his person against Sergeant Matthew Bray and Officer Nico Hurd, and is otherwise **GRANTED**.
- The Motion is **GRANTED** as to Plaintiffs' federal and state law claims against the City of Detroit.

---

[1] SOI stands for source of information.

- The Motion is **GRANTED** as to Plaintiffs' claims for intentional infliction of emotional distress.
- The Motion is **GRANTED** as to Plaintiffs' claims for conversion of the seized marijuana plants, the cash, and the dogs.

The Court **DENIES** Plaintiffs' Motion for Leave to File Second Amended Complaint [59], **OVERRULES** Plaintiffs' Objection to the Magistrate Judge's Order on the Motion to Compel [50], and **DENIES** Plaintiffs' Motion to Amend/Correct Scheduling Order [51].

## FACTUAL BACKGROUND

### I. The anonymous tip, the confidential informant's attempted purchase, and Officer Fox's surveillance

On January 26, 2016, someone called the Detroit Police Department to report that narcotics were being sold out of the two-unit residence located at 5437 and 5441 Springwells Street,[2] where Joel Castro and Nicole Motyka lived.

Officers Johnny Fox and Nico Hurd attempted to use an undercover informant, SOI #3030, to engage in a controlled buy with the alleged seller at the Springwells residence. (Dkt. 7-2). Officer Hurd had worked with SOI #3030 "hundreds of times" over an approximately two-and-a-half year period. (Defs.' Ex. C at 9:9-16). The officers gave cash to the SOI, who then proceeded to 5437 Springwells and knocked on the front door. (Dkt. 63-1 at 42:12-15). Officer Fox

_____

[2] The search warrant affidavit describes the house as "a 2 story 2 family dwelling." (Dkt. 54-4).

saw the SOI "speaking with who [he] believed to be the seller," a 5'9", 150 pound white man between the ages of 18 and 22 years old. *Id.* at 44-45. Although this person refused to sell anything to SOI #3030, the SOI allegedly told Fox that the person was carrying a large sandwich bag of marijuana when he opened the door. Hurd also "observed somebody at the door holding bags of marijuana." (Defs.' Ex C at 20:13-16, 26:1-3). Both Fox and Hurd stated that drug dealers commonly answer the door carrying bags of narcotics. *See id.* at 13:15-21; Dkt. 63-1 at 46:13-25. Fox also said that he was "aware through training and experience that narcotics sellers often will not sell to people they do not know in order to avoid detection by law enforcement." (Dkt. 30-2, Page ID 440-41).

Officer Fox continued surveilling the Springwells house. In the span of 45 minutes, Fox saw two white men arrive, separately and independent of each other, at the home. After bringing each individual inside 5437 Springwells, the alleged seller left, entered 5441 Springwells for several minutes, then walked back and reentered 5437 Springwells. The two men left approximately 30 seconds to one minute after the seller returned. Based on his experience and observations, Office Fox believed that he had witnessed narcotics trafficking.

At the time of the investigation, Fox did not know that Joel Castro is licensed by the Department of Licensing and Regulatory Affairs to serve as a licensed medical marijuana caregiver. Michigan law allows Joel Castro to possess

up to 36 marijuana plants for the use of himself and registered qualifying patients. M.C.L. § 333.26424(b)(2). Joel Castro used the facility at 5441 Springwells to grow his medical marijuana plants.

Fox and Hurd later determined that the seller was Chris Bullman,[3] who is Joel Castro's friend and Alonzo Bullman's cousin. (Dkt. 63-1 at 45:3-11; Defs.' Ex C at 21:3-7, 71-72). Joel Castro, however, maintains that Chris Bullman wasn't at his home on January 26, 2016. (Dkt. 63-3).[4] Joel Castro remembers that someone he didn't know knocked on his door that day. Joel Castro did not sell any drugs to that person because he was not his patient. (Dkt. 33-1, Pg. ID 453). Joel Castro adamantly denies that he was holding a bag of marijuana when he answered the door, as such behavior would be "foolish and highly dangerous." *Id.* He said that the only marijuana on the first floor at the time was his personal supply, which could not be seen from the front door.

## II. The execution of the search warrant

Officer Fox obtained a search warrant on January 27, 2016. At mid-afternoon that day, Fox and the other officers went to the Springwells residence. At that time, Joel Castro and Chris Bullman were playing video games in the living

---

[3] Chris Bullman is not a party to this lawsuit. He was not deposed by either party.

[4] This is an unsworn, unsigned affidavit, and is not in compliance with the Federal Rules of Civil Procedure. *See Nassif Ins. Agency, Inc. v. Civic Prop. and Cas. Co.*, 2005 WL 712578, at *3 (6th Cir. Mar. 30, 2005).

room. One of Joel Castro's dogs, Yayo, was with them. The other two dogs, Junior and Blanca, were confined in the kitchen, which is separated from the living room by what appears to be an island, a book shelf, and an approximately four foot tall wood board. (Dkt. 7-1). Access to the kitchen is blocked.

What happened next is contested by the parties. Joel Castro said that he heard police officers on his front porch. (Defs.' Ex. M, 27:25-28:1). The officers said "Detroit Police" and then "no more than 3 seconds later, [Castro's] door was being kicked in." *Id.* at 28:3-4. "As [he] heard the first few slams against the door, [Castro] grabbed Yayo by his collar" and threw him inside the bedroom, which was about four feet away. *Id.* at 28:9-10. Joel Castro then "went to [his] front door and yelled at the police officer . . . that [he] was going to open it." *Id.* at 28:11-13. He kicked the security board down from the front door, at which point the police entered the house. Joel Castro and Chris Bullman immediately complied with the officers' orders to get on the ground.

Blanca and Junior, were confined to the kitchen when the police entered the home. Plaintiffs assert that the dogs were scared and "cowering in the corner." (Compl. ¶30). The officers claim differently. Officer Hurd testified that the dogs were "barking, jumping up and down, [and] showing teeth." (Defs.' Ex. C at 35:6). Officer Samuel Galloway described the dogs as "being aggressive." (Defs.' Ex. X at 10:8).

While on the ground, Joel Castro asked if he could put Junior and Blanca away. Sergeant Matthew Bray ignored this request and fired his shotgun six times, killing the two dogs. The officers subsequently seized Joel Castro's 26 marijuana plants and $4,683.00 in cash.

## III.  The police officers stop Alonzo Bullman

Alonzo Bullman drove to Joel Castro's home shortly before 1 PM. When he arrived, he saw "a bunch of police officers . . . in the yard [and] on the porch." (Defs.' Ex. AA at 14:10-19). He decided to circle the block a few times to call Chris Bullman[5] and try to figure out what was happening. *Id.* at 16:18-20. Sergeant Bray and Officer Hurd, both dressed in full SWAT gear, stopped Alonzo Bullman after the third drive-by. The officers ordered Alonzo Bullman "to get the F out the car" and told him that his car smelled of marijuana. *Id.* at 18:11-16. They searched the vehicle, but found no contraband or weapons. *Id.* at 29:9-10. After Alonzo Bullman asked why this was happening, one of the officers "got aggravated and told [him] if [Bullman] don't talk . . . [the officer's] going to take [Bullman] in the house and give [him] a Detroit ass whipping and send [him] on [his] way." *Id.* at 21:11-13. Alonzo Bullman refused to speak to the officers and one of them threatened him a second time. *Id.* at 21:15-16. Ultimately, the officers released Alonzo Bullman and directed him to leave the premises. *Id.* at 29:11-12.

---

[5] Again, Chris Bullman is Alonzo Bullman's cousin. Chris was inside Joel Castro's home on January 27, 2016, when the police executed the search warrant.

## THE PARTIES' MOTIONS

## I.    Defendants' Motion for Summary Judgment

### LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Defendants bear the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that Plaintiffs lack evidence to support an essential element of their case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Plaintiffs cannot rest on the pleadings and must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586-87. Plaintiffs must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (*quoting* Rule 56(e)); *see also United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993).

**ANALYSIS**

## A. Federal Claims

Plaintiffs purport to bring claims under the Fourth and Fourteenth Amendments. However, because Plaintiffs have failed to brief or address the Fourteenth Amendment due process arguments, the Court deems these claims abandoned. *See Conner v. Hardee's Food Sys., Inc.*, 65 Fed. Appx. 19, 24-25 (6th Cir. 2003); *Anglers of the Au Sable v. United States Forest Svc.*, 565 F.Supp.2d 812, 839 (E.D. Mich. 2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issues in response to [a] motion for summary judgment.").

To prevail on a claim under 42 U.S.C. § 1983, Plaintiffs "must establish that a person acting under color of state law deprived [them] of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown, TN*, 242 F.3d 353, 358-59 (6th Cir. 2001). At the summary judgment stage, the police officer defendants are entitled to qualified immunity unless Plaintiffs present sufficient evidence to create a genuine dispute of material fact as to whether (1) the defendants violated a constitutional right (2) that was clearly established such that a reasonable person in defendants' position would know that the conduct complained of was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). The officers are entitled to qualified immunity claim if Plaintiffs fail to meet either

requirement. *Pray v. City of Sandusky*, 49 F.3d 1154, 1157 (6th Cir. 1995) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### 1. Joel Castro and Nicole Motyka

#### i.    The search of 5437 Springwells

Plaintiffs submit that the unlawful search of Joel Castro's home occurred because of intentional misrepresentations in the search warrant affidavit; either Officer Fox lied about what the SOI said, and/or SOI #3030 lied about seeing the seller holding marijuana in his hand when he answered the door.

In his warrant affidavit, Officer Fox swore that after receiving a complaint that drugs were being sold at the Springwells residence, he and Officer Hurd met with SOI #3030, with whom they'd previously worked. The SOI unsuccessfully attempted to make a controlled buy. The SOI told the officers that the seller refused to sell to him because the seller didn't know him, and that the seller was holding a bag of marijuana when he opened the door. During Officer Fox's surveillance, he saw two white men, separate and independent of each other, enter 5437 Springwells. The seller would then walk out of 5437 Springwells, enter 5441 Springwells, and return to 5437 Springwells.

Plaintiffs vehemently dispute the warrant affidavit. Joel Castro states that there were no white men in his house on January 26. He also maintains that he

would never carry a bag of marijuana while answering his front door, as "[s]uch action would be foolish and highly dangerous." (Dkt. 33-1).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and that "no warrants shall issue but upon probable cause." U.S. Const. Amend. IV. The information presented in support of a search warrant must be "believed or appropriately accepted by the affiant as true." *Franks v. Delaware*, 438 U.S. 154, 165 (1978). In the criminal context, a warrant must be voided, and evidence obtained in a search conducted pursuant to that warrant must be suppressed, if (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Id.* at 155-56.

To overcome an officer's entitlement to qualified immunity, § 1983 plaintiffs must first make "a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). "An officer's statement . . . is 'deliberately' false' when the officer makes the statement knowing that it is untrue." *United States v. Ellis*, 910 F.Supp. 2d 1008, 1016 (W.D. Mich. 2012) (internal citations omitted). "Similarly, an officer displays reckless disregard for the truth when he

'entertains serious doubts as to the truth of his allegations' in an affidavit." *Id.* at 1016-17 (quoting *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001)); *see also Griffin v. City of Detroit*, 996 F.2d 1215, at *5 (6th Cir. 1993).

Joel Castro's factual allegations largely corroborate Fox's warrant affidavit. The parties agree that the SOI attempted to buy marijuana from someone at the Springwells residence on January 26, but was unable to do so because the seller didn't know the SOI. *See* Dkt. 30-2; Dkt. 33-1. Fox's warrant affidavit indicates that a person at the Springwells residence would retrieve marijuana from 5441 Springwells, and Joel Castro admits that this is where the marijuana is grown. *Id.* The warrant affidavit also states that Joel Castro sold marijuana to two men on January 26, and Joel Castro admits that he had two marijuana customers. *Id.* Joel Castro also explains in his affidavit,

> When dispensing to my patients . . . [t]hey would [ ] come to my front door. I would greet them at the door and we would exchange payment for their marijuana . . . Before they arrived, I would have their prescription available in my residence.

(Dkt. 33-1).

This seems to suggest that Joel Castro would, in fact, come to the door with marijuana in his hand, and at the very least, that he kept marijuana within close distance of the front door.

Although there are some minor differences between Plaintiffs' and Defendants' stories, Plaintiff have not made "a substantial showing that [Fox]

stated a deliberate falsehood or showed reckless disregard for the truth." *Valkilian*, 335 F.3d at 517. Plaintiffs offer no evidence in support of their claims that the officers and/or the SOI lied. And, although Plaintiffs repeatedly emphasize that it would be ludicrous for a person to answer the door holding a bag of marijuana, Fox and Hurd both testified that in their experiences, this is common practice among drug dealers. (Defs.' Ex. C at 13:15-21; Dkt. 63-1 at 46:13-25). Moreover, Joel Castro himself admitted that when he sold marijuana to his patients, he would have the prescription available and ready, and the exchange took place at or near the front door. (Dkt. 33-1). Again, as stated above, this undermines Plaintiffs' position.

### ii. The killing of the dogs

### a. Personal material involvement

It is undisputed that Officer Bray was the only person who shot Blanca and Junior. Plaintiffs have not shown that the other officers "did more than play a passive role in the alleged violation or showed mere tacit approval of the events." *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998) (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989)). Because Officers Galloway, Mitchell, Muhammad, Hurd, Severy, and Fox did not fire their weapons or harm the dogs, they did not seize the dogs. *See Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003). The § 1983 claims for illegal

seizure of the dogs against Officers Galloway, Mitchell, Muhammad, Hurd, Severy, and Fox are dismissed.

### b. Legitimate possessory interest

Defendants argue that Nicole Motyka lacked a constitutionally protected property interest in Blanca by virtue of the fact that the dog was contraband, *i.e.* not properly licensed. Therefore, according to Defendants, Blanca was not protected by the Fourth Amendment.

Defendants' argument is misplaced for several reasons. First, dogs are lawful property, and the lack of a license doesn't deprive a dog of its legitimacy. Defendants present no binding authority that holds otherwise.

The Sixth Circuit recently explained that "[m]arijuana is contraband because its possession and production is prohibited under federal law and the criminal laws of most states." *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016) (citing Black's Law Dictionary 365 (9th ed. 2009) (defining contraband as "[g]oods that are unlawful to import, export, produce, or possess."). A dog – licensed or not – does not fit this definition. Furthermore, although unlicensed property may be subject to seizure, such seizure must be reasonable because the owner retains a Fourth Amendment interest in the property. *See Hudson v. Michigan*, 547 U.S. 586, 602 (2006) ("[E]xcessive or unnecessary destruction of property . . . may

violate the Fourth Amendment.") (quoting *United States v. Ramirez*, 523 U.S. 65, 71 (1998)).

Furthermore, in Michigan, "dogs have value, and are the property of the owner." *Ten Hopen v. Walker*, 96 Mich. 236, 240 (1893). Nowhere in Michigan's Dog Law is there language that 1) deprives a dog owner of her possessory interest in her dog simply because the dog is unlicensed, and/or 2) authorizes the killing of a dog by virtue of the fact that it's unlicensed.

In sum, the Court holds that Nicola Motyka retained a constitutionally protected property interest in Blanca.

### c. Imminent Threat

The Sixth Circuit recently held that a person has a right to not have her dog unreasonable seized; such a seizure violates the Fourth Amendment; and this right was clearly established in 2013. *Brown v. Battle Creek Police Department*, 844 F.3d 556, 566-67 (6th Cir. 2016). The question for the Court, therefore, is whether the seizures of Junior and Blanca were reasonable under the Fourth Amendment. *Id.* at 567.

"Reasonableness is the touchstone of any seizure under the Fourth Amendment." *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005). Under the standard adopted by the Sixth Circuit,

> [A] police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety.

*Brown*, 844 F.3d at 568.

The Court analyzes the question of whether a dog constitutes an imminent threat "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 567 (quoting *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016)). The Court recognizes that law enforcement agents are "are regularly forced to make critical decisions" and split-second judgments in high pressure situations. *Pray*, 49 F.3d at 1159.

In *Brown*, the police obtained a search warrant to search a house suspected of drug activity. *Brown*, 844 F.3d at 561. Prior to executing the warrant, the police learned that Vincent Jones, a dangerous criminal and known gang leader, lived at the residence. They did not know, however, whether dogs were present in the house until they were en route to the house, at which point they also learned that Jones had left the residence and had been detained elsewhere by police. The officers also learned that Plaintiff Mark Brown was in the house.

The *Brown* Court examined the totality of the circumstances and concluded that the officers acted reasonably when they shot and killed the two pit bulls. Specifically, the court noted:

Jones' criminal history, gang affiliations, the types of drugs he was suspected of distributing, the fact that the officers had no time to plan for the dogs, in addition to the officers' unrebutted testimony that the dogs either lunged or were barking aggressively at the officers, the nature and size of the dogs, [and] the fact that the dogs were unleashed and loose in a small residence.

*Id.* at 572.

There are some similarities between this case and *Brown*. The officers here, like those in *Brown*, had no advanced notice of the dogs' presence in the house. In addition, officers in both cases testified that they could not safely clear the space with the dogs there. *Id.* at 570; *see also* Defs.' Ex. C, 49:3-7 (Officer Hurd explained that he would shoot the dogs even if they were passive and confined "to make sure the location was deemed clear.").

*Brown* is also distinguishable from this case in many important respects. First, there's no evidence showing that the officers believed they would have to contend with a highly dangerous criminal. Additionally, in *Brown*, the officers encountered the two dogs "in an unsupervised environment where they were unleashed and [running loose] in an enclosed space with the officers." *Id.* at 572. One of the dogs also jumped at the officers as they entered the house. *Id.* at 569.

Critically, this was not the case here. Blanca and Junior were not running loose; in fact, they were confined to the kitchen and separated from the officers. In addition, Joel Castro, pursuant to police orders, was on the ground and asked to be allowed to secure the two dogs, who he claims were cowering in the corner.

Viewing the facts in the light most favorable to Plaintiffs, a jury could reasonably conclude that – given that the dogs were separated from the officers and never lunged at or attacked the officers – the dogs did not pose an imminent threat to officer safety. Therefore, seizing the dogs by killing them was unreasonable.

## 2. Alonzo Bullman – the stop and search of the vehicle

Alonzo Bullman alleges that he was a victim of an unconstitutional seizure and that Sergeant Bray and Officer Hurd lacked reasonable suspicion to stop his vehicle. He also contends that the search of his vehicle was unjustified.

The parties agree that Sergeant Bray and Officer Hurd stopped Alonzo Bullman in his vehicle and that this was an investigative detention, "which must be supported by a reasonable, articulable suspicion of criminal activity." *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (quoting *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)). The reasonable suspicion inquiry requires the Court to determine whether the totality of the circumstances gave the officers "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The question is whether all of the circumstances "taken together give rise to reasonable suspicion that criminal activity may be afoot." *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005).

Officer Hurd explained that he stopped Alonzo Bullman because he "was driving around the block several times, it raised suspicion to myself and Sergeant

Bray that he could possibly be attempting to ambush us, traveling around a

narcotic raid." (Defs.' Ex. C at 54:20-23). Similarly, Sergeant Bray said:

> I saw him drive by two prior times . . . I saw both times that it was the same vehicle that went by. I was standing out in front of the location, I saw the vehicle coming down the block the third time . . . I wanted to see who was continually driving by.

(Defs.' Ex. Y at 58:4-17).

Defendants Hurd and Bray are not entitled to qualified immunity. First,

Alonzo Bullman's Fourth Amendment right to be free from an unreasonable

seizure is a clearly established right of which a reasonable official would know.

*See California v. Hodari D.*, 499 U.S. 621, 624-25 (1991). Second, Bray and Hurd

lacked reasonable suspicion to stop Alonzo Bullman. A vague, generalized fear

that Alonzo Bullman was going to ambush the officers does not satisfy the

"particularized and objective basis for suspecting" him of breaking the law. *Heien*

*v. North Carolina*, 135 S.Ct. 530, 536 (2014) (citing *Navarette v. California*, 134

S.Ct. 1683, 1687 (2014)); *see also Arvizu*, 534 U.S. at 274 ("[A]n officer's reliance

on a mere hunch is insufficient to justify a stop."). Furthermore, because Alonzo

Bullman was stopped without reasonable suspicion, the subsequent search of the

car was also invalid. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

### 3. Plaintiffs' claims against the City of Detroit

Plaintiffs argue that the City of Detroit is liable for the violations of their 4th

and 14th Amendment rights vis-à-vis its policies and practices, which Plaintiffs

claim fostered the officers' unconstitutional conduct. They also contend that the City failed to adequately supervise, train, monitor and discipline its officers and that such failures evidence the City's tolerance of police misconduct.

To succeed on a municipal liability claim, Plaintiffs must show that their constitutional rights were violated *and* that the "violation occurred because of [an official] municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *see also Connick v. Thompson*, 563 U.S. 51, 60-61 (2011). Plaintiffs can establish the existence of an illegal policy or custom by alleging "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.*

### i. Inaction Theory

Plaintiffs submit that the City of Detroit has implemented a "de facto" policy of tolerating acts of police misconduct. This appears to be a custom-of-tolerance, or "'inaction theory,' where a policy of tolerating federal rights violations is unwritten but nevertheless entrenched." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Under this theory, Plaintiffs must show: "(1) the existence of a clear and persistent pattern of illegal activity; (2) notice or

constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation." *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996). Because Plaintiffs have set forth no evidence to meet any of these requirements, nor have they provided anything to show that the City of Detroit "had a 'custom' that reflected a deliberate, intentional indifference to" their constitutional rights, this claim is dismissed. *Id.* at 508.

### ii. Failure to Train

Inadequate training may serve as the basis for § 1983 municipal liability where it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Brown*, 814 F.3d at 463 (internal quotations omitted). To succeed, Plaintiffs must show "prior instances of unconstitutional conduct demonstrating that the [municipality] . . . ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (internal quotations omitted).

The City is entitled to summary judgment, as Plaintiffs have not identified any illegal acts for which it is responsible. *See Pembauer v. Cincinnati*, 475 U.S.

469, 479 (1986). Although Plaintiffs contend that their failure-to-train claim "is bolstered by the incredibly high percentage of search warrants that include Detroit police breaking down people's doors, and the callousness and indifference of Detroit police officers in general," they have provided no information whatsoever about these alleged illegal searches and/or the deliberate indifference of Detroit police officers. (Compl. ¶ 129). Moreover, Plaintiffs have not established any evidence of a pattern of violations by Detroit police. Plaintiffs have also failed to allege anything with respect to the content, duration, or frequency of the City's training on the execution of search warrants, the level of justification required for different types of police/citizen interactions, or the like.

## B. State Claims

### 1. Conversion of the marijuana, dogs, and money

"Conversion is any distinct act of dominion wrongly exerted over another's personal property in denial of or inconsistent with his rights therein." *Thoma v. Tracy Motor Sales, Inc.*, 104 N.W.2d 360, 362 (1960). Defendants argue that governmental immunity under Michigan law bars Plaintiffs' conversation claims.

### i.  The City of Detroit

Under Michigan's Government Tort Liability Act (GTLA), municipalities[6] are immune from tort liability where they are engaged in the exercise or discharge of a governmental function. M.C.L. § 691.1407(1). Although there are some exceptions, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." M.C.L. § 691.1401 *et seq.*; *Nawrocki v. Macomb Co. Rd. Comm.*, 463 Mich. 143, 156-58 (2000). Plaintiffs must plead facts in avoidance of governmental immunity, and can do so "by stating a claim that fits within a statutory exception or by pleading facts that demonstrate that the alleged tort occurred during the exercise or discharge of a non-governmental or proprietary function." *Mack v. Detroit*, 467 Mich. 186, 204 (2002)

Although Plaintiffs do not address Defendants' immunity argument, it is clear that because the City of Detroit, through its officers, was "engaged in the exercise or discharge of a governmental function," it is protected by immunity. *Mack*, 467 Mich. at 200. Plaintiffs complain about the Detroit Police Department's training and hiring procedures and policies, all of which are "decisions that the police department makes in the course of discharging its governmental function."

---

[6] The City of Detroit qualifies as a governmental agency under the GTLA. *See* M.C.L. § 691.1401(a), (d), and (e).

*Id.* at 205. Therefore, the Court will grant summary judgment as to the City of Detroit on Plaintiffs' state law claims.

### ii. The individual police officer defendants

The individual police officers are immune from liability if they show that they: (1) acted during the course of their employment and acted, or reasonably believed they acted, within the scope of their authority; (2) acted in good faith; and (3) performed discretionary-decisional, rather than ministerial-operational,[7] acts. *Alexander v. Riccinto*, 192 Mich. App. 65, 70 (1991) (citing *Ross v. Consumers Power Co.*, 420 Mich. 567, 592 (1984)). Michigan courts have held that "[a] police officer's determination regarding the type of action to take . . . constitutes discretionary action entitled to immunity." *Norris v. Lincoln Park Police Officers*, 292 Mich. App. 574, 579 (2011); *see also Alexander*, 192 Mich. App. at 71.

Good faith in the context of qualified immunity for intentional tort liability "is subjective in nature." *Odom*, 482 Mich. at 481–82. A government employee does not act in good faith if she acts "maliciously or with a wanton or reckless disregard of the rights of others." *Id* at 474. To establish willful and wanton misconduct, there must be either intent to harm, or "such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Rankin v.*

---

[7] "Ministerial acts 'constitute merely an obedience to orders or the performance of a duty in which the individual has little or no choice.'" *Odom v. Wayne County*, 482 Mich. 459, 476 (2008).

*City of Highland Park*, No. 318385, 2015 WL 773734, at *6 (Mich. Ct. App. Feb. 24, 2015), *appeal denied*, 498 Mich. 920, 871 N.W.2d 173 (2015) (quoting *Odom*, 482 Mich. at 474).

As described above, Plaintiffs have presented no evidence in support of their claim that Officer Fox and/or the SOI lied in furtherance of Fox's efforts to secure a search warrant. Plaintiffs rightly concede that in the light of the Court's finding that the search warrant was valid, the seizure of the marijuana plants and cash was proper.

The conversion claim as it relates to the killing of Junior and Blanca is also subject to dismissal because the record does not demonstrate that Defendants acted with malice. *See Armstrong v. Ross Twp.*, 82 Mich. App. 77, 85-86 (1978).

### 2. Intentional Infliction of Emotional Distress

The four elements necessary for a prima facie case of intentional infliction of emotional distress are: "(1) extreme or outrageous conduct; (2) intent or recklessness; (3) caution; and (4) severe emotional distress." *Preston v. City of St. Clair Shores*, 2015 WL 12516687, at *10 (E.D. Mich. Dec. 31, 2015) (quoting *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985)). "Pets have long been considered personal property in Michigan" and "[t]here is no Michigan precedent that permits the recovery of damages for emotional injuries allegedly suffered as a consequences of property damage." *Koester v. VCA Animal Hosp.*,

244 Mich. App. 173, 176 (2000); *see also Smith v. City of Detroit*, 2017 WL

3279170, at *11 (E.D. Mich. Aug. 2, 2017); *Preston*, 2015 WL 12516687 at *8.

Therefore, the Court will grant summary judgment to Defendants on Plaintiffs'

IIED claim.

## II. Plaintiffs' Motion for Leave to File Second Amended Complaint; the Magistrate Judge's Order Denying Without Prejudice Plaintiff's Motion to Compel; and Plaintiffs' Motion to Amend/Correct Scheduling Order

### A. Motion for Leave to File Second Amended Complaint and Motion to Amend/Correct Scheduling Order

Fed. R. Civ. P. 15(a) allows a party to amend the pleading after a responsive

pleading has been served "only by leave of court . . . and leave shall be freely

given when justice so requires." The decision to grant or deny an opportunity to

amend is within the Court's discretion. The Court is not compelled to grant leave

where amendment would be futile, meaning that "the proposed amendment would

not permit the complaint to survive a motion to dismiss." *Miller v. Calhoun

County*, 408 F.3d 803, 817 (6th Cir. 2005) (citing *Neighborhood Dev. Corp. v.

Advisory Counsel on Historic Pres.*, 632 F.2d 21, 23 (6th Cir. 1980)).

Plaintiffs submit that Alonzo Bullman's Fifth Amendment rights were

violated when Sergeant Bray and Office Hurd asked him questions while he was in

their custody. They also seek to add a claim of conspiracy under 42 U.S.C. § 1985.

Finally, they wish to add SOI #3030 as a defendant in this case.

### 1. Alonzo Bullman's Fifth Amendment Claim

The Fifth Amendment requires that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. That this is a civil, rather than criminal, case "does not alter [the] conclusion that a violation of the constitutional right against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case." *Chavez v. Martinez*, 538 U.S. 760, 770 (2003).

Although the police arrested Alonzo Bullman, they released him that same day. It is also undisputed that Alonzo Bullman was never charged with a crime. It is well settled "that the Fifth Amendment is a trial protection." *McKinley v. City of Mansfield*, 404 F.3d 418, 430 n.11 (6th Cir. 2005). "It is only once compelled incriminating statements are used in a criminal proceeding . . . that an accused has suffered the requisite constitutional injury for purposes of a § 1983 action." *Id.* (citing *Chavez*, 538 U.S. at 769); *see also Lingler v. Fechko*, 312 F.3d 237, 238-40 (6th Cir. 2002) (plaintiffs could not prevail on their Fifth Amendment claim because their statements were not used against them in a criminal case).

### 2. Plaintiffs' conspiracy claim under 42 U.S.C. § 1985

To maintain a cause of action for conspiracy under 42 U.S.C. § 1985(3), Plaintiffs must establish: (1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the

equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a U.S. citizen. *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998) (citing *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994)). Plaintiffs must also show that the conspiracy was motivated by a class-based animus. *Id.* (citing *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996), *cert. denied*, 520 U.S. 1267 (1997)). Because Plaintiffs have never alleged that the police officer defendants were motivated by any type of class-based animus, this claim would not survive a motion to dismiss, and the Court declines to allow Plaintiffs to add this claim to their complaint.

### 3. The addition of the SOI as a defendant

As discussed above, Plaintiffs have not established that they are entitled to the identity of SOI #3030. Accordingly, there's no need to modify the scheduling order for the SOI's deposition, nor should Plaintiffs be permitted to add the SOI as a defendant in this case.

### B. Magistrate Judge's Order Denying Without Prejudice Plaintiffs' Motion to Compel

The Court may set aside the Magistrate Judge's order if it is clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001). A decision is "clearly erroneous" if "although there is evidence to support it, the reviewing court on the entire evidence

is left with the definite and firm conviction that a mistake has been committed."
*United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

The Magistrate Judge did not clearly err in denying without prejudice Plaintiffs' Motion to Compel. Plaintiffs presented no objective evidence that the anonymous tipster does not exist and that either Officer Fox or the SOI fabricated the allegations in the search warrant affidavit. Plaintiffs are not entitled to the identity of the anonymous tipster because she "merely convey[ed] information to the" police; she neither "witness[ed] nor participat[ed] in the offense." *Wilson v. O'Dea*, 16 F.3d 1224, at *4 (6th Cir. 1994). As for the SOI, the fact that Plaintiffs consider it ludicrous that Joel Castro would answer the door carrying a bag of marijuana is not a justification for "overriding both the public interest in encouraging the flow of information, and the informant's private interest in his or her own safety." *United States v. Martinez*, 922 F.2d 914, 921 (1st Cir. 1991). Accordingly, the Court **OVERRULES** Plaintiffs' Objection.

### CONCLUSION

For the reasons discussed on the record and as set forth above,

Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, as follows:

- The Motion is **DENIED** as to Joel Castro's Fourth Amendment illegal seizure claim for the killing of his dog, Junior, against Sergeant Bray, and is otherwise **GRANTED**.

- The Motion is **DENIED** as to Nicole Motyka's Fourth Amendment illegal seizure claim for the killing of her dog, Blanca, against Sergeant Bray, and is otherwise **GRANTED**.
- The Motion is **DENIED** as to Alonzo Bullman's Fourth Amendment claim for the illegal search of his car and seizure of his person against Sergeant Bray and Officer Hurd, and is otherwise **GRANTED**.
- The Motion is **GRANTED** as to Plaintiffs' federal and state law claims against the City of Detroit.
- The Motion is **GRANTED** as to Plaintiffs' claim of intentional infliction of emotional distress against all Defendants.
- The Motion is **GRANTED** as to Plaintiffs' claims for conversion of the seized marijuana plants, the cash, and the dogs.

Plaintiffs' Motion for Leave to File Second Amended Complaint [59] is

**DENIED**.

Plaintiffs' Objection to the Magistrate Judge's Order Denying Without

Prejudice the Motion to Compel [50] is **OVERRULED**.

Plaintiffs' Motion to Amend/Correct Scheduling Order [51] is **DENIED**.

**SO ORDERED**.


s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: February 28, 2018          Senior United States District Judge